# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LAUREL GARDENS, LLC, AMERICAN WINTER SERVICES, LLC, LAUREL GARDEN HOLDINGS, LLC, LGSM, GP, and CHARLES P. GAUDIOSO | : : : : | C.A. No._____ |
| Plaintiffs | : : | |
| vs. | : : : | JURY TRIAL DEMANDED |
| TIMOTHY McKENNA, MICHAEL McKENNA, MAT SITE MANAGEMENT, LLC, BOBBY AERENSON, GREGORY PETTINARO, BERNARD MEYERS, CHARLES WILKINSON, WILKINSON BUILDERS, LLC, TECHNIVATE, INC., THOMAS DiDONATO, KEVIN EAISE, EAISE DESIGN & LANDSCAPING, LLC, EAISE SNOW SERVICES, LLC, HAINES & KIBBLEHOUSE, INC., HANK JULICHER, MARGIT JULICHER, CHRISTOPHER W. WRIGHT, DON ISKEN, PAUL ISKEN, LONGVIEW MANAGEMENT, LLC, MATTHEW SIBLEY, M&M LANDSCAPING, LLC, ALAN PERRY, MARY TRESIZE, FRANK ALCARAZ, STRIVE FORCE, LLC, MJL ENTERPRISES, JOHN HYNANSKI, NORMAN AERENSON, JOHN PURSELL, ISKEN ENTERPRISES, LLC, MOON NURSERIES, LLC, and FRONTIER MULCH, LLC | : : : : : : : : : : : : : : : : : : : ; : : : : : : : : | **CIVIL ACTION COMPLAINT**<br><br>1. **AIDING AND ABETTING BREACH OF FIDUCIARY DUTY;**<br>2. **CIVIL CONSPIRACY;**<br>3. **CIVIL RICO** 18 U.S.C. §1962(c);<br>4. **CIVIL RICO** 18 U.S.C. §1962(b);<br>5. **CONSPIRACY TO ENGAGE IN CIVIL RICO** 18 U.S.C. §1962(d);<br>6. **FRAUD;**<br>7. **BREACH OF FIDUCIARY DUTY;**<br>8. **CONVERSION;**<br>9. **NEGLIGENT MISREPRESENTATION CIVIL CONSPIRACY;** and,<br>10. **TORTIOUS INTERFERENCE WITH CONTRACT.** |
| Defendants | | |

18417809v.1

AND NOW, comes Laurel Gardens, LLC ("LG"), American Winter Services, LLC ("AWS"), Laurel Garden Holdings, LLC ("LGH"), LGSM, GP ("LGSM"), AND Charles P. GAUDIOSO ("GAUDIOSO") (collectively the "Plaintiffs" or the "Company") who bring this suit and in support thereof aver the following:

## NATURE OF ACTION

1.      The primary cause of this action is a widespread criminal *enterprise* engaged in a *pattern of racketeering activity* across State lines, and a conspiracy to engage in *racketeering activity* involving numerous RICO predicate acts during the past ten (10) calendar years.

2.      The predicate acts alleged here cluster around:  See 18 U.S.C. §§ 201 (bribery), 891-894 (Extortionate credit transactions, 1341 (mail fraud), 1343 (wire fraud), 1512 (witness tampering), and 1513 (retaliation), respectively.

3.      Other RICO predicate acts, although *appearing* to be isolated events, were actually part of the overall conspiracy and *pattern of racketeering activity* alleged herein, *e.g.* mail fraud and witness retaliation.  See 18 U.S.C. §§ 1341 and 1513, respectively.

4.      The primary objective of the racketeering *enterprise* has been to inflict severe and sustained economic hardship upon Plaintiffs, with the intent of impairing, obstructing, preventing and discouraging Plaintiff from continuing to work in the field of landscaping and snow removal services.

5.      This action is also commenced by the Plaintiffs against defendants for actual, consequential and punitive damages under Pennsylvania law for fraud, conversion, negligent misrepresentation, breach of fiduciary duty, tortious interference with contract, aiding and abetting breach of fiduciary duty, and civil conspiracy, arising out of the defendants'

-2-

collective scheme to defraud the Plaintiffs and deplete their assets for the benefit of defendants and to the Plaintiffs' great detriment.

6.      Through a series of transactions the Defendants developed a scheme to misappropriate Plaintiffs' funds and business opportunities. The scheme operated with Timothy and Michael McKenna (the "McKennas") at the center and various interrelationships between the parties currently known to LG, AWS, its principals and current and former employees. The individual components of the scheme, as it is currently understood, will be described in detail below.

## PARTIES

7.      Plaintiff, LG, is a Pennsylvania Limited Liability Company having a registered principal place of business located at 334 Kennett Pike, Chadds Ford, Pennsylvania. At all times relevant, the LG owned property in Pennsylvania and conducted its business in Pennsylvania.

8.      Plaintiff, AWS, is a Pennsylvania Limited Liability Company having a registered principal place of business located at 334 Kennett Pike, Chadds Ford, Pennsylvania. At all times relevant, AWS owned property in Pennsylvania and conducted its business in Pennsylvania.

9.      Plaintiff, LGH, is a Delaware Limited Liability Company having a registered principal place of business located at 334 Kennett Pike, Chadds Ford, Pennsylvania.

10.     Plaintiff, LGSM, is a Pennsylvania General Partnership having a registered principal place of business located at 334 Kennett Pike, Chadds Ford, Pennsylvania. At all times relevant, the LGSM, GP owned property in Pennsylvania and conducted its business in Pennsylvania.

18417809v.1

11.     Defendant, Timothy McKenna ("TIMOTHY McKENNA") is an adult individual believed to be a resident of the State of Delaware who maintains a business address at 9 North Hampton Court, Wilmington, Delaware 19807.

12.     Defendant, Michael McKenna ("MICHAEL McKENNA") is an adult individual believed to be a resident of the Commonwealth of Pennsylvania who maintains a business address at MAT Site Management, 3828 Kennett Pike, Suite 201, Greenville, Delaware 19807.  MICHAEL McKENNA is the President and Chief Executive Officer of MAT Site Management.

13.     Defendant, Bobby Aerenson ("AERENSON") is an adult individual believed to be a resident of the State of Delaware who maintains a business address at 2213 Concord Pike, Wilmington, Delaware 19803.  AERENSON is a principal of the owner of Polly Drummond Shopping Center.

14.     Defendant, Gregory Pettinaro ("PETTINARO") is an adult individual believed to be a resident of the State of Delaware who maintains a business address at 234 North James Street, Newport, Delaware 19804

15.     Defendant, Bernard Meyers ("MEYERS") is an adult individual believed to be a resident of the Commonwealth of Pennsylvania, 1830 Rittenhouse Square, Philadelphia, Pennsylvania 19103 and at 3699 Toulouse Drive, Palm Beach, Florida 33410.

16.     Defendant, Charles Wilkinson ("WILKINSON") is an adult individual believed to be a resident of the Commonwealth of Pennsylvania who maintains a business address at 1020 Broad Run Road, Landenberg, Pennsylvania 19350.  WILKINSON is the President and Chief Executive Officer of Wilkinson Builders and Technivate, Inc.

-4-

17.     Defendant, Technivate, Inc. ("TECHNIVATE") is a Pennsylvania corporation having a registered principal place of business at 1020 Broad Run Road, Landenberg, Pennsylvania 19350.

18.     Defendant, Thomas DiDonato ("DiDONATO") is an adult individual believed to be a resident of the State of Delaware who maintains a business address at 101 Centre Road, Wilmington, Delaware 19805.

19.     Defendant, Kevin Eaise ("EAISE") is an adult individual believed to be a resident of the State of New Jersey who maintains a business address at 28 Glassboro Road, Monroeville, New Jersey 08343.  EAISE is the President and Chief Executive Officer of Eaise Design & Landscaping, LLC and Eaise Snow Services, LLC.

20.     Defendant, Eaise Design & Landscaping LLC ("EAISE DESIGN") is a New Jersey Limited Liability Company having a registered principal place of business located at 28 Glassboro Road, Monroeville, New Jersey 08343.

21.     Defendant Eaise Snow Services, LLC ("EAISE SNOW REMOVAL") is New Jersey Company have a registered principal place of business located at 28 Glassboro Road, Monroeville, New Jersey 08343.

22.     Defendant, Haines & Kibblehouse, Inc. ("HAINES & KIBBLEHOUSE") is a Pennsylvania corporation having a registered principal place of business located at 2052 Lucon Road, Skippack, PA  19474

23.     Defendants, Hank Julicher ("HANK JULICHER") and Margit Julicher ("MARGIT JULICHER") are adult individuals believed to be residents of the Commonwealth of Pennsylvania and who reside at 534 Brighton Way, Phoenixville, Pennsylvania 19460.

24.     Defendant, Don Isken ("DON ISKEN") is an adult individual believed to be a resident of the State of Delaware who resides at 913 Stuart Road, Wilmington, Delaware 19807

25.     Defendant, Paul Isken ("PAUL ISKEN") is an adult individual believed to be a resident of the State of Delaware who resides at 51 Guyencourt Road, Wilmington, Delaware 19807.

26.     Defendant, Isken Enterprises, LLC ("IE") is a limited partnership under the laws of the Commonwealth of Pennsylvania who maintain a business address at Isken Enterprises, LLC Holiday Inn Express, 1203Christiana Road, Newark, DE 19713.

27.     Defendant, Longview Management LLC ("LONGVIEW") is a limited partnership under the laws of the Commonwealth of Pennsylvania who maintain a business address at 1055 Westlakes Drive, #170, Berwyn, Pennsylvania 19312.

28.     Defendant, Matthew Sibley ("SIBLEY") is an adult individual believed to be a resident of the Commonwealth of Pennsylvania who maintain a business address at 300 Walnut Street, Lansdale, Pennsylvania 19446.

29.     Defendant, M&M Landscaping, LLC ("M&M") is a Pennsylvania limited liability company with a business address of 300 Walnut Street, Lansdale, Pennsylvania 19446.

30.     Defendant, Alan Perry ("PERRY") is an adult individual believed to be a resident of the State of Delaware at 15 Stabler Circle, Wilmington, Delaware 19807 who maintains a business, Montchanin Development Group at 911 North Tatnall Street, Wilmington, Delaware 19807.

31.     Defendant, Mary Tresize ("TRESIZE"), is an adult individual believed to be a resident of the State of Delaware who resides at 23 Selbourne Drive, Wilmington, Delaware 19807.

32.     Defendant, Christopher W. Wright ("WRIGHT"), is an adult individual believe to be a resident of the Commonwealth of Pennsylvania who resides at 68 Cabot Drive, Chesterbrook, Pennsylvania 19807.

33.     Defendant, MAT Site Management, LLC is a limited liability company with a business address, 3828 Kennett Pike, Suite 201, Greenville, Delaware 19807.

34.     Defendant Frank Alcaraz ("ALCARAZ"), is an adult individual believe to be a resident of the Commonwealth of Pennsylvania whose business address is 1020 Broad Run Road, Landenberg, Pennsylvania 19350.

35.     Defendant John Hynanski ("HYNANSKI"), is an adult individual whose business address is 520 S Walnut St Wilmington, Delaware.

36.     Defendant Norman Aerenson ("NORMAN AERENSON"), is an adult individual believe to be a resident of the Commonwealth of Pennsylvania whose business is 2213 Concord Pike, Wilmington, Delaware 19803.

37.     Defendant John Pursell ("PURSELL"), is an adult individual believe to be a resident of the Commonwealth of Maryland whose business address 145 Moon Road Chesapeake City, Maryland 21915.

38.     Defendant, Strive Force, LLC ("STRIVE FORCE") is a Pennsylvania limited liability company with a business address of 1020 Broad Run Road, Landenberg, Pennsylvania 19350.

18417809v.1

39.     Defendant, MJL Enterprises, LLC ("MJL") is a Commonwealth of Virginia company with a business address of 2748 Sonic Drive, Virginia Beach, Virginia 23453.

40.     Defendant, Moon Nurseries, LLC ("MOON") is a Pennsylvania limited liability company with a business address of 145 Moon Road, Chesapeake City, MD 21915.

41.     Defendant, Frontier Mulch, LLC ("FRONTIER") is a Pennsylvania limited liability company with a business address of 1 Quarry Road, Douglassville, Pennsylvania 19518

## JURISDICTION AND VENUE

42.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because the action arises out of the laws of the United States, specifically the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, *et seq.*

43.     This Court also has supplemental jurisdiction over the Partnerships' state law claims pursuant to 28 U.S.C. § 1367 because they are so related to the claims in the action within such original jurisdiction of this Court that they form part of the same case or controversy under Article III of the United States Constitution.

44.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the Partners' claims occurred in this District.

## FACTUAL BACKGROUND

### General Background

45.     TIMOTHY MCKENNA and MICHAEL MCKENNA are at the center of a criminal enterprise that is on-going, has, been active over the last 20 years, and has left numerous victims in its wake. Typically they and their associates convert assets owned by

-8-

others for their own benefit, either directly or to pay off debts that they have accumulated. Sometimes the conversion is in collusion with private creditors and takes the form of personal debt relief. Their network is organized into cells

46.     The TIMOTHY MCKENNA and MICHAEL MCKENNA criminal enterprise is at least 20 years old. Its other victims include, among others, Michael Holly, Andrew DeGroat *et al* (2006- 2008), Ed Morgan Sr., John Morgan, Kathy Morgan, Chemical Equipment Labs (2000-2008), Harry French and Jack Lowe Enterprises (early 1990s).

47.     Criminal activities are also continuing, even after TIMOTHY MCKENNA's termination from employment LG and AWS for theft in June 2014.

48.     Upon information and belief, all of the communications and transactions described in this complaint were directed by defendants by mail, e-mail, wire transfer and/or online access in order to provide additional liquid funds with which to fund payment of the debts of TIMOTHY MCKENNA and MICHAEL MCKENNA to advance their business interests or personal interests of all of the defendants.

49.     From July 2014 to November 2014 MICHAEL MCKENNA stole company trade secrets while employed by the company as a senior executive. He was however, actually actively working for MAT Site Management (MAT), his father's company. All the while he was frequently telling Company and Plaintiffs' superiors that he was a loyal LG/AWS employee who would never work for his father again. On November 7, 2014 MICHAEL MCKENNA disclosed critical, highly confidential financial information to his father, TIMOTHY MCKENNA. He was almost immediately caught red handed and confessed. MICHAEL MCKENNA then resigned abruptly on November 9, 2014. Plaintiffs later learned

that MICHAEL MCKENNA had deliberately sabotaged the Plaintiffs' relationships with customers during this time period for MAT's benefit.

50.     In the Fall of 2015, TIMOTHY MCKENNA attempted to extort the company's insurance agent, threatening to have other customers of that agent move their business to another entity if the agent facilitated insurance coverage for Plaintiffs.

51.     In the Fall of 2015, TIMOTHY MCKENNA solicited a bribe from a key company subcontractor in an attempt to steal a Company marquee customer.

**Gaudioso Buys LG and LGSM**

52.     Between March 30, 2012 and June 25, 2012, GAUDIOSO, through LGH, acquired all of the interest in LG and LGSM from WILKINSON, for whom TIMOTHY McKENNA AND MICHAEL McKENNA were working.

53.     TIMOTHY McKENNA and MICHAEL McKENNA were both affiliated with the Plaintiffs for a number of years and TIMOTHY McKENNA was initially the managing member of LG and AWS until May, 2012 when GAUDIOSO became the managing member of both LG and AWS.

54.     TIMOTHY McKENNA initially had a small ownership percentage in the Plaintiffs, .01%, but by the summer of 2012 had transferred all of his ownership interest to GAUDIOSO.

55.     TIMOTHY McKENNA admitted to fraudulent behavior with the Plaintiffs and agreed that he would not repeat such behavior. As a result, he signed an agreement in June, 2013 to pay back certain funds to the Company but to date none of this obligation has been paid.

56.     TIMOTHY McKENNA remained a consultant to the Company until June 2014 when he was terminated for cause.

18417809v.1

57.     MICHAEL McKENNA is TIMOTHY McKENNA's son and was the General Manager for LG and AWS until he terminated his relationships with the Plaintiffs on November 9, 2014.

58.     Subsequent to MICHAEL McKENNA's departure, the Plaintiffs sought and obtained temporary restraining orders from the Delaware Chancellery Court against TIMOTHY McKENNA, MICHAEL McKENNA and MAT Management, LLC for misappropriation of trade secrets of the Company and breach of fiduciary duties.

59.     TIMOTHY McKENNA and MICHAEL McKENNA remain in violation of the court Orders.

**Fraudulent Use of Company Assets to Pay Personal Debts of the McKennas**

60.     AERENSON and his family own the Polly Drummond Shopping Center in Wilmington, DE.

61.     AERENSON signed a contract with AWS for snow removal services for the 2013/14 season. After sending AERENSON several invoices that remained unpaid, AWS learned that TIMOTHY McKENNA made an arrangement with AERENSON for snow removal, salt, and landscaping services to be provided by the Plaintiffs for free in exchange for debt forgiveness of a personal loan to TIMOTHY McKENNA.

62.     AERENSON entered into a handwritten agreement with TIMOTHY McKENNA, which was intended to relieve a $60,000 personal debt TIMOTHY McKENNA owed to AERENSON whereby TIMOTHY McKENNA provided Company goods and services and agreed not to charge for those services.

63.    AERENSON paid TIMOTHY McKENNA an $18,000 personal check, which reflected the excess value of the services provided by the Company over the $60,000 personal debt of TIMOTHY McKENNA that was forgiven.

64.    The handwritten agreement also provided for free Company services to BOBBY AERENSON the following year as well for a properties also owed by PETTINARO.

65.    TIMOTHY McKENNA apparently hid the evidence of salt deliveries and to AERENSON.  There are no listed deliveries going to Polly Drummond based upon AWS's analysis of its salt deliveries. It is believed and therefore averred that TIMOTHY McKENNA was able to hide the deliveries amongst other deliveries, most likely made by TECHNIVATE. TIMOTHY McKENNA also arranged for TECHNIVATE to perform snow removal services at Polly Drummond and to bill AWS.  Technivate, Inc. only charged AWS for the hourly rate of the plow, not for salt. TECHNIVATE used AWS's salt which TIMOTHY McKENNA had shipped to the site without recording that it was intended for Polly Drummond.

66.    AWS continued to try and obtain payment from AERENSON for the above referenced services and product, but AERENSON continued to refuse payment. GAUDIOSO has demanded that AERENSON pay the invoices per the contract.

67.    In the summer of 2014, after TIMOTHY McKENNA was terminated for cause, Plaintiffs discovered that MICHAEL McKENNA, under TIMOTHY McKENNA's instruction, assigned LG labor and assets to perform landscaping services on ground in southern Delaware that belonged to both AERENSON and PETTINARO.  Again, the Plaintiffs attempted to collect payment for these services and AERENSON and PETTINARO refused to pay.

68.    TIMOTHY McKENNA and MICHAEL McKENNA both owed MEYERS money.  In lieu of payment for those personal loans and receipt of debt forgiveness,

-12-

TIMOTHY McKENNA and MICHAEL McKENNA directed extensive free work to be performed at MEYERS'S daughter's residence, Ilene Miller, with the work being valued at over $16,000.

69.     In December, 2013, WILKINSON made a short term loan to the Company of $25,000 to cover a payroll while AWS waited for snow payments to arrive. The arrangement, as orchestrated by TIMOTHY McKENNA, was that the Company would pay back the $25,000 to MEYERS who would in turn wire $25,000 to WILKINSON. The Company paid MEYERS the $25,000.

70.     Several months later, it was discovered that WILKINSON had offset invoices due to the Company by $25,000.  When GAUDIOSO inquired about this, he was alerted by Frank Alcaraz ("ALCARAZ"), Vice President of Finance for WILKINSON, that MEYERS never sent the $25,000 to WILKINSON.

71.     GAUDIOSO then contacted MEYERS and Meyer's partner, Ira Gerber, to attempt to recover the money.  MEYERS and Ira Gerber refused to return the money.

72.     The $25,000 was kept by MEYERS and Ira Gerber for a debt payment due to them by TIMOTHY McKENNA personally.  MEYERS some months later admitted to GAUDIOSO (well after TIMOTHY McKENNA was terminated and MICHAEL McKENNA quit) that TIMOTHY McKENNA still owed MEYERS a lot of money.

73.     MEYERS has acknowledged that the Company did not owe him this money and that TIMOTHY McKENNA's personal debts to MEYERS did not permit MEYERS to steal from the Company.

18417809v.1

74. After the 2013/14 snow season, AWS owed Chemical Equipment Labs approximately $300,000, for salt purchased by AWS that was directed by TIMOTHY MCKENNA to for MOON NURSERIES for its own use in servicing its own customers.

75. MOON NURSERIES, however, never paid the Company for the salt. TIMOTHY McKENNA orchestrated a plan to not only pay off this debt for the Company, but release TIMOTHY McKENNA from monies he personally owed to the Company.

76. MEYERS paid Chemical Equipment Labs $300,000 owed by AWS, which WILKINSON guaranteed and agreed to pay back to MEYERS on or about February 1, 2015. To date and to the best of the Company's knowledge, MEYERS has not been paid back.

77. However, as the plants from the TIMOTHY McKENNA/MOON NURSERIES "plants-for-salt" scam are now located on WILKINSON'S property, Plaintiffs believe, and therefore aver, that TIMOTHY McKENNA, using the $300,000 credit TIMOTHY McKENNA claimed he had with MOON NURSERIES after stealing the Company's asset, offered WILKINSON this credit in exchange for getting TIMOTHY McKENNA out of the debts TIMOTHY McKENNA owed the Company.

78. MOON NURSERIES was cash poor, but promised to barter plants for salt. Ultimately, AWS had a $300,000 credit from Moon Nurseries for plants.

**DiDonato Credit Card Fraud**

79. The owner of the Center Exxon gas station, DiDONATO, is a friend of TIMOTHY McKENNA.

80. From September, 2013 to May, 2014 TIMOTHY McKENNA and MICHAEL McKENNA used this station almost exclusively for fuel, despite the fact that there

are two gas stations almost adjacent to the Company shop location, while Center Exxon is a 20 minute drive from the shop.

81.     At the time, the Company operated under the system of purchasing gift cards at the station and handing them out to the crews to use for fuel. The crews were instructed to turn in receipts when they fueled up. TIMOTHY McKENNA and MICHAEL McKENNA were in charge of this system. The Company would advance checks, for example $500, towards the purchase of gift cards and TIMOTHY McKENNA/MICHAEL McKENNA's duty was to return receipts showing the purchase of the gift cards.

82.     The advance checks were made out to Center Exxon and to TIMOTHY McKENNA and MICHAEL McKENNA personally.  GAUDIOSO'S personal credit cards were also given to TIMOTHY McKENNA and MICHAEL McKENNA for these purchases.

83.     There are over $17,000 in missing receipts, because TIMOTHY McKENNA and MICHAEL McKENNA arranged a scam with DiDONATO to produce phony gift card receipts and TIMOTHY McKENNA, MICHAEL McKENNA and DiDONATO would steal the cash.

84.     On at least one instance, TIMOTHY McKENNA and MICHAEL McKENNA committed credit card fraud by using GAUDIOSO'S credit card for a fraudulent $1,012 gift card purchase wherein the station owner produced a phony receipt. On the back of the receipt MICHAEL McKENNA wrote two bank account numbers that belonged to TIMOTHY McKENNA with amounts next to each account that totaled the amount of the credit card transaction (less the $12.00 "fee"), indicating the amount of cash TIMOTHY McKENNA and MICHAEL McKENNA stole from the credit card transaction that was deposited into TIMOTHY McKENNA's personal bank accounts.

-15-

85.     There are also receipts indicating purchases labeled "Parts". Also, there are transactions for "Parts" with no backup, in particular a $653 "Parts" transaction. Lastly, it appears "Parts" was used to charge the Company "fees" for using a credit card. No other stations charged the Company a fee for using credit cards. The Company was charged a "fee" on at least one occasion for using an Amex card although according to the merchant contract with Amex, the merchant is not permitted to do so.

86.     Many receipts indicate that "local accounts" were used for purchases without any accounting or back up detail to explain their use or business purpose. Accounts were called "daisy", "miscellaneous" and others. The Company never saw any receipts for payments toward these accounts and was never billed or sent a statement to pay these accounts.

87.     DiDONATO produced a hand-written receipt for a gift card purchase, which the Company in an apparent effort by DiDONATO to "keep off the books."

88.     These practices ceased in April of 2014 because the Company began using a fleet fuel card service that was much more secure.

**Kevin Eaise and Eaise Design & Landscaping / Eaise Snow Removal**

89.     As part of a settlement AWS reluctantly entered into with EAISE before the Plaintiffs had received the forensic analysis completed by Asterion. AWS learned from that report that EAISE is complicit in committing fraud against AWS and its customers with TIMOTHY McKENNA and MICHAEL McKENNA during the 2013/2014 snow season. AWS is committed by the settlement to begin making payments to EAISE on October 15, 2015 and monthly thereafter for a total of $125,000 unless it can provide evidence of fraud to the Eaise attorney holding the escrow payments.

-16-

90.     EAISE DESIGN and EAISE SNOW REMOVAL, owned by EAISE, is a subcontractor used by AWS during the 2013/14 snow season. EAISE has a long history with TIMOTHY McKENNA and MICHAEL McKENNA.

91.     EAISE has caused problems for AWS and its previous entities for years, including incorrect invoicing, inflated invoicing, and missing paperwork, among others. Yet TIMOTHY McKENNA insisted on continuing to employ EAISE, apparently because TIMOTHY McKENNA owed EAISE money. EAISE would lend money, use kickbacks and engage in other forms of illegal and/or unlawful conduct.

92.     TIMOTHY McKENNA, MICHAEL McKENNA, and EAISE conspired to commit fraud against AWS and its customers by submitting false and inflated invoices, double invoicing, stealing salt and calcium, and falsifying job tickets. AWS believes, and therefore avers, this was done not only to satisfy debts owed to EAISE by TIMOTHY McKENNA/MICHAEL McKENNA, but also to take advantage of AWS and its customers.

93.     TIMOTHY McKENNA/MICHAEL McKENNA used EAISE for several years before the 2013/2014 snow season under different companies. EAISE was not used during the 2012/2013 season according to controller Laura Mohr, who has been with the company for the past 10 years, because of invoice issues, overbilling, and double billing during previous seasons.

94.     Around March of 2013, there was an account entry on the Company's books showing funds due to EAISE of approximately $25,000. ALCARAZ, Vice President of Finance for Wilkinson Builders who owned LG at the time told Laura Mohr to remove the amount due as they did not feel it was due and EAISE was not pursing payment. TIMOTHY McKENNA announced that he had "taken care of EAISE" by giving him a significant amount of

salt and calcium some time in December of 2012 free of charge.  The amount of material provided was never disclosed though repeatedly requested.  Laura Mohr estimated it was around $20,000.

95.     Prior to the start of the 2013/2014 snow season, TIMOTHY McKENNA insisted that AWS use EAISE for the upcoming snow season without explanation. Laura Mohr, knowing the history of using EAISE, voiced her opposition, but MICHAEL McKENNA assured that he would keep EAISE in line.  So GAUDIOSO, as managing member, agreed.

96.     From the very start of the season there were invoicing problems that continued the entire season. AWS did not realize the scope of the problems until it and Asterion completed a forensic analysis of EAISE's invoices and paperwork after the season was over, on or about February of 2016.

97.     Additionally, there were complaints about EAISE's service from AWS' customers. AWS was not aware of the complaints until after it began investigating EAISE well after the season had ended as MICHAEL McKENNA kept the complaints to himself, receiving them via phone and email.

98.     EAISE invoiced AWS for about $535,000 over about 400 services during the 2013/2014 season. AWS paid EAISE $235,000.  AWS discovered over the course of its audit of EAISE's invoices that EAISE overbilled, double billed, re-invoiced, invoiced for dates he didn't service, and in violation of the Master Service Agreement he signed, did not provide job tickets for most dates, submitted job tickets after the 24 hour time limit, submitted invoices after the 30 day time limit, and dated invoices prior to the actual service date in order to make invoices appear due before they actually were. This resulted in credits due to AWS that, in effect, show EAISE was overpaid and actually owed AWS money.

-18-

99.   AWS repeatedly requested job tickets from EAISE. And because of EAISE's extensive delays in providing required job tickets (on average it took 19 days for EAISE to submit job tickets, yet he would submit his own invoices within a day or two), AWS was unable to invoice its customers in a timely manner putting AWS in difficult financial situations. EAISE berated AWS staff for payment, yet his own delays in submitting job tickets caused EAISE's own delays in payment.

100.   Pulaski & Sons Construction ("PULASKI") is the subcontractor EAISE contracted with to perform snow removal services at Clover Square Shopping Center in Hamilton, NJ and the AT&T store in Lawrenceville, NJ.

101.   AWS as part of its snow services sells bulk rock salt and bagged calcium to its subcontractors, negotiating rates the subcontractors would not be able to get on their own.

102.   AWS then back charged the subcontractor for materials ordered. AWS delivered about 200 tons of rock salt to Clover Square as ordered by EAISE.

103.   On job tickets provided by PULASKI, it is indicated that PULASKI used "bagged" rock salt on several occasions at the beginning of the season. After that, PULASKI strangely stopped putting amounts of rock salt used on its job tickets. AWS inquiry why PULASKI used bagged material when tons of bulk material was on site and why PULASKI stopped recording the amount of material it used.

104.   In addition, according to the contract between PULASKI and EAISE, Pulaski was charging EAISE a significantly higher amount for bagged rock salt than EAISE was paying AWS for bulk salt. AWS wanted to know why EAISE agreed to pay PULASKI so much more to use bagged rock salt when salt he had paid much less for was already on site.

18417809v.1

105.   Finally, according to the invoices PULASKI billed to EAISE, EAISE owed Pulaski approximately $20,000.  This situation contributed EAISE submitting fraudulent bills to AWS.

106.   EAISE, in an email from early in the season, indicated that someone else had serviced the AT&T location, possibly whoever did the Casual Male store that is adjacent to it.

107.   Laura Mohr confirmed with the management company that the AT&T location was vacant, but still needed to be serviced per contract. This information was passed on to EAISE.

108.   EAISE did not supply one single job ticket, either during the snow season or as part of discovery during the lawsuit, that the AT&T was serviced even though he supplied job tickets for all other locations.

109.   When AWS requested job tickets during discovery, EAISE's attorney emailed, "...there are no separate tickets for AT&T. The same person who did AT&T did Clover...services provided were same".

110.   PULASKI serviced Clover so, therefore, according to EAISE's attorney's email, Pulaski serviced the AT&T. AWS was supplied with invoices from Pulaski to EAISE for services at the AT&T.

111.   Out of the 88 services that EAISE billed to AWS, Pulaski only invoiced EAISE 23.  Pulaski provided no job tickets however.

   a)   EAISE self-performed the other 65 times. However, there are no EAISE internal job tickets as there are for the other locations.

   b)   The AT&T (and Clover Square) is over sixty miles away from EAISE's shop. Pulaski's shop is within a 2 mile radius of both properties. It is not believed that EAISE would self-perform on a site that required a 120 mile round trip in bad weather.

c)    AWS believes and, therefore, avers that upon discovering that some other contractor had serviced the AT&T site, EAISE continued to allow the site to be serviced by the other contractor yet invoiced AWS.

**Haines & Kibblehouse, Inc.**

112.   HAINES & KIBBLEHOUSE initiated legal proceedings on the Company for amounts they allege are due to them for snow removal services they performed. This is yet another vendor that the Company believes and, therefore, avers conspired with TIMOTHY McKENNA and MICHAEL McKENNA to defraud the Company.

113.   The Company and HAINES & KIBBLEHOUSE operated under agreed rates for the 2012/13 season. MICHAEL McKENNA had negotiated these rates and GAUDIOSO not knowing of the new pricing arrangement that was offered to Haines and Kibblehouse by MICHAEL McKENNA who knowingly in his effort to steal from the company for the benefit of himself and TIMOTHY MCKENNA did not perform in the best interests of the Company.

114.   Unbeknownst to anyone, MICHAEL McKENNA signed a new, multi-year proposal with HAINES & KIBBLEHOUSE on December 16, 2013 that significantly increased the rates. Equipment costs increased on average by 31% and weekend rates increased by an average of 37%.   Additionally, this was a multi-year proposal. In most cases, companies DECREASE rates in an attempt to win a multi-year contract.

115.   Additionally, HAINES & KIBBLEHOUSE's rates under the 2012/2013 contract were already high compared to market rates.   Furthermore, MICHAEL McKENNA could have rented equipment and paid significantly less.

116.   After MICHAEL McKENNA's resignation in November, 2014 and after the 2014/2015 winter season, AWS discovered the new proposal that MICHAEL McKENNA signed with HAINES & KIBBLEHOUSE and AWS and halted further payments to HAINES &

-21-

KIBBLEHOUSE.  AWS attempted to meet with HAINES & KIBBLEHOUSE to discuss the increased rates matter. Subsequently, HAINES & KIBBLEHOUSE, in an attempt to discredit AWS with a major marquee customer, contacted that customer directly to complain they had not been paid. This is in direct conflict with the Master Service Agreement HAINES & KIBBLEHOUSE had already signed.

117.   It was recently discovered that the 2012/2013 rates, the first year GAUDIOSO owned the Company, were increased by HAINES & KIBBLEHOUSE and signed off by MICHAEL McKENNA.  Overall, since 2011/2012 the Company's rates with HAINES & KIBBLEHOUSE have gone up an average of 35% on equipment and 23% on weekend work.

118.   AWS ordered road salt and calcium from Frontier Mulch. Upon information and belief, FRONTIER is owned by HAINES & KIBBLEHOUSE.

119.   AWS was given written rates it was to be charged for salt, yet AWS was always invoiced for higher amounts. FRONTIER has filed claim against AWS for amounts it claims are due.

120.   Plaintiffs believe and therefore aver that the contract with FRONTIER and HAINES & KIBBLEHOUSE, on the one hand, and Plaintiffs, on the other was fraudulent and designed to harm the Plaintiffs.

**Hank Julicher**

121.   HANK JULICHER, through his wife MARGIT JULICHER, is a lender to LGH, with GAUDIOSO as guarantor. MARGIT JULICHER is a straw person. There has been almost no contact with her except greetings. On the other hand, there have been literally hundreds of calls and dozens of meeting with HANK JULICHER and Chris Wright, HANK JULICHER's partner and closest assistant.

18417809v.1

122.   HANK JULICHER, despite warnings from GAUDIOSO not to do so, became associated with TIMOTHY McKENNA in May 2014 in numerous ways, namely as follows:

a)   Multiple personal loans to TIMOTHY McKENNA;

b)   Salt deals with TIMOTHY McKENNA; WRIGHT would send TIMOTHY McKENNA spreadsheets detailing the financial workings of the deal and WRIGHT would instruct TIMOTHY McKENNA not to share the information with anyone. TIMOTHY McKENNA immediately shared the information with ISKEN and others in an attempt to show TIMOTHY McKENNA had income;

c)   Introduction by TIMOTHY McKENNA to a customer (MOON NURSERIES) who conspired with TIMOTHY McKENNA to steal from the company; and

d)   Free landscape services from MAT and MICHAEL McKENNA.

123.   As a lender, HANK JULICHER and WRIGHT have demanded and been provided detailed, full and material disclosures about the business – both financial, legal, and operational plans as well as general business disclosures with the expectation that the materials provided are proprietary and for use of the lender alone solely in order to keep them informed.

124.   HANK JULICHER and WRIGHT have used this information inappropriately to enhance their own personal financial situations as well as those with whom GAUDIOSO and the Company are adversarial. In addition, HANK JULICHER and WRIGHT are expressly aware that TIMOTHY McKENNA and MOON NURSERIES are not only adversarial with the Company but have expressly and specifically engaged in theft from the Company. Therefore, having been privy to this detailed and material information as required by the terms of the loan documents HANK JULICHER, MARGIT JULICHER and WRIGHT have harmed the companies while aiding and abetting MOON NURSERIES and TIMOTHY McKENNA in committing conversion and thefts.  All the while knowing that the reason the

-23-

Company is having financial difficulties that have led to defaults on MARGIT JULICHER's note is these thefts.

125.   HANK JULICHER has used this information inappropriately to benefit himself, his associates, TIMOTHY McKENNA and MOON NURSERIES specifically as follows:

a)   Inserted himself (against his lawyer's advice) into a Chancery Court case against MICHAEL McKENNA, TIMOTHY McKENNA, Arnold Dunn and MAT in order to impede and prevent disclosure of his full set of activities that have harmed us;

b)   Threaten GAUDIOSO physically to compel an agreement with MOON NURSERIES;

c)   Threatened the companies and GAUDIOSO with his active efforts to cause financial ruin to both by forcing both out of business thus aiding and abetting the efforts of TIMOTHY McKENNA to deliver on his threat to do the same. TIMOTHY McKENNA (along with HANK JULICHER and CHRIS WRIGHT) not only hurt GAUDIOSO and the Company, but are positioning themselves or their proxies to pick up all of the business for themselves -- thereby increasing their ill-gotten gains. Any financial difficulty the Company is experiencing is solely due to TIMOTHY McKENNA's HANK JULICHER and MICHAEL McKENNA's thefts and fraudulent conspiracies, a fact made clear by GAUDIOSO to both HANK JULICHER and WRIGHT numerous times;

d)   HANK JULICHER met with TIMOTHY McKENNA and coordinated parties who were being encouraged by TIMOTHY McKENNA to push the Plaintiffs into bankruptcy – not to recover any legitimate debts (which were dubious to begin with) but to aid and abet TIMOTHY McKENNA's plan to commit bankruptcy fraud to put the Companies out of business so they could pick up the ongoing business;

e)   TIMOTHY McKENNA and HANK JULICHER stole Company resources by providing services to HANK JULICHER'S personal residence over and above those required by the loan documents. Such work exceeded $15,000.  The work was scheduled by MICHAEL McKENNA;

f)   As a lender, HANK JULICHER was informed almost immediately afterwards TIMOTHY McKENNA was terminated for cause, namely, theft;

g)   HANK JULICHER nevertheless continued to work very closely with TIMOTHY McKENNA. In a January, 2015, Chancery Court hearing, TIMOTHY McKENNA even insisted in court on maintaining his continued relationship with HANK JULICHER notwithstanding an existing TRO;

h)   TIMOTHY McKENNA introduced HANK JULICHER to MOON NURSERIES who was party to a fraud against the Company;

i)   HANK JULICHER offered to collect AWS accounts receivable ("AR") from MOON NURSERIES. That AR is approximately $300,000. The detail that justified this number was provided to HANK JULICHER through his key assistant WRIGHT. HANK JULICHER and WRIGHT, however, withheld key information, namely that they had a controlling interest in MOON NURSERIES, a fact that was not revealed until 4 months later;

j)   HANK JULICHER's extensive business relations with TIMOTHY McKENNA are not only a misuse of Company information, those relationships have enhanced TIMOTHY McKENNA's capacity to do damage to the Companies, thereby hindering the Companies' ability to repay HANK JULICHER and MARGIT JULICHER; and

k)   HANK JULICHER has made threats of violence against company officers, namely GAUDIOSO and JIM PORTER. Specifically, HANK JULICHER at least twice threatened GAUDIOSO that a mobster associate of his would hold a gun to GAUDIOSO'S head while two black men (used the N word) would abuse him. He voiced the same threat to Ron Coruzzi ("Ron Coruzzi"). In January 2015, in a telephone conference call with Jim Porter who was acting as CEO at the time HANK JULICHER threatened Jim Porter. Since then HANK JULICHER has made repeated threats of the same kind if GAUDIOSO did not do what he wanted.

126.   HANK JULICHER openly touted his Sicilian roots and his connections with the Gambino family. In one instance, GAUDIOSO was present in his house where over the phone HANK JULICHER threatened a pharmacist, a health insurance representative, and one of his attorneys. In each of those threats he made reference to his Sicilian roots.

**Hynansky/Pond's Edge**

127.   Don "Smokey" Robinson worked for WILKINSON prior to GAUDIOSO purchasing the companies. TIMOTHY McKENNA convinced GAUDIOSO to hire Don

Robinson as an outside salesman as he would be able to bring in a large amount of business, which proved to be untrue.

128.    On April 30, 2013, TIMOTHY McKENNA purchased a used 2011 Ford Explorer for Don Robinson.  Apparently, TIMOTHY McKENNA owed Don Robinson money. TIMOTHY McKENNA purchased the vehicle from Winner Dover Autocenter, owned by John HYNANSKY ("HYNANSKY") who, at the time, was a friend of TIMOTHY McKENNA. TIMOTHY McKENNA was illegally allowed to put the vehicle in LG's name even though TIMOTHY McKENNA signed the purchase agreement, when he had no ownership interest or executive authority in the company.  HYNANSKY was aware of those circumstances.

129.    The used, two-year old vehicle was sold to TIMOTHY McKENNA for $37,435.00.   TIMOTHY McKENNA then paid for the vehicle with a personal check that bounced.

130.    HYNANSKI is also an owner/partner in a group called Pond's Edge Associates and/or Montchanin Development Group along with PERRY.  They own a tract of land in Delmar, Montchanin Development. TIMOTHY McKENNA, HYNANSKI, and Perry conspired to steal Company assets and labor to performing site work there, specifically clearing 18 acres of trees. TIMOTHY McKENNA priced the job at $29,247 and apparently advised would take three weeks to complete.

131.    The Company later analyzed their expenditures for the job and learned it spent over $59,000 on labor alone.  Not only did the Company only collect only $17,000 for the job, Gary Bickham, an employee of the Company and manager for the Ponds End work obtained a quote from Strobert, a professional tree service, in advance who priced the job at $91,000 and taking four to six weeks to complete.  TIMOTHY McKENNA apparently also got a quote from

-26-

David Horsey for $95,000. TIMOTHY McKENNA booked this job to repay HYNANSKI for the Explorer and/or other loans. This is also reflected in a reconciliation done by either Alan Perry or HYNANSKI indicating a credit off the Company's contract for the car.

132.    The Company discovered what appears to be a reconciliation prepared by HYNANSKI, PERRY, and/or TIMOTHY McKENNA where it is clear that a credit is being taken by HYNANSKI and PERRY for a balance due on the vehicle purchased for Don Robinson.

133.    Additionally, there was a balance due of $6,061 on the Company's books for the installation of an irrigation system at Pond's Edge. The amount was applied to a deposit on a Cadillac from Winner Cadillac that was for TIMOTHY McKENNA's benefit. That amount is due and owing to the Company including interest.

**Isken and Isken Enterprises**

134.    DON ISKEN and PAUL ISKEN have been associated with TIMOTHY McKENNA for several years. They own several local hotels, specifically the Homewood Suites, Holiday Inn Express, and Comfort Inn in Wilmington, DE.

135.    TIMOTHY McKENNA conspired with DON ISKEN and PAUL ISKEN to steal Company assets and labor by delivering loads of salt and calcium at no charge to the ISKEN' hotels in return for some debt relief to TIMOTHY McKENNA. This was late in the 2014 season when salt and melt products were generally unavailable at any price and the Company's inventory was stretched. TIMOTHY McKENNA and MICHAEL McKENNA also directed snow removal services to the hotels and DON ISKEN' home with no intention of billing DON ISKEN. When the Company learned of this, the Company sent a bill and attempted to collect payment from DON ISKEN and PAUL ISKEN. DON ISKEN and PAUL ISKEN refused

to pay advising GAUDIOSO, "Our deal was with Tim McKenna". When GAUDIOSO pressed as to what that meant, neither DON ISKEN nor PAUL ISKEN would explain.

136.   Having loaned TIMOTHY McKENNA a significant amount of money (upwards of $200,000) and TIMOTHY McKENNA being unable to pay it back, DON ISKEN has initiated several Sherriff Goods and Chattel sales on TIMOTHY McKENNA's home. The email trail between TIMOTHY McKENNA and DON ISKEN goes back years and shows TIMOTHY McKENNA promising to pay DON ISKEN and always reneging on payment. Ultimately, DON ISKEN initiated the Sherriff sale and then TIMOTHY McKENNA somehow came up with an amount to get DON ISKEN off his back for a short time. Then the process started again.

137.   Counsel for the Company, SNYDER and FALCONE of SAUL EWING were advising TIMOTHY McKENNA on how to handle this situation with ISKEN.

**Longview Management**

138.   Longview Management ("LONGVIEW") owns and manages several shopping centers that LG, LGSM, and AWS, (collectively the Company) have serviced since 2003.

139.   TIMOTHY McKENNA and MICHAEL McKENNA have had close personal relationships with upper management at Longview, particularly President, Robin McGill and the managing member, Bill Anderson, for years.  Denton Moyle owned American Winter Services (AWS) during a time when he was an upper level executive with LONGVIEW.

140.   Although TIMOTHY McKENNA and MICHAEL McKENNA in past years signed snow contracts with LONGVIEW as McKenna American (which TIMOTHY McKENNA and MICHAEL McKENNA owned), and as LGSM (MICHAEL McKENNA with

-28-

apparent authority as General Manager), LONGVIEW was aware that GAUDIOSO was the sole managing member of AWS and therefore, sole authority.  GAUDIOSO signed all contracts with LONGVIEW on behalf of AWS in 2012/13 and 2013/14.

141.    AWS is currently in litigation with LONGVIEW over about $400,000 that AWS is owed from the 2013/2014 snow season. The issue at hand are two clauses in the snow contract (drafted by LONGVIEW) that describe a cap provision whereby if a certain amount is reached during the season, any amounts above that cap would be payable to AWS in equal installments over 8 months beginning in April. LONGVIEW, however, is contending that the interpretation of the cap clause is that the cap is the limit that AWS can collect for the season. So the litigation on the surface is basically a contract dispute over language and a judge has already said that the language is ambiguous at best and LV as the author of the contract bears the burden of that.

142.    TIMOTHY McKENNA and LONGVIEW conspired to defraud AWS by not paying the $400,000 amounts that exceeded the cap, using the contract clause as an excuse. About February or March of 2014, TIMOTHY McKENNA advised LONGVIEW that since the caps had been met, "that AWS would not receive any further remuneration." TIMOTHY McKENNA said something to the effect of, 'The rest of these are freebies'". This conversation was with Josh Introvatolo, CFO for LONGVIEW.  TIMOTHY McKENNA did this without Company knowledge or permission and to curry favor with LONGVIEW in his ultimately successful attempt to steal the LONGVIEW contracts from AWS.  LONGVIEW was a willing accomplice to this – rewarding TIMOTHY McKENNA for getting LONGVIEW out of a $400,000 payment.

143.    During this time TIMOTHY McKENNA was also working with several members of LONGVIEW, including Bill Anderson, on gaining investors for a project called Cherry Ridge Apartments.  LONGVIEW indicated they "would be happy to pay (TIMOTHY McKENNA) a big commission on getting investments into this project.

144.    TIMOTHY McKENNA and MICHAEL McKENNA, in dereliction of their fiduciary duty, were working for the benefit of themselves and LONGVIEW and not AWS. And LONGVIEW aided and abetted the McKENNAS by giving their new company, MAT Site Management, the snow contracts.

145.    Notwithstanding, LONGVIEW acted in conspiracy they committed with TIMOTHY McKENNA and MICHAEL McKENNA in awarding MAT Site Management the snow contracts.

- Fall, 2013: AWS and LONGVIEW execute snow contracts for the 2013/2014 snow season at 12 LONGVIEW properties. The clauses in question are 2(A)(vi)(F) and 3(C).

- Fall, 2013 – 2014: LONGVIEW and TIMOTHY McKENNA engage in discussions about the Cherry Ridge Apartments project. They mention a group called Streamlight – a company owned by Harry French from whom TIMOTHY McKENNA has borrowed and owes money.

- On or about Jan 8, 2014, TIMOTHY McKENNA took it upon himself (and without authorization from GAUDIOSO) to agree that LONGVIEW could avoid paying certain AWS invoices due to services issues.

- In March, 2014, TIMOTHY McKENNA advised LONGVIEW, without authority or authorization, that caps have been met and AWS is no longer owed any amounts.

- On July 1, 2014, Robin McGill responded to Josh Introvolo's email regarding TIMOTHY McKENNA, praising how she is handling TIMOTHY McKENNA.  She then says "…MICHAEL McKENNA does all of the coordinating so if he leaves…" indicating Robin McGill knew as early as July 1, 2014 that MICHAEL McKENNA was leaving AWS.

- On or about September 8, 2014, MAT Site Management was incorporated.

- On or about September 8, 2014, MICHAEL McKENNA supposedly delivered AWS' 2014/2015 snow proposal to LONGVIEW.

- On September 9, 2014 Jackie Scanzello (JS2) emailed Laura Mohr and asked for a hard copy of the proposal that TIMOTHY McKENNA dropped off. Laura Mohr emailed back asking for clarification concerning who dropped off the contract. Laura Mohr never received a reply. TIMOTHY McKENNA and MICHAEL McKENNA took AWS's proposal and either passed it off as their own under MAT Site Management or used insider knowledge of AWS's pricing to under bid AWS.

- On October 22, 2014, Jess Travers emailed Robin McGill, et al talking about how they should add language on invoices they get from McKenna once the cap is met. This clearly shows LONGVIEW hired the McKENNAS, while MICHAEL McKENNA was still employed by the Company.

- Immediately after MICHAEL McKENNA quit on November 9, 2014, GAUDIOSO, JIM PORTER and Ron Coruzzi called Robin McGill to inquire about the proposal. Robin McGill informed them that they have awarded the contracts to someone else, but she refused to identify the contract winner.

146.    LONGVIEW's   internal   communications   regarding   TIMOTHY McKENNA and MICHAEL McKENNA reflect that management of LONGVIEW was not impressed by TIMOTHY McKENNA and MICHAEL McKENNA and their work. Yet, TIMOTHY McKENNA and MICHAEL McKENNA held LONGVIEW'S contracts for over ten years

**Matt Sibley**

147.    M&M, owned by SIBLEY, is a subcontractor that the Company engaged with during the 2013/2014 snow season and prior seasons.    SIBLEY has worked with TIMOTHY McKENNA/MICHAEL McKENNA for many years.    SIBLEY had an outstanding balance at the end of the snow season (as all the snow subcontractors did) due to the activities of MICHAEL McKENNA and TIMOTHY McKENNA.    It was not until the Company began its forensic analysis that it became aware of the true circumstances.

-31-

148.   At the end of the 2013-14 snow season, GAUDIOSO believed SIBLEY was owed about $100,000.

149.   Communications between SIBLEY and the Company continued throughout 2014/15 regarding monies owed to SIBLEY. Most of the time it was civil.   In October of 2014 things began to deteriorate.   Discussions with SIBLEY took place mostly by Jim Porter, then the CEO of the Company. These conversations involved settling the debt with SIBLEY via salt the Company would supply SIBLEY and some arrangement of equipment financing. The Company's salt supplier was unwilling to participate in the salt arrangement. So Jim Porter and SIBLEY drafted promissory notes totaling $118,500 over three payments beginning November, 2014. SIBLEY expressed interest in continuing to work with The Company as a snow subcontractor for the upcoming season and reiterated that he had no interest in working for TIMOTHY McKENNA or MICHAEL McKENNA. However, there was an unexplained urgency around this time expressed by SIBLEY to get the notes signed and GAUDIOSO, under duress, signed them on the advice of Jim Porter and again without the benefit of the forensic analysis by Asterion This all took place within a week of MICHAEL McKENNA quitting his employment with the Company.

150.   The Company was unable and unwilling to make the payments to SIBLEY according to the terms of the note because significate billing irregularities were subsequently discovered.   SIBLEY ended up not working for The Company and The Company discovered that SIBLEY was, in fact, working for TIMOTHY McKENNA and MICHAEL McKENNA/MAT Site Management on the LONGVIEW sites.

151.   SIBLEY, GAUDIOSO and Jim Porter continued into January and February of 2015 to work on coming to a payment arrangement.   Around February 18, 2015,

-32-

SIBLEY advised GAUDIOSO that he was no longer working for TIMOTHY McKENNA or MICHAEL McKENNA because TIMOTHY McKENNA and MICHAEL McKENNA owed SIBLEY money.

152.    Then on February 17, 2015, SIBLEY called one of the Plaintiffs marquee customers violating the MSA.  SIBLEY was fishing for information to get himself, TIMOTHY McKENNA and MICHAEL McKENNA back into that marquee contract.

153.    Negotiations with SIBLEY ceased and SIBLEY filed suit over the promissory notes that GAUDIOSO signed.

154.    It was also discovered during the Company's internal audit that MICHAEL McKENNA, TIMOTHY McKENNA and SIBLEY conducted salt transactions using The Company resources for the benefit of MICHAEL McKENNA, TIMOTHY McKENNA, SIBLEY and third parties, particularly Berg Construction.

- The $118,000 agreed to is incorrect and incredibly inflated.  The Company after subsequent audit owes SIBLEY, at most, about $8,000.

- MICHAEL McKENNA, showing extreme favoritism to SIBLEY, approved all SIBLEY invoices even when Laura Mohr and Steven Coruzzi questioned them.

- The Company's maintained a standard arrangement with subcontractors. Internal, proprietary structure not to be shared outside the company. However, all the subs knew that's how it worked as MICHAEL McKENNA and TIMOTHY McKENNA shared this information with them all the time. MICHAEL McKENNA told Laura Mohr and Steven Coruzzi that SIBLEY was not to be back charged for salt even though SIBLEY had contracts for The Company marquee customers to provide complete snow removal services – plowing, labor, calcium and salt. SIBLEY used The Company's salt and calcium on both sites. And SIBLEY invoiced The Company for full service, per the contract. SIBLEY was never back charged for it. The Company calculates SIBLEY should have been back charged about $51,000 for salt and calcium.

- Additionally, per the same rate philosophy above, SIBLEY was to provide all labor on these sites. However, MICHAEL McKENNA had Company labor on MS's sites performing every event. The Company calculates that

SIBLEY should have been back charged at least $20,000 for labor The Company provided.

- The Company believes this was a fraud concocted by MICHAEL McKENNA, TIMOTHY McKENNA and SIBLEY to allow SIBLEY to invoice The Company for amounts significantly over what that to which he was entitled.

- Finally, SIBLEY should have been back charged for damages on the properties for the amount of $4,500, which was never back charged.

155. SIBLEY worked with TIMOTHY McKENNA and MICHAEL McKENNA to defraud The Company. SIBLEY lied about not working for TIMOTHY McKENNA/MICHAEL McKENNA. SIBLEY violated the MSA by contacting a major marquee client. And SIBLEY purposefully defrauded GAUDIOSO by (1) pledging loyalty to The Company in the face of TIMOTHY McKENNA and MICHAEL McKENNA departing The Company and (2) into signing promissory notes for amounts that are false and, in fact, intentionally inflated.

156. In addition, the Company has discovered a paycheck cut for a laborer who performed snow removal at Met Life Stadium under SIBLEY. SIBLEY invoiced the Company for this work. It appears that Strive Force also invoiced the Company for this same laborer. There is reason to believe this is not the only instance of this fraud.

**The MCKENNAs**

157. Aside from the issues with TIMOTHY McKENNA and MICHAEL McKENNA as they relate to third parties, there is also extensive fraud committed by TIMOTHY McKENNA and MICHAEL McKENNA internally against the Company.

158. GAUDIOSO purchased Laurel Gardens Holdings, Laurel Gardens, and American Winter Services (the Company) in 2012 and relied heavily on TIMOTHY McKENNA and MICHAEL McKENNA's "expertise" and "experience" to manage the Company.

-34-

18417809v.1

GAUDIOSO at this time was dealing with his wife's serious health issues. TIMOTHY McKENNA and MICHAEL McKENNA took advantage of this situation to benefit themselves personally.

159.   TIMOTHY McKENNA never revealed to GAUDIOSO before GAUDIOSO bought the Company how significant TIMOTHY McKENNA's financial problems were (owing millions to the IRS and hundreds of thousands in personal loans to various individuals). TIMOTHY McKENNA also never revealed that TIMOTHY McKENNA was banned from the Company's most significant customer.

160.   The Company was expelled from WSFS bank in May 2012 as they would not allow TIMOTHY McKENNA to be a signer on any accounts. Artisan's bank threatened the same so GAUDIOSO had to become a signer on all Company accounts.

161.   TIMOTHY McKENNA's thefts can be traced back to at least 2012. At the time a signer on the bank account, TIMOTHY McKENNA wrote himself thousands of dollars' in checks and never provided backup or receipts despite repeated requests. TIMOTHY McKENNA would claim he needed to be paid back for something but would never provide back up. TIMOTHY McKENNA claimed he paid SAUL EWING a $10,000 retainer but never provided back up and Saul Ewing never applied this retainer to the Company's bills.

162.   When GAUDIOSO found out about McKENNA's fraudulent conduct GAUDIOSO appointed new management and took a more direct managerial role in the Company, had TIMOTHY McKENNA sign a document admitting he stole funds of the Company and removed TIMOTHY McKENNA's ownership and check signing from the company. TIMOTHY McKENNA promised he would discontinue his fraud. TIMOTHY McKENNA gave GAUDIOSO permission to monitor TIMOTHY McKENNA's personal bank

-35-

account which Laura Mohr, the Company's bookkeeper and administrator, already had access to from when WILKINSON owned the Company.

163.   It is at this point, however, TIMOTHY McKENNA decided that GAUDIOSO had stolen TIMOTHY McKENNA's company and TIMOTHY McKENNA would destroy the Company and GAUDIOSO personally.

164.   TIMOTHY McKENNA was in a constant juggling act of paying debts by going further into debt. He would pay debts off by either borrowing from a third party, stealing Company assets, or just flat out default on payment. For example, TIMOTHY McKENNA borrowed $12,000.00 from McIntyre Risk Management that was paid directly to Ed Morgan, a huge creditor of TIMOTHY McKENNA. The payback was a three-month contract to bring in new business to McIntyre. McIntyre cancelled the contract as TIMOTHY McKENNA didn't perform.

165.   Daily, TIMOTHY McKENNA considered ways on how he was going to get money out of GAUDIOSO or the Company.   GAUDIOSO, at the time sympathetic to TIMOTHY McKENNA's situation but still not aware of the scope of his fraud, tried to help TIMOTHY McKENNA by giving TIMOTHY McKENNA short term loans from the Company and GAUDIOSO personally that TIMOTHY McKENNA promised to pay back within a day or week. GAUDIOSO was attempting to keep TIMOTHY McKENNA motivated to work for the Company. TIMOTHY McKENNA, so desperate for money, would have the Company write, with MICHAEL McKENNA's consent, MICHAEL McKENNA's expense reimbursements to TIMOTHY McKENNA and even MICHAEL McKENNA's paychecks.

166.   TIMOTHY McKENNA shared company contracts with third parties such as Saul Ewing to show money coming in that he would have access to. TIMOTHY McKENNA

-36-

18417809v.1

not only did this to the Company, but to his own associates as well. TIMOTHY McKENNA would make notes of Company accounts receivable to see what would be available to steal.

167.    From the time TIMOTHY McKENNA was caught stealing by GAUDIOSO and TIMOTHY McKENNA's ownership had been removed, TIMOTHY McKENNA held a thinly veiled threat over the Company of leaving and taking all of the Company's customers and MICHAEL McKENNA with him. TIMOTHY McKENNA said as much to Ron Coruzzi at a meeting at Sullivan's Restaurant, also putting out feelers to see if Ron Coruzzi wanted to join TIMOTHY McKENNA.

168.    TIMOTHY McKENNA and MICHAEL McKENNA claimed expenses without receipts. TIMOTHY McKENNA and MICHAEL McKENNA turned in receipts that were found subsequently to be fraudulent having nothing to do with Company business. GAUDIOSO believed that TIMOTHY McKENNA and MICHAEL McKENNA were ultimately working for the Company – TIMOTHY McKENNA and MICHAEL McKENNA were the Company's highest paid employees, TIMOTHY McKENNA earning over $78,000 per year in consulting fees and MICHAEL McKENNA earning $150,000 per year in salary and benefits. Both TIMOTHY McKENNA and MICHAEL McKENNA had Company Ford Explorers and the Company paid health insurance premiums and medical bills. GAUDIOSO did not realize how badly TIMOTHY McKENNA and MICHAEL McKENNA were conning GAUDIOSO and the Company.

169.    TIMOTHY McKENNA and MICHAEL McKENNA lived off of the Company. TIMOTHY McKENNA/MICHAEL McKENNA submitted on their expense reimbursements:

- Cigarettes, drinks and snacks "hidden" in fuel receipts.

18417809v.1

- Snacks and drinks for the office that were exclusively for TIMOTHY McKENNA and MICHAEL McKENNA.

- Every single meal, whether a bagel from Wawa or a $45 steak from Sullivan's. TIMOTHY McKENNA would turn in meal receipts even if TIMOTHY McKENNA ate alone.

- Office supplies for TIMOTHY McKENNA's home office including an HP printer. TIMOTHY McKENNA was constantly purchasing office supplies for TIMOTHY McKENNA's home office including refills for his Cross pen.

- If TIMOTHY McKENNA had a personal errand, such as a shoe shine, TIMOTHY McKENNA would submit the parking fee for reimbursement.

- Lunch and dinner meetings with potential customers that never materialized under the guise of Company business with the third parties that are part of this action.

170.   Both TIMOTHY McKENNA and MICHAEL McKENNA used the Company owned vehicles, fuel, email accounts, and expense accounts for their personal and McKenna American business related activities. McKenna American is TIMOTHY McKENNA and MICHAEL McKENNA's defunct company that TIMOTHY McKENNA and MICHAEL McKENNA used to continue to do business for themselves outside the Company.

171.   Through forensic accounting, several criminal activities were uncovered in February 2016.

172.   MICHAEL McKENNA had a scam where MICHAEL McKENNA would turn in phony credit card receipts he picked up from gas stations. There are over 30 instances of MICHAEL McKENNA submitting phony credit card receipts as MICHAEL McKENNA's own and being reimbursed.

173.   MICHAEL McKENNA had another fuel scam wherein he would submit "pre-paid" receipts for reimbursement. A "pre-paid" receipt is a receipt one is given when one pays cash up front and then pumps fuel. For example, MICHAEL McKENNA would pay $100,

get a "pre-paid" receipt showing $100 paid. Then MICHAEL McKENNA would pump $80 worth of fuel and get a refund of $20 as well as a final receipt showing the actual fuel amount purchased. MICHAEL McKENNA would submit the "pre-paid" receipt for reimbursement. MICHAEL McKENNA knew full well he was to submit "final" receipts and not "pre-paid" receipts for reimbursement as MICHAEL McKENNA wrote this on several "pre-paid" receipts submitted.

174.    Additionally, former employee Dan Coggins caught MICHAEL McKENNA doing this fraud, confronted him, and MICHAEL McKENNA promised he would stop so Dan did not report it. Dan did copy all of the receipts in question, totaling $5,857.93 from February, 2013 – May 2013. The only reason this activity stopped was because in April, 2014 the Company began using a more secure fleet fuel card service that prevented cash fuel transactions. However, TIMOTHY McKENNA and MICHAEL McKENNA attempted several fraudulent fuel reimbursements by submitting fleet card receipts as reimbursable cash receipts.

175.    Spreadsheets analyzing TIMOTHY McKENNA and MICHAEL McKENNA's expenses and loans outline a massive fraud.  To date, TIMOTHY McKENNA and MICHAEL McKENNA have stolen over $500,000 from the Company.  Detailed analysis of TIMOTHY McKENNA and MICHAEL McKENNA's expenses is ongoing.

176.    TIMOTHY McKENNA took kickbacks from customers and vendors. TIMOTHY McKENNA lived off of personal loans from several Company lenders, vendors, customers and associates and stole Company resources to pay them back – offering "free" landscaping or snow removal in exchange for loans or personal debt forgiveness. TIMOTHY McKENNA's partial financial records indicate between December, 2012 and June, 2014,

transactions between TIMOTHY McKENNA and these individuals that are clearly loans and loan paybacks:

- SIBLEY - $11,000.00
- Apex Engineering - $18,000.00
- STRIVEFORCE - $56,300.00\
- Joe Scali - $59,000.00
- Sabatelli Trucking - $8,800.00
- EAISE - $45,000.00
- Doug McKenna - $15,000.00
- FALCONE - $56,000.00
- Chip French - $18,500.00
- Ed Morgan - $195,340.00
- Kathy Morgan - $20,000.00
- J. Ray Patterson – $9,200.00
- Norman Aerenson - $10,000.00
- Jim Colburn - $3,500.00
- Zeigler - $18.000.00
- Urban, Poole, & Heath - $47,650.00
- Charlene Walters - at least $10,000.00
- Dan Bachtle, Edge Construction - $9,000.00
- WILKINSON - $212,510.00
- HANK JULICHER - $16,100.00
- MOON NURSERIES - $2,500.00
- PAUL ISKEN and DON ISKEN – est. $200,000.00

18417809v.1

- MEYERS - $55,000.00

177.   There are significantly more transactions than those set forth in paragraph 162 hereinabove and they went unreported at tax time.

178.   TIMOTHY McKENNA arranged to make the payments on Kathy Morgan's Cadillac as payment of a personal debt, yet the Company ended up having to make the payments as TIMOTHY McKENNA had no money.

179.   TIMOTHY McKENNA made deals that were bad for the Company but good for him. TIMOTHY McKENNA purchased a CAT machine at above any reasonable market value, exclusively to do site work for WILKINSON at seriously below market rates.

180.   TIMOTHY McKENNA volunteered to head up American Winter Services' (AWS) salt supply during the 2013/14 snow season and because of his "experience" and "expertise" GAUDIOSO agreed, before the breath of the continuing frauds that had been discovered against the Company. TIMOTHY McKENNA used this position to broker deals to benefit himself, pay back personal debts (EAISE, AERENSON and SIBLEY) and generally position himself to create personal advantages, resulting in hundreds of tons of unaccounted for salt and thousands of pounds of unaccounted for calcium.

181.   TIMOTHY McKENNA spent a lot of time and money on tickets – representing them as a perk anyone doing business with the Company would enjoy. TIMOTHY McKENNA promised several associates of the Company tickets for the Super Bowl. He presented himself as having special connections that could acquire tickets where others could not.  TIMOTHY McKENNA, in fact, purchased tickets at regular prices through StubHub and ticket brokers, submitting the receipts to the Company as expenses

182.   Dan Bachtle, Eric Dunn and The Horsey Foundation were the most significant examples of TIMOTHY McKENNA's deceit. TIMOTHY McKENNA was given

large loans in exchange for super bowl tickets. TIMOTHY McKENNA never delivered the tickets. Eric Dunn in particular had gone to great expense (in excess of $100,000) booking hotels and flights to New Orleans and was literally at the door of the stadium when he discovered TIMOTHY McKENNA had not delivered the tickets. The Company had to pay Dunn $100,000 on TIMOTHY McKENNA's behalf for TIMOTHY McKENNA's theft and Dunn is still owed $50,000 from these transactions.

183. During the summer of 2014, the Company was actively pursuing snow contract renewals for the upcoming 2014/15 season. MICHAEL McKENNA was spearheading this activity. Around August, MICHAEL McKENNA informed Ron Coruzzi and Steven Coruzzi that MICHAEL McKENNA received a phone call from Ralph Magnatta of Brite Realty. MICHAEL McKENNA told Ron Coruzzi and Steven Coruzzi that Ralph informed him that Brite would not be renewing snow contracts with the Company because "you know why." MICHAEL McKENNA explained to Ron Coruzzi and Steven Coruzzi that "you know why" must have something to do with TIMOTHY McKENNA but played dumb as to what this actually meant.

184. Then around the beginning of October, 2014, an email exchange took place between Laura Mohr and Tara Ivins, a property manager for Endurance Realty. Tara Ivins advised Laura Mohr that she would not be renewing snow contracts with the Company due to an outstanding bill with Atco Fence Company. Laura Mohr informed Tara Ivins that the invoice in question was paid in a timely manner, but Laura Mohr never received a response back from Tara Ivins. The Company was also not awarded other Endurance contracts the Company had held for several years.

185. In mid-October 2014, MICHAEL McKENNA sent an email to a major marquee customer asking "if there was still an opportunity to...provide a proposal". As a

significant customer for several years, the Company was under the impression that MICHAEL McKENNA was actively pursuing this important renewal well before October. MICHAEL McKENNA, Ron Coruzzi and Steven Coruzzi rushed to produce a proposal which MICHAEL McKENNA submitted on November 7 – two days before MICHAEL McKENNA quit. The Company was not awarded the contract.

186.   At the end of October, the Company inquired to its contact at CBRE, Bridget O'Halloran, as to the status of the snow contract for Warrington Plaza, a contract the Company had for several years. Bridget O'Halloran informed the Company that CBRE decided to go with another contractor. When the Company asked which contractor Bridget O'Halloran advised they hired MERIT.

187.   The Company performed snow removal for Lipinski during the 2012/13 season.   Around February of 2013, Lipinski terminated the contract over some unclear complaints they had. The Company was owed $48,000 for work performed and Lipinksi refused to pay.

188.   GAUDIOSO, TIMOTHY McKENNA and the Vice Chairman of Lipinski met to discuss and the Vice Chairman indicated he would see what he could do.  To date, the bill remains unpaid.  In consort with TIMOTHY McKENNA's usual conduct, the Company believes and, therefore, avers that this receivable was converted by TIMOTHY McKENNA for TIMOTHY McKENNA's own benefit to curry favor with Lipinski. TIMOTHY McKENNA and the owner of Lipinksi are longtime friends and associates. Lipinksi is now contracting as MERIT.

189.   Then, just after November 9, 2014, the day MICHAEL McKENNA quit, GAUDIOSO, JIM PORTER and Ron Coruzzi contacted Robin McGill of Longview to check on

-43-

the status of the proposals the Company submitted. Robin McGill informed GAUDIOSO and Ron Coruzzi that the snow contracts were awarded to another contractor. When asked which contractor, Robin McGill refused to answer.

190. Also during this time, the Company was pursing renewals of snow contracts with US Facilities. The Company was having a difficult time arranging a meeting with its contact. It was learned that TIMOTHY McKENNA had been in contact with US Facilities in an attempt to steal the contract from the Company while he was still employed by the Company. Through a Chancery Court proceeding where the Company was awarded a Temporary Restraining Order against TIMOTHY McKENNA, MICHAEL McKENNA and Arnold Dunn, it was discovered that TIMOTHY McKENNA and MICHAEL McKENNA had already been awarded the US Facilities contracts at the insistence of the Chief Judge of Family court.

191. A short time after the sudden and unexpected loss of all of these significant contracts, the Company discovered that on September 5, 2014, TIMOTHY McKENNA, MICHAEL McKENNA and Arnold Dunn and Catharine McKenna (TIMOTHY McKENNA'S wife) had incorporated a company called MAT Site Management (Michael Arnold Timothy-standing for MAT), apparently with the help of FALCONE of SAUL EWING. It has been learned that MAT Site Management was awarded snow contracts by at least LONGVIEW, US Facilities, Brite Realty and the Company suspects others. The LONGVIEW contracts were awarded to MAT Site Management as a reward for TIMOTHY McKENNA getting LONGVIEW out of paying the Company over $400,000 in proper snow invoices from the 2013/14 snow season.

192. It is believed that MICHAEL McKENNA, while still employed by the Company, was not pursing contracts on the Company's behalf but on the behalf of MAT Site

Management.  In an email from Jackie Scanzello of LONGVIEW to Laura Mohr wherein Jackie Scanzello asks for a digital copy of the proposal TIMOTHY McKENNA dropped off and also in an email where Robin McGill indicates "...if MICHAEL McKENNA leaves..." showing Robin McGill knew MICHAEL McKENNA was intending on leaving the Company as early as July 1, 2014.  It is also believed that when snow contracts held previously by the Company were not awarded to MAT Site Management, TIMOTHY McKENNA and MICHAEL McKENNA had a hand and benefited in getting those contracts awarded elsewhere for instance, to Merit.\

193.   Since TIMOTHY McKENNA's termination in June, 2014 and the incorporation of MAT Site Management on September 5, 2014, the Company has "lost" snow contracts with:

- Longview

- Endurance

- Brite Realty

- U.S. Facilities

- CBRE

- Brooks Range (SSA)

- Citizens Bank Park

- Met Life Stadium

194.   These contracts had been held by the Company for many years, generating almost $3,000,000 in gross revenue for the Company in 2013/14 – almost two-third of the total gross revenue earned by the Company that season.

195.   Since MICHAEL McKENNA's resignation on November 9, 2014, TIMOTHY McKENNA and MICHAEL McKENNA have continued to engage in criminal activity that harms the Company.  Specifically:

-45-

- TIMOTHY McKENNA contacted the Company's insurance agent asking if he provided the Company with any insurance. TIMOTHY McKENNA indicated that if that agent would provide TIMOTHY McKENNA with insurance that TIMOTHY McKENNA could obtain a marquee contract. TIMOTHY McKENNA also said that if the Company agent did provide insurance to the Company, that WILKINSON, a large customer of the agent, would pull his business from the agent.

- TIMOTHY McKENNA asked for a meeting with a former subcontractor of TIMOTHY McKENNA who TIMOTHY McKENNA still owes a lot of money. The subcontractor performed snow removal services for TIMOTHY McKENNA at one time and continues to do so today under the subcontractor's own contracts. The Company and the subcontractor have recently entered into a contract for services at a site. TIMOTHY McKENNA apparently lured the subcontractor into the meeting with a plan to get all of his money that he is owed. At the meeting, TIMOTHY McKENNA indicated that he needed to act fast and for $5,000 cash TIMOTHY McKENNA could facilitate getting a marquee contract for the subcontractor. The subcontractor declined. The company filed a Contempt of Court proceeding against TIMOTHY McKENNA for violation of the TRO.  It has been learned that just before the New Year and after the Company filed a Contempt of Court proceeding for violation of the TRO, TIMOTHY McKENNA again contacted the subcontractor and askedif subcontractor was in business with the Company. TIMOTHY McKENNA shows a willful disregard for the court mandated TRO.

- On or about the beginning of 2015, HANK JULICHER threatened GAUDIOSO and the Company with an involuntary bankruptcy that was being organized by TIMOTHY McKENNA and involved HANK JULICHER and SIBLEY. TIMOTHY McKENNA has been attempting to organize this involuntary bankruptcy since at least the time he was terminated, although suspicion is that it's been planned since GAUDIOSO purchased the Company. TIMOTHY McKENNA has said repeatedly that he intends to destroy the Company and GAUDIOSO personally. GAUDIOSO was told by John Morgan of Chemical Equipment Labs that during a conversation Morgan had with MICHAEL McKENNA, Morgan asked MICHAEL McKENNA why MICHAEL McKENNA left the Company.  MICHAEL McKENNA replied that MICHAEL McKENNA's father (TIMOTHY McKENNA) was "obsessed" with destroying the Company and "when TIMOTHY McKENNA sets TIMOTHY McKENNA's mind on something like that TIMOTHY McKENNA doesn't let it go."

196.    TIMOTHY McKENNA kept a lot of personal financial information in the

Company offices and TIMOTHY McKENNA's assistant, Mary Tresize handled all of

-46-

TIMOTHY McKENNA's personal and business finances. She used a Company owned laptop, her personal email account, and a hand written ledger containing symbol notations that seem to indicate if a check cleared, was returned, or was a stop payment. Between January, 2013 and June, 2014 there were:

- Stop Payments - $158,929.36

- NSF Returned Checks - $563,554.73

197. As demonstrated in the worksheets, TIMOTHY McKENNA bounced a significant number of checks. He promised to pay people, would give them a check, and then stop payment on it. His bank account was constantly overdrawn and checks would be returned. TIMOTHY McKENNA would write checks to Janssen's Market to get cash as his bank would not cash his checks because there were no funds to cover in his account.

198. Despite unequivocal instructions from GAUDIOSO to the contrary, TIMOTHY McKENNA and Mary Tresize did McKenna American work from the Company offices and had McKenna American correspondence sent to the Company office. TIMOTHY McKENNA performed almost no work on behalf of the Company during the period from early 2014 until GAUDIOSO fired him for cause in June, 2014.

199. TIMOTHY McKENNA used Company assets and his time was spent exclusively to work deals for himself. He contracted with MJL Enterprises through his defunct company, McKenna American, to deliver salt for the State of NJ. He contracted with Indian Valley to haul the salt. But Indian Valley was charging TIMOTHY McKENNA more that TIMOTHY McKENNA was making from MJL Enterprises. Indian Valley wasn't getting paid and would call the Company office looking for payment even though the Company had nothing to do with it. All TIMOTHY McKENNA cared about was having an income stream – paying his

-47-

vendors was not a concern. And because McKenna American was not a real company and had no bank account, MJL Enterprises was inappropriately paying TIMOTHY McKENNA personally, wiring payments directly to TIMOTHY McKENNA's personal bank account.

200.    TIMOTHY McKENNA fraudulently had health insurance for himself and his wife Catherine through TIMOTHY McKENNA's defunct McKenna American.  In order to keep the minimum number of "employees" required to keep the coverage in force he covered Company employed laborers as McKenna American employees, even though they did absolutely no work for McKenna American. The Company was reimbursing TIMOTHY McKENNA for his health insurance premiums.

201.    TIMOTHY McKENNA spent a considerable amount of time working on a coal mine/natural gas deal with an attorney named Joe Scali that involved SNYDER and FALCONE of SAUL EWING, MEYERS, and others.   Joe Scali also loaned TIMOTHY McKENNA at least $50,000 and it is unclear if Joe Scali has been paid back.

202.    TIMOTHY McKENNA attempted to maintain a certain lifestyle he and his wife, Catherine were accustomed to. He maintained memberships at Greenville and Fieldstone Country Clubs, struggled to pay for them, yet was never ejected. It is believed that WILKINSON actually owns TIMOTHY McKENNA's Fieldstone membership.

203.    TIMOTHY McKENNA claimed he was unable to claim bankruptcy because that would mean losing his house, his health insurance and his social status.

**MJL Enterprises**

204.    MJL Enterprises is a company based in Virginia that sells materials to various government agencies.

205. In January, 2014, LG was introduced to MJL Enterprises by a common vendor.

206. Marty Hierholzer and Ron Halsey of MJL Enterprises had dinner with TIMOTHY McKENNA, Ron Coruzzi, and GAUDIOSO around March, 2014 at Sullivan's near the Company's office location. It was about this same time that TIMOTHY McKENNA and MJL Enterprises began a salt transaction deal that took place with no Company involvement.

207. The Company spent hundreds of hours assembling a bid as MJL Enterprises' subcontractor for the State of NJ's "Good Neighbor Program." MJL Enterprises had no landscaping experience and relied completely on the Company's expertise.

208. Per the required specifications in the NJDOT bidding documents, the Company was identified specifically in the bid documents as the subcontractor party that would be providing the landscaping services.

209. MJL Enterprises represented to the Company that the Company would be providing the landscaping for any work awarded to MJL Enterprises under the Good Neighbor Program. On August 13, 2014 the bid was approved.

210. On or about September 4, 2014, TIMOTHY McKENNA and MICHAEL McKENNA and Arnold Dunn, a neighbor of TIMOTHY McKENNA, set up a company called MAT Site Management, at the time unbeknownst to anyone at the Company.

211. On September 23, 2014, the State of NJ informed MJL Enterprises and the Company via email that it wanted landscaping work in Hackensack, NJ performed.

212. On September 26, 2014, the Company, specifically Ron Coruzzi and MICHAEL McKENNA, met with NJDOT employees at the site in Hackensack. MJL Enterprises did not attend.

-49-

213.    On October 10, 2014, NJDOT issued a work order to MJL Enterprises as a result of the meeting.

214.    On October 22, 2014, MJL Enterprises submitted a purchase order and contract to MICHAEL McKENNA for work in Hackensack, NJ. The contract terms were inconsistent with the NJ bid requirements and specifically limited the contract to a project by project basis in direct conflict with the three year term of the NJ contract. MICHAEL McKENNA did not notify anyone at the Company about the purchase order with the intention of forcing the Company to lose the contract and MAT Site Management gaining the contract.

215.    On or about November 7, 2014, the Company paid off a loan from PETTINARO or (Greg Pettinaro if not an initial defendant?).  It was discovered that MICHAEL McKENNA told TIMOTHY McKENNA about this and TIMOTHY McKENNA told HANK JULICHER, also a creditor of the Company. HANK JULICHER called Jim Porter, then CEO of the Company, screaming about the Company paying PETTINARO and not HANK JULICHER. Ron Coruzzi confronted MICHAEL McKENNA about this unauthorized disclosure of confidential company information despite his previous promise to Gaudioso and Ron Coruzzi to be a loyal employee which Gaudioso rewarded with a buy in opportunity. MICHAEL McKENNA admitted he shared this confidential company information with TIMOTHY McKENNA.  TIMOTHY McKENNA had been fired for cause back in June of 2014. MICHAEL McKENNA quit on November 9, 2014 before Ron Coruzzi could speak further to MICHAEL McKENNA about this breach of fiduciary duty.

216.    On or about November 11, 2014, the Company discovered the purchase order for the Hackensack work and contacted MJL Enterprises to notify them about MICHAEL McKENNA's departure and ascertain what damage MICHAEL McKENNA had done.

-50-

217.   On November 14, 2014, Ron Coruzzi received a call from Ron Halsey informing Ron Coruzzi that MJL Enterprises had decided to go in a different direction and would have the Hackensack project completed by someone else.  MJL Enterprises refused to identify who would be doing the work. Ron Coruzzi reminded Ron Halsey that the Company had an outstanding purchase order for the work and within minutes Ron Coruzzi received an email from Ron Halsey cancelling the purchase order.   The Company was also informed that MJL Enterprises would not be using the Company as its exclusive landscaping contractor in connection with the Good Neighbor Project.

218.   On January 6, 2015, the Company advised MJL Enterprises that refusal to use the Company as its landscaping contractor under the Good Neighbor Program was a breach of NJDOT contract and the Company sent MJL Enterprises an invoice for $160,000 for the work the Company put into the bid.

219.   On March 9, 2015, MJL Enterprises filed suit against the Company in Virginia for amounts they claimed were lost due to the Company's delay in beginning the Hackensack project. The truth of which is the project manager for the Hackensack project postponed the project until spring per an email to Ron Coruzzi.

220.   On March 18, 2015, MJL Enterprises in collusion with the MCKENNA's submitted to TIMOTHY McKENNA the bid documents required to operate as a subcontractor under the NJ Good Neighbor Program.

221.   The TRO the Company obtained against TIMOTHY McKENNA, MICHAEL McKENNA and MAT Site Management on January 16, 2015 included that the only dealings they could have with MJL Enterprises was TIMOTHY McKENNA's salt deal.

-51-

222.    TIMOTHY McKENNA's salt contract was between MJL Enterprises and McKenna American, TIMOTHY McKENNA's company that was and remains defunct. The contract provided for McKenna American trucking salt MJL Enterprises purchased via McKenna American from Chemical Equipment Labs at $9.00/ton to various locations in NJ. MJL Enterprises inappropriately wired payments directly to TIMOTHY McKENNA and not to a McKenna American bank account because McKenna American could not open a bank account.

223.    TIMOTHY McKENNA then sub-contracted with Indian Valley to do the hauling of the salt. But the cost of the hauling was set at $14.25/ton. TIMOTHY McKENNA lost money on each haul, but didn't care. As long as he could invoice MJL Enterprises and retain the proceeds for himself, he did not care about paying Indian Valley as evidenced in the many emails between Indian Valley and TIMOTHY McKENNA where Indian Valley is demanding payments, having stop payments put on checks, and threating to take legal action. Per TIMOTHY McKENNA's bank ledgers, TIMOTHY McKENNA was only able to pay Indian Valley via wire transfers into TIMOTHY McKENNA's account from WILKINSON.

224.    It is unclear, but emails show remaining balances due to TIMOTHY McKENNA went to either MEYERS or to TECHIVATE, WILKINSON's trucking company that took over the hauling.

**Moon Nurseries**

225.    TIMOTHY McKENNA concocted a "plants-for-salt" deal with PURSELL of MOON NURSERIES.

226.    Under the deal, $250,000 in plants were to be delivered at retail but traded at their cost and AWS' salt cost. The plants had a 20% mark-up, and the deal was for plants at cost for salt at cost plus 5% for shipping and handling. That meant that $208,000 in salt plus

-52-

shipping translated into $250,000 in plants at their standard retail in exchange. Any additional salt deliveries were to be paid in cash.

227.    By the end of December, 2013, MOON NURSERIES had accrued about $125,000 in salt.  At this time, GAUDIOSO became suspicious of the deal and told TIMOTHY McKENNA to stop further deliveries of salt to MOON NURSERIES.  TIMOTHY McKENNA ignored this.

228.    By Mid-January, MOON NURSERIES had accrued about $350,000 in salt.

229.    When the Company went to collect, MOON NURSERIES refused to pay, saying they did not receive certain salt shipments.

230.    MOON NURSERIES agreed that they gave the Company $137,000 in plants. The total at their retail price for plants was supposed to be $250,000.

231.    Plaintiffs provided MOON NURSERIES, approximately $168,000 of salt over the value of plants delivered.  In addition, there were other loads that were shipped that they were disputing resulting in another approximately $50,000.

232.    The actual cash and plant amounts tied to the Company's accounts payable, is over $300,000.

233.    The "plant exchange value" in the calculation was not all received. It is a number that was supposed to be received in order to arrive at the amount of cash owed.

234.    The Company did not know going into its contract with MOON NURSERIES that MOON NURSERIES has a long reputation for this kind of behavior which was why MOON NURSERIES could not get salt from anyone unless they paid cash. The

Company relied on TIMOTHY McKENNA working for the Company when he was actually working for his and MOON NURSERIES benefit.

235.    Moreover, MOON NURSERIES was reportedly in serious financial trouble. They were cash poor, but they had plants -- plants that the Company needed for the following season.

236.    It was subsequently learned by the Company through emails from John Lynch to TIMOTHY McKENNA over the Company's servers that TIMOTHY McKENNA was claiming he had a $300,000 personal credit with MOON NURSERIES.

237.    Ultimately, TIMOTHY McKENNA set up this dealing knowing full well that MOON NURSERIES would not uphold their end of the deal, giving TIMOTHY McKENNA that asset to use for his own benefit - a plants credit for his future use.

238.    HANK JULICHER was a lender to the Company.  The Company owed HANK JULICHER $275,000.  HANK JULICHER agreed to take the plants that the Company did receive from MOON NURSERIES for a $100,000 reduction of the debt.  HANK JULICHER then convinced TIMOTHY McKENNA to assume another $100,000 of the Company's debt, leaving $75,000 the Company owed to HANK JULICHER.

239.    In June 2015, GAUDIOSO first learned that HANK JULICHER was working with TIMOTHY McKENNA and had made a significant financial investment in MOON NURSERIES.  HANK JULICHER was putting substantial pressure on GAUDIOSO, going so far as to threaten violence, to settle the "plants-for-salt" issue with MOON NURSERIES  for much less that the Company was owed.

240.    GAUDIOSO, in a meeting with WRIGHT who is HANK JULICHER's partner, asked if he could help WRIGHT and HANK JULICHER with MOON NURSERIES and

-54-

WRIGHT replied, "We have MOON NURSERIES under control". So HANK JULICHER, unknown to GAUDIOSO at the time, was negotiating with an entity that had defrauded the Company. Moreover HANK JULICHER had taken a "controlling" financial interest using Company information in that very entity that HANK JULICHER knew, with TIMOTHY McKENNA's help, had defrauded the Company.

241.    It is believed and therefore averred that MOON NURSERIES delivered these plants on WILKINSON's property for use next spring.

**Saul Ewing**

242.    Saul Ewing was counsel of record for Laurel Gardens Holdings (the Company) from March 2012 through February 2015. In August of 2012, Saul Ewing executed the documents that removed TIMOTHY McKENNA's .001% ownership and made GAUDIOSO the sole member.

243.    Evan Foster said to GAUDIOSO that Saul Ewing only represents the Company, not GAUDIOSO personally or anyone else at the Company.

**Dave Falcone**

244.    TIMOTHY McKENNA, MICHAEL McKENNA and Dave Falcone conspired to steal Company labor and resources to perform extensive free work at Dave Falcone's house in exchange for legal work and personal loans from Dave Falcone to TIMOTHY McKENNA and MICHAEL McKENNA.

245.    This free work was also performed at another property owned by Dave Falcone, 453 Marlbridge Road. Once GAUDIOSO became aware of TIMOTHY McKENNA and MICHAEL McKENNA's activity, he advised Evan Foster and FALCONE. FALCONE

18417809v.1

panicked and immediately paid the Company for the work it invoiced him for, about $26,000. The Company has since discovered more work the Company provided Falcone.

**Improper Billing**

246.    On at least one instance, Saul Ewing (Evan Foster in particular) used the Company's Saul Ewing account to bill TIMOTHY McKENNA, MICHAEL McKENNA, Catherine McKenna (TIMOTHY McKENNA's wife) and/or McKenna American for legal services. This was done as, according to Evan Foster's email, "neither McKenna American nor the MCKENNA'S personally are active clients in our system". The Company paid this bill. The Company believes and therefore avers it has paid for other non-Company related legal expenses that were actually for the MCKENNAS.

247.    At the same time, Saul Ewing generated this invoice, Saul Ewing was billing the MCKENNAS under a Saul Ewing account called "Iron Oak Development," which was an entity TIMOTHY McKENNA owned with PETTINARO. Not sure accurate??

248.    Also, Saul Ewing did not want to officially represent McKenna American as McKenna American owed Saul Ewing a significant amount of money.

**John Snyder**

249.    SNYDER, supervisor to Evan Foster and FALCONE, unethically represented or participated with TIMOTHY McKENNA on a number of occasions in conflict with his representation of the Company:

- He represented TIMOTHY McKENNA on TIMOTHY McKENNA's issues with the ISKEN.

- On or about September, 2012, he advised TIMOTHY McKENNA on TIMOTHY McKENNA's employment contract with the Company, which GAUDIOSO found out about and advised SNYDER that he cannot do.

- He developed a program with TIMOTHY McKENNA and Dave Horsey to get Horsey's sand approved for oil drilling.

-56-

- He, along with TIMOTHY McKENNA, WILKINSON, and MEYERS defrauded Wilmington Trust by hiding an asset WILKINSON owned, the Mica quarry, valued at $25,000,000.

250.    In June 2014, shortly after TIMOTHY McKENNA was terminated for cause by the Company, John Snyder, friends with TIMOTHY McKENNA since at least college, told TIMOTHY McKENNA he could no longer associate with him.

251.    Around February, 2015, the Company received a termination letter from Saul Ewing, indicating Saul Ewing would no longer represent the Company due to an outstanding balance. This balance was a mere few hundred dollars.

**Frank Alcaraz/Strive Force**

252.    Strive Force, a company operated by ALCARAZ, provided labor and payroll services to the Company for snow removal.  ALCARAZ is also the Vice President of Finance for WILKINSON.

253.    Because of their experience in the snow removal business, TIMOTHY McKENNA and MICHAEL McKENNA were left to run snow removal operations for The Company per GAUDIOSO'S instruction.  Like other instances, TIMOTHY McKENNA and MICHAEL McKENNA, in collaboration with ALCARAZ used their positions to commit fraud against The Company, diverting funds and resources to forgive debts owed by TIMOTHY McKENNA and MICHAEL McKENNA.

254.    The Company entered into a contract with STRIVE FORCE for snow labor. ALCARAZ, in conjunction with MICHAEL McKENNA, assembled hours and issued paychecks for the snow laborers and submitted to The Company bulk payroll amounts due to Strive Force – without back up.  Per TIMOTHY McKENNA, "Frank Alcaraz adds 10% to the labor number each week to cover his costs". The Company paid the amounts claimed due by ALCARAZ in good faith as there was no cause to think otherwise.

-57-

255.    During an extremely busy winter, numerous errors were made by ALCARAZ and MICHAEL McKENNA (missing laborers, missing checks, incorrect check amounts) and it had become apparent that ALCARAZ and MICHAEL McKENNA were terrible at keeping track of the snow labor.  Ron Coruzzi began assisting in this task and the paperwork improved.

256.    At the conclusion of this above average snow season when The Company began reconciling the Strive Force account, it had to request all back up for the entire season from ALCARAZ, which he did eventually supply. The Company discovered an extensive amount of discrepancies in the invoicing from Strive Force. Spreadsheets were produced detailing these errors.

257.    The Company was advised by TIMOTHY McKENNA that "Frank needed to make 25% for costs and profit". It wasn't until after the snow season while the Company was reconciling the Strive Force account that the Company realized that the contract rates Strive Force charged The Company gave STRIVE FORCE a 40% profit.  This was intentional to get the Company to cover money owed to ALCARAZ and possibly WILKINSON by TIMOTHY McKENNA and MICHAEL McKENNA.

258.    There were also a significant number of paychecks written to laborers that were never handed out and never cashed. The Company was invoiced by STRIVE FORCE for these checks for about $3,000.  Also, the Company has discovered one check cut by ALCARAZ for a laborer employed by SIBLEY for snow removal at Met Life Stadium. Both Frank Alcaraz and SIBLEY invoiced the Company for this laborer.

259.    In addition to significant invoicing errors, Strive Force was to be back charged for van rentals, food, fuel, and cash used to perform snow removal.  Once The Company

-58-

analyzed the invoices and took into account the back charges, it was shocked to learn that the Company had overpaid Strive Force and Frank Alcaraz by over $200,000. Yet, Frank Alcaraz claims that he is owed $220,000 by The Company.

260.    The Company believes and, therefore, avers that, with TIMOTHY McKENNA and MICHAEL McKENNA's help, ALCARAZ submitted inflated labor amounts to The Company to pay debts owed to Frank Alcaraz and/or WILKINSON.

**Charles Wilkinson**

261.    WILKINSON is the owner of Wilkinson Builders and the former owner of LG. TIMOTHY McKENNA and WILKINSON have a "special" relationship.

262.    WILKINSON and TIMOTHY McKENNA along with ALCARAZ created phony credit card charges on a company AMEX that was in TIMOTHY McKENNA's name but was for company use only. The card was provided by Chemical Equipment Labs as a way to help the Company.

263.    On two separate occasions in April through June 2013, phony charges were made to this card through WILKINSON's merchant account with the cash going to TIMOTHY McKENNA. The Company paid the charges not knowing they were phony.

264.    After GAUDIOSO found out, TIMOTHY McKENNA signed a confession saying he stole $68,000 with a promise to pay it back. It has never been paid back.

265.    At TIMOTHY McKENNA and MICHAEL McKENNA's direction, unbilled work was performed for WILKINSON using stolen Company assets at White Clay Knoll, the "Brick House", and Chrissy Wilkinson's residence.

266.    TIMOTHY McKENNA and MICHAEL McKENNA arranged a contract with WILKINSON were the Company would dig basements for $750 per basement. TIMOTHY

McKENNA also arranged the purchase of a CAT machine to dig the basements faster. Forensic review has shown that $750 per basement was well below market and the Company was losing money on each basement. This was purposefully done by TIMOTHY McKENNA and MICHAEL McKENNA for their benefit with WILKINSON.

267.    WILKINSON has financially supported TIMOTHY McKENNA for years and continues to do so.

268.    WILKINSON is also the owner of TECHNIVATE a trucking company TIMOTHY McKENNA used for his personal salt deal with MJL Enterprises…a deal TIMOTHY McKENNA worked on using Company assets. TIMOTHY McKENNA purposefully arranged this deal to lose money. His trucking contract rates with Indian Valley trucking was more than he was getting paid by MJL Enterprises. TIMOTHY McKENNA did not care as he is only ever interested in collecting whatever he can without regard to what he needs to pay out.

269.    TIMOTHY McKENNA also arranged to have TECHNIVATE perform snow removal at AERENSON's Polly Drummond Shopping Center and to invoice AWS for those services. TIMOTHY McKENNA was giving AERENSON free snow work in exchange for a loan.

270.    On November 19, 2015, Laura Mohr received a phone call from Dave Clark of Wilkinson to allegedly offer Laura Mohr a job. Dave Clark indicated they had a lot of developments opening.  This is where the Company believes "plants-for-salt" materials will end up.  Laura Mohr indicated that she felt Dave Clark was fishing for information on the Company and/or attempting to get Laura Mohr on WILKINSON's side by hiring her. Laura Mohr asked if Dave Clark had seen TIMOTHY McKENNA.   Dave Clark replied that since TIMOTHY

18417809v.1

McKENNA owed so much money to WILKINSON that they were "stuck with him [TIMOTHY McKENNA]."

## COUNT I
### Aiding and Abetting Breach of Fiduciary Duty
### (vs. All Defendants)

271.    Plaintiffs incorporate by reference paragraphs 1 through 256 as if set forth herein at length.

272.    Under Pennsylvania law, a cause of action exists for aiding and abetting a breach of fiduciary duty pursuant to Section 876 of the Restatement (Second) of Torts.

273.    The elements of a cause of action for aiding and abetting a breach of fiduciary duty are: (1) a breach of a fiduciary duty owed to another; (2) knowledge of the breach by the aider and abettor; and (3) substantial assistance or encouragement by the aider and abettor in effecting that breach.

274.    In each of the transactions described in paragraphs 47 through 256 heretofore, TIMOTHY MCKENNA and MICHAEL MCKENNA by virtue of their positions with the Plaintiffs owed a fiduciary duty to the Plaintiffs.

275.    In each of the transactions described in paragraphs 47 through 256 heretofore, the defendants named therein in each specific transaction were aware that TIMOTHY MCKENNA and MICHAEL MCKENNA by virtue of their positions with the Plaintiffs owed a fiduciary duty to the Plaintiffs.

276.    As a result of the aiding and abetting a breach of fiduciary duty averred herein, Plaintiffs have suffered damages.

277.    In each of the transactions described in paragraphs 47 through 256 heretofore, the defendants named therein in each specific transaction gave substantial assistance or encouragement to TIMOTHY MCKENNA and MICHAEL MCKENNA and they each,

18417809v.1

individually and severally aided and abetted in effecting the various breaches of fiduciary duty by TIMOTHY MCKENNA and MICHAEL MCKENNA.

278.   As a result of the aiding and abetting a breach of fiduciary duty averred herein, Plaintiffs have suffered damages.

WHEREFORE, Plaintiffs demand judgment in their favor together with interest, costs and attorneys' fees as permitted by law in an amount in excess of $150,000.00.

## COUNT II
### Civil Conspiracy
### (vs. All Defendants)

279.   Plaintiffs incorporate by reference paragraphs 1 through 261 as if set forth herein at length.

280.   To state a valid claim for civil conspiracy in Pennsylvania, a party must show that: "two or more persons combined or agreed with intent to do an unlawful act or to do any otherwise lawful act by unlawful means."

281.   In each of the transactions described in paragraphs 47 through 256 heretofore, the defendants individually and severally conspired to assist TIMOTHY MCKENNA and MICHAEL MCKENNA to engage in the following acts:

       a.    Conversion;

       b.    breach of fiduciary duty;

       c.    theft of services;

       d.    fraud;

       e.    intentional interference with contractual relationships;

       f.    intentional interference with prospective contractual relationships.

282.   As a result of the conspiracy averred herein, Plaintiffs have suffered damages.

18417809v.1

In each of the transactions described in paragraphs 47 through 256 heretofore, the defendants named therein in each specific transaction gave substantial assistance or encouragement to TIMOTHY MCKENNA and MICHAEL MCKENNA and they each, individually and severally aided and abetted in effecting the various breaches of fiduciary duty by TIMOTHY MCKENNA and MICHAEL MCKENNA.

WHEREFORE, Plaintiffs demand judgment in their favor together with interest, costs and attorneys' fees as permitted by law in an amount in excess of $150,000.00.

**COUNT III**

**Conduct and Participation in an Enterprise through a Pattern of
Racketeering Activity in Violation of the Racketeer Influenced and Corrupt
Organizations Act ("RICO"), 18 U.S.C. §1962(c)
(All Plaintiffs v. All Defendants)**

283. Plaintiffs incorporate herein by reference each of the foregoing allegations as if fully set forth at length.

284. LG, AWS, GSBB, LGH, GAUDIOSO and LGSM are each a "person" under 18 U.S.C. §§ 1961(3) and 1962(c).

285. TIMOTHY McKENNA, MICHAEL McKENNA, MAT SITE MANAGEMENT, AERENSON, PETTINARO, MEYERS, WILKINSON, WILKINSON BUILDERS, TECHNIVATE, DiDONATO, EAISE, EAISE DESIGN  EAISE SNOW SERVICES, HAINES & KIBBLEHOUSE, INC., JULICHER, JULICHER, DON ISKEN, PAUL ISKEN, LONGVIEW MANAGEMENT, SIBLEY, M&M, ALAN PERRY, TRESIZE, WRIGHT, ALCARAZ, STRIVE FORCE MJL, HYNANSKI, NORMAN AERONSON, PURSELL, ISKEN ENTERPRISES, MOON, and FRONTIER, are each a "person" under 18 U.S.C. §§ 1961(3) and 1962(c).

-63-

286.    TIMOTHY McKENNA, MICHAEL McKENNA, MAT SITE MANAGEMENT, AERENSON, PETTINARO, MEYERS, WILKINSON, WILKINSON BUILDERS, TECHNIVATE, DiDONATO, EAISE, EAISE DESIGN  EAISE SNOW SERVICES, HAINES & KIBBLEHOUSE, INC., JULICHER, JULICHER, DON ISKEN, PAUL ISKEN, LONGVIEW MANAGEMENT, SIBLEY, M&M, ALAN PERRY, TRESIZE, WRIGHT, ALCARAZ, STRIVE FORCE MJL, HYNANSKI, NORMAN AERONSON, PURSELL, ISKEN ENTERPRISES, MOON, and FRONTIER were a group of persons associated in fact for the common purpose conducting the unlawful and fraudulent scheme described in this Complaint (the "MCKENNA" Enterprise"); namely, fraudulently and unlawfully seizing and/or asserting functional control over the Plaintiffs and their liquid assets and depleting those assets through a variety of unlawful and unauthorized transfers and other actions that (1) funneled money to TIMOTHY McKENNA, MICHAEL McKENNA, MAT SITE MANAGEMENT, AERENSON, PETTINARO, MEYERS, WILKINSON, WILKINSON BUILDERS, TECHNIVATE, DiDONATO, EAISE, EAISE DESIGN  EAISE SNOW SERVICES, HAINES & KIBBLEHOUSE, INC., JULICHER, JULICHER, DON ISKEN, PAUL ISKEN, LONGVIEW MANAGEMENT, SIBLEY, M&M, , ALAN PERRY, TRESIZE, WRIGHT, ALCARAZ, STRIVE FORCE MJL, HYNANSKI, NORMAN AERONSON, PURSELL, ISKEN ENTERPRISES, MOON, and FRONTIER; and (2) financially and professionally benefited TIMOTHY McKENNA, MICHAEL McKENNA, MAT SITE MANAGEMENT, AERENSON, PETTINARO, MEYERS, WILKINSON, WILKINSON BUILDERS, TECHNIVATE, DiDONATO, EAISE, EAISE DESIGN  EAISE SNOW SERVICES, HAINES & KIBBLEHOUSE, INC., JULICHER, JULICHER, DON ISKEN, PAUL ISKEN, LONGVIEW MANAGEMENT, SIBLEY, M&M, , ALAN PERRY, TRESIZE,

-64-

WRIGHT, ALCARAZ, STRIVE FORCE MJL, HYNANSKI, NORMAN AERONSON, PURSELL, ISKEN ENTERPRISES, MOON, and FRONTIER.

287.   The MCKENNA Enterprise constitutes an "enterprise" within the meaning of 18 U.S.C. §1961(4) and §1962(c), which "enterprise" was engaged in activities affecting interstate commerce, including but not limited to the business of the Plaintiffs, which are Pennsylvania limited partnerships or limited liability companies doing business in the Commonwealth of Pennsylvania, Delaware,  New Jersey and elsewhere.

288.   As detailed in the TIMOTHY McKENNA, MICHAEL McKENNA, MAT SITE MANAGEMENT, AERENSON, PETTINARO, MEYERS, WILKINSON, WILKINSON BUILDERS, TECHNIVATE, DiDONATO, EAISE, EAISE DESIGN  EAISE SNOW SERVICES, HAINES & KIBBLEHOUSE, INC., JULICHER, JULICHER, DON ISKEN, PAUL ISKEN, LONGVIEW MANAGEMENT, SIBLEY, M&M, , ALAN PERRY, TRESIZE, WRIGHT, ALCARAZ, STRIVE FORCE MJL, HYNANSKI, NORMAN AERENSON, PURSELL, ISKEN ENTERPRISES, MOON, and FRONTIER , and CHRISTOPHER W. WRIGHT were, and are, each associated with the MCKENNA Enterprise and have conducted or participated in the affairs of the MCKENNA Enterprise in relationship to the Plaintiffs through a pattern of activity unlawful under 18 U.S.C. 1961(a); specifically, multiple, repeated violations of 18 U.S.C. §1341(pertaining to mail fraud) and 18 U.S.C.§1343 (pertaining to wire fraud).

289.   As described herein and detailed below, TIMOTHY McKENNA, MICHAEL McKENNA, MAT SITE MANAGEMENT, AERENSON, PETTINARO, MEYERS, WILKINSON, WILKINSON BUILDERS, TECHNIVATE, DiDONATO, EAISE, EAISE DESIGN  EAISE SNOW SERVICES, HAINES & KIBBLEHOUSE, INC., JULICHER, JULICHER, DON ISKEN, PAUL ISKEN, LONGVIEW MANAGEMENT, SIBLEY, M&M,

-65-

ALAN PERRY, TRESIZE, WRIGHT, ALCARAZ, STRIVE FORCE MJL, HYNANSKI,

NORMAN AERENSON, PURSELL, ISKEN ENTERPRISES, MOON, and FRONTIER each

agreed to and participated in the conduct of the MCKENNA Enterprise by engaging in a "pattern

of racketeering activity" within the meaning of 18 U.S.C. §§ 1961(1) and (5).

    290.  The pattern of racketeering activity consisted of and was furthered by acts

constituting of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.  Specifically, by

way of example but not limitation:

    a)  TIM MCKENNA – See Exhibit "A"

      1. 3/24/14 - Tim received cash using Charlie Gaudioso's Amex at Centre Exxon

      2. 3/15/13 – Tim charged Company AMEX at Wilkinson for cash.

      3. Early 2013 – Tim signed a confession admitting to fraudulently using the Company AMEX to get cash. It is believed that these 'bounce backs' were charged through Wilkinson's merchant account.

      4. 4/27/13 – Tim sent the Company Walsh Contract to Ed Morgan, Sr and Dave Falcone of Saul Ewing.\

      5. 5/1/14 – MJL wires payment to Tim's personal bank account, not McKenna American.

    b)  MICHAEL MCKENNA – See Exhibit "B"

      1. 3/24/14 - Michael took cash Tim received at Centre Exxon using Charlie Gaudioso's Amex, deposited it into Tim's bank accounts, and fraudulently wrote on the receipts that the purchase was for fuel cards.

      2. 12/16/14 - Michael paid the Company a customer's outstanding debt. This customer is one that Tim and Michael arranged free work, after his resignation.

      3. 10/15/14 – Michael, using the Company's weather service, emailed a weather report to Robin, Jackie, and Vicki at Longview after he was working for MAT Site Management and MAT had Longview contracts and while still employed by the Company.

4. 10/13/14 – Michael, using the Company's weather service, emailed a weather report to Tim after Tim was fired for cause and Michael was working for MAT Site Management and MAT had Longview contracts and while still employed by the Company.

5. Various dates in 2014 – Michael using Company email to do work for Tim, unrelated to Company business, before and after Tim was fired for cause.

6. 4/26/13 – Michael's reservation at Homewood Suites owned by the Isken and site of "free" snow work.

c) MAT Site Management – See Exhibit "C"

1. 7/3/14 – Email regarding Glen Eyre project. The Company never bid or heard of this project. It is suspected Tim bid and/or contracted the project under MAT.

d) BOBBY AERENSON/NORMAN AERENSON – See Exhibit "D"

1. On or about 5/1/14 – The Company sent Aerenson a statement showing amount due for snow services. Aerenson mailed the statement back with a hand written note saying "Paid in full. See Tim".

2. 6/2/14 – The Company emailed Aerenson requesting explanation for the "See Tim" written on his statement. Aerenson emailed back, "See Tim".

e) PETTINARO – See Exhibit "E"

1. 10/1/14 – Hal Simmons email.

2. 6/8/14 – Email regarding the vacant lot where the Company did work but was not paid due to arrangement between Tim and Bobby Aerenson. Pettinaro told Charles Gaudioso that Pettinaro was partners with Aerenson on that project.

f) MEYERS – See Exhibit "F"

1. 8/4-5/14 - Email between Ira Gerber and Charles Gaudioso discussing the $25k.

2. 5/30/13 – Email regarding Saul Ewing contract and Mica quarry.

3. 6/5/13 – Email between Frank Alcaraz and Bernie Meyers regarding factoring.

-67-

g)    WILKINSON/WILKINSON BUILDER – See Exhibit "G"

1.    12/30/13 – Email from Elisa at Technivate indicates that part of a payment made by the Company to Technivate was used to pay Charles Wilkinson back a debt owed by Tim.

2.    2013-2014 – Charles Wilkinson wired significant sums into Tim's bank account, supporting Tim's activities against the Company.

3.    12/11/13 – Wilkinson purchase orders for basements at a low $600 rate and Wilkinson disputing amounts on other invoices from the Company.

h)    TECHNIVATE – See Exhibit "H"

1.    January-March 2014 – Technivate mailed invoices to the Company for work performed at Polly Drummond Shopping Center. The Company paid Technivate for snow services, but the Company was not paid by Bobby Aerenson, owner of the center, due to an agreement between Aerenson and Tim for free snow work.

2.    On or about 3/13/14 - Technivate did not invoice the Company for salt until the end of the season because it was using the Company's salt Tim had fraudulently delivered to the center. Technivate is owned by longtime Tim cohort Charles Wilkinson.

i)    THOMAS DIDONATO/CENTRE EXXON – See Exhibit "I"

1.    3/24/14 – Thomas DiDonato charged Charles Gaudioso's Amex and gave Tim the cash, fraudulently indicating on the receipts that the charges were for "parts" and "gift card".

2.    2/17/14 plus others – Thomas DiDonato charged fees on Charles Gaudioso's credit card (disguised as "parts") which is illegal (?)

*Visa and MasterCard prohibit surcharges, and American Express discourages them. Amex does prohibit "discrimination" against the Amex card, however, so if a merchant accepts Visa and MasterCard (and cannot impose a surcharge under those companies' rules), the merchant may not discriminate against Amex by imposing a surcharge.*

j)    EAISE, EAISE DESIGN & LANDSCAPING, LLC, EAISE SNOW SERVICES, LLC – See Exhibit "J"

1. 4/8/14 - Emailed invoice 4554 that is fraudulent as it is on the Company's list of invoices that Eaise double charged u

2. 4/8/14 - Emailed invoice 4555 that is fraudulent as it is on the Company's list of invoices that Eaise double charged us.

k)  HAINES & KIBBLEHOUSE, INC. – See Exhibit "K"

1. 12/6/13 - H&K faxed new contract to Michael, unbeknownst to the Company, with inflated rates.

2. On or about 11/19/14 - H&K mailed invoice with inflated rates.

l)  HANK JULICHER/MARGIT JULICHER/CHRIS WRIGHT – See Exhibit "L"

1. 4/22/14 - Emailed Tim personal loan agreement.

2. 4/18/14 - Emailed Tim regarding work to be done at Julicher's house that the Company was never intended to be paid for.

3. 9/23/14 – Email from Chris Wright regarding Company financial records.

4. 6/4/14 – Email from Chris Wright to Tim regarding MJL salt deal.

m)  DON ISKEN/PAUL ISKEN/ISKEN ENTERPRISES – See Exhibit "M"

1. 5/2/14 – One of a significant number of emails between Don and Paul Isken and Tim pressuring and threatening Tim about the money owed to the Isken by Tim.

2. 4/28/14 – Another email pressuring Tim for payment, this one referencing Tim's salt deal with MJL.

3. On or about 4/15/14 – Invoice sent to Homewood Suites/Isken for snow services.

4. 6/5/14 – Isken's response to Tim forwarding him an email from Chris Wright having to do with the MJL salt deal.

n)  LONGVIEW – See Exhibit "N"

1. 9/9/14 - Email from Jackie Scanzello to Laura Mohr asking for the Excel file of the contract TIM dropped off.10/15/14 - Michael emails WeatherWorks report to Robin, Jackie, and Vicki after

-69-

MAT is formed and has Longview contracts and before he quits the Company.

o)   SIBLEY/M&M LANDSCAPING – See Exhibit "O"

    1.   On or about 12/17/13 - Mailed invoice #1052 from M&M showing services at a marquee customer when AWS labor was onsite.

    2.   1/13/14 - Mailed invoice #1110 from M&M showing services at a marquee customer when AWS labor was onsite.

p)   HYNANSKI/ PERRY – See Exhibit "P"

    1.   On or about 11/7/13 - Letter mailed to Tim from Allen Perry regarding work at Pond's Edge.

    2.   10/11/13 - Email from Allen Perry to Michael regarding Pond's Edge and mentioning money owed to John Hynansky.

q)   TRESIZE – See Exhibit "Q"

    1.   2013-2014 - Mary was Tim's assistant and kept a hand written ledger of Tim's bank accounts and made hand written notations regarding the status of transactions.

    2.   2014 – Emails between Mary, Tim, and Indian Valley regarding past due payments, returned checks, and stop payments.

r)   ALCARAZ/STRIVE FORCE – See Exhibit "R"

    1.   On or about 2/2/14 – Frank Alcaraz mailed or emailed an invoice to the Company for snow labor at Met Life Stadium. One of the laborer's checks was never delivered and is believed to be fraudulent.

    2.   6/5/13 – Email between Frank Alcaraz and Bernie Meyers regarding factoring.

s)   MJL – See Exhibit "S"

    1.   3/18/15 - MJL emailing Tim bid documents.

    2.   11/14/14 - MJL emailing Ron Coruzzi cancelling contract.

    3.   5/1/14 – MJL wires payment directly to Tim's personal bank account, not to McKenna American.

        4. 6/16/14 – MJL email to Tim asking for Charles Wilkinson's email address.

t)    MOON NURSERIES/PURSELL – See Exhibit "T"

        1. 11/14/14 – Email from Chris Wright to Jim Porter discussing "negotiations" with Moon regarding amounts owed to the Company.

        2. 1/10/14 – Email from Tim to John Pursell advising of a "solution".

        3. 1/28/14 – Email from John Pursell to Charlie Gaudioso regarding the $250K worth of plants.

        4. 1/23/14 - Email from John Pursell to Charlie Gaudioso regarding the $250K worth of plants.

u)    SAUL EWING – See Exhibit "U"

        1. 8/31/12 - Email from Saul Ewing with invoice to the Company for McKenna business.

        2. 6/6/14 – Email from John Snyder to Tim advising Tim on the MJL salt deal.

291.    The scheme to defraud the Plaintiffs and unlawfully deplete their assets, accomplished through the commission of the acts set forth above in violation of federal and state laws, left Plaintiffs undercapitalized, unable to pay for expenses or to execute their business plans, and forced them to default on or forgo business opportunities at significant losses.

292.    As a direct and proximate cause of the aforementioned violations of 18 U.S.C. §1962(c) by TIMOTHY McKENNA, MICHAEL McKENNA, MAT SITE MANAGEMENT, AERENSON, PETTINARO, MEYERS, WILKINSON, WILKINSON BUILDERS, TECHNIVATE, DiDONATO, EAISE, EAISE DESIGN  EAISE SNOW SERVICES, HAINES & KIBBLEHOUSE, INC., JULICHER, JULICHER, DON ISKEN, PAUL ISKEN, LONGVIEW MANAGEMENT, SIBLEY, M&M, ALAN PERRY, TRESIZE, WRIGHT, ALCARAZ, STRIVE FORCE MJL, HYNANSKI, NORMAN AERENSON,

PURSELL, ISKEN ENTERPRISES, MOON, and FRONTIER, each of the Plaintiffs, suffered

substantial injury to business and/or property within the meaning of 18 U.S.C §1964(c) in an

amount to be determined at trial.

WHEREFORE, Plaintiffs demand judgment in their favor together with interest,

costs and attorneys' fees as permitted by law in an amount in excess of $150,000.00.

### COUNT IV

**Acquisition and Maintenance of an Interest in and Control of
an Enterprise  Engaged in a Pattern of Racketeering Activity in
Violation of RICO, 18 U.S.C. §1962(b)
(All Plaintiffs v. All Defendants)**

293.    Plaintiffs incorporate herein by reference each of the foregoing allegations

as if fully set forth at length.

294.    At various times and places as alleged in this Complaint and enumerated

in Plaintiffs' documentary material, TIMOTHY McKENNA, MICHAEL McKENNA, MAT

SITE MANAGEMENT, AERENSON, PETTINARO, MEYERS, WILKINSON, WILKINSON

BUILDERS, TECHNIVATE, DiDONATO, EAISE, EAISE DESIGN  EAISE SNOW

SERVICES, HAINES & KIBBLEHOUSE, INC., JULICHER, JULICHER, DON ISKEN,

PAUL ISKEN, LONGVIEW MANAGEMENT, SIBLEY, M&M, HEATH, ALAN PERRY,

TRESIZE, WRIGHT, ALCARAZ, STRIVE FORCE MJL, HYNANSKI, NORMAN

AERENSON, PURSELL, ISKEN ENTERPRISES, MOON, and FRONTIER acquired and/or

maintained, directly or indirectly, an interest in or control of each of the Plaintiffs, whose

activities affected interstate commerce, in violation of 18 U.S.C. §1962(b).

295.    As detailed in this Complaint, *e.g., supra* at ¶ 290, 310, 326 and 331,

TIMOTHY McKENNA, MICHAEL McKENNA, MAT SITE MANAGEMENT, AERENSON,

PETTINARO, MEYERS, WILKINSON, WILKINSON BUILDERS, TECHNIVATE,

-72-

DiDONATO, EAISE, EAISE DESIGN  EAISE SNOW SERVICES, HAINES & KIBBLEHOUSE, INC., JULICHER, JULICHER, DON ISKEN, PAUL ISKEN, LONGVIEW MANAGEMENT, SIBLEY, M&M, HEATH, ALAN PERRY, TRESIZE, WRIGHT, ALCARAZ, STRIVE FORCE MJL, HYNANSKI, NORMAN AERENSON, PURSELL, ISKEN ENTERPRISES, MOON, and FRONTIER each committed two or more of the RICO predicate acts that are itemized at 18 U.S.C. §§1961(1)(A) and (B), and did so in violation of 18 U.S.C. §1962(b) in order to further their own interests by and through their control of the Plaintiffs.

296.    TIMOTHY McKENNA, MICHAEL McKENNA, MAT SITE MANAGEMENT, AERENSON, PETTINARO, MEYERS, WILKINSON, WILKINSON BUILDERS, TECHNIVATE, DiDONATO, EAISE, EAISE DESIGN  EAISE SNOW SERVICES, HAINES & KIBBLEHOUSE, INC., JULICHER, JULICHER, DON ISKEN, PAUL ISKEN, LONGVIEW MANAGEMENT, SIBLEY, M&M, , ALAN PERRY, TRESIZE, WRIGHT, ALCARAZ, STRIVE FORCE MJL, HYNANSKI, NORMAN AERENSON, PURSELL, ISKEN ENTERPRISES, MOON, and FRONTIER, by and through their active participation in and/or by exercising control over Plaintiffs, in violation of 18 U.S.C. §1962(b), caused each of those entities to be undercapitalized, unable to pay for expenses or execute their business plans, and forced them to default on obligations and/or lose business opportunities and suffer significant losses.

297.    As a direct and proximate cause of the aforementioned violations of 18 U.S.C. §1962(b) by, Plaintiffs suffered substantial injury to business and/or property within the meaning of 18 U.S.C §1964(c) in an amount to be determined at trial.

WHEREFORE, Plaintiffs demand judgment in their favor together with interest, costs and attorneys' fees as permitted by law in an amount in excess of $150,000.00.

18417809v.1

## COUNT V

### Conspiracy to Engage in a Pattern of Racketeering
### Activity in Violation of RICO, 18 U.S.C.§1962(d)
### (All Plaintiffs v. All Defendants)

298.    Plaintiffs incorporate herein by reference each of the foregoing allegations as if fully set forth at length.

299.    TIMOTHY McKENNA, MICHAEL McKENNA, MAT SITE MANAGEMENT, AERENSON, PETTINARO, MEYERS, WILKINSON, WILKINSON BUILDERS, TECHNIVATE, DiDONATO, EAISE, EAISE DESIGN  EAISE SNOW SERVICES, HAINES & KIBBLEHOUSE, INC., JULICHER, JULICHER, DON ISKEN, PAUL ISKEN, LONGVIEW MANAGEMENT, SIBLEY, M&M, ALAN PERRY, TRESIZE, WRIGHT, ALCARAZ, STRIVE FORCE MJL, HYNANSKI, NORMAN AERENSON, PURSELL, ISKEN ENTERPRISES, MOON, and FRONTIER conspired amongst themselves within the meaning of 18 U.S.C. §1962(d) to violate 18 U.S.C. §1962(c) by agreeing to conduct and participate, directly and indirectly, in the conduct of the affairs of the MCKENNA Enterprise through a pattern of racketeering activity as detailed in this Complaint.  The agreement of TIMOTHY McKENNA, MICHAEL McKENNA, MAT SITE MANAGEMENT, AERENSON, PETTINARO, MEYERS, WILKINSON, WILKINSON BUILDERS, TECHNIVATE, DiDONATO, EAISE, EAISE DESIGN  EAISE SNOW SERVICES, HAINES & KIBBLEHOUSE, INC., JULICHER, JULICHER, DON ISKEN, PAUL ISKEN, LONGVIEW MANAGEMENT, SIBLEY, M&M, ALAN PERRY, TRESIZE, WRIGHT, ALCARAZ, STRIVE FORCE MJL, HYNANSKI, NORMAN AERENSON, PURSELL, ISKEN ENTERPRISES, MOON, and FRONTIER was in violation of 18 U.S.C. §1962(d).

300.    Alternatively, TIMOTHY McKENNA, MICHAEL McKENNA, MAT SITE MANAGEMENT, AERENSON, PETTINARO, MEYERS, WILKINSON, WILKINSON

18417809v.1

BUILDERS, TECHNIVATE, DiDONATO, EAISE, EAISE DESIGN  EAISE SNOW

SERVICES, HAINES & KIBBLEHOUSE, INC., JULICHER, JULICHER, DON ISKEN,

PAUL ISKEN, LONGVIEW MANAGEMENT, SIBLEY, M&M, ALAN PERRY, TRESIZE,

WRIGHT, ALCARAZ, STRIVE FORCE MJL, HYNANSKI, NORMAN AERENSON,

PURSELL, ISKEN ENTERPRISES, MOON, and FRONTIER conspired within the meaning of

18 U.S.C. §1962(d) to violate 18 U.S.C. §1962(b), by agreeing to conduct and participate in a

scheme to acquired and/or maintain, directly or indirectly, an interest in or control of Plaintiffs in

order to plunder their assets for their individual and/or collective gain.

301.   TIMOTHY McKENNA, MICHAEL McKENNA, MAT SITE

MANAGEMENT, AERENSON, PETTINARO, MEYERS, WILKINSON, WILKINSON

BUILDERS, TECHNIVATE, DiDONATO, EAISE, EAISE DESIGN  EAISE SNOW

SERVICES, HAINES & KIBBLEHOUSE, INC., JULICHER, JULICHER, DON ISKEN,

PAUL ISKEN, LONGVIEW MANAGEMENT, SIBLEY, M&M, ALAN PERRY, TRESIZE,

WRIGHT, ALCARAZ, STRIVE FORCE MJL, HYNANSKI, NORMAN AERENSON,

PURSELL, ISKEN ENTERPRISES, MOON, and FRONTIER committed and caused to be

committed a series of overt predicate acts of racketeering in furtherance of their conspiracy,

including but not limited to those acts described in this Complaint. (*See, e.g., supra* at ¶ 290,

310, 326 and 331.)

302.   As a direct and proximate cause of the aforementioned violations of 18

U.S.C. §1962(d) by TIMOTHY McKENNA, MICHAEL McKENNA, MAT SITE

MANAGEMENT, AERENSON, PETTINARO, MEYERS, WILKINSON, WILKINSON

BUILDERS, TECHNIVATE, DiDONATO, EAISE, EAISE DESIGN  EAISE SNOW

SERVICES, HAINES & KIBBLEHOUSE, INC., JULICHER, JULICHER, DON ISKEN,

PAUL ISKEN, LONGVIEW MANAGEMENT, SIBLEY, M&M, ALAN PERRY, TRESIZE, WRIGHT, ALCARAZ, STRIVE FORCE MJL, HYNANSKI, NORMAN AERENSON, PURSELL, ISKEN ENTERPRISES, MOON, and FRONTIER , Plaintiffs suffered substantial injury to business and/or property within the meaning of 18 U.S.C §1964(c) in an amount to be determined at trial.

WHEREFORE, Plaintiffs demand judgment in their favor together with interest, costs and attorneys' fees as permitted by law in an amount in excess of $150,000.00.

<u>COUNT VI</u>
**Fraud**
**(vs. all Defendants)**

303.   Plaintiffs incorporate by reference paragraphs 1 through 256 as if set forth herein at length.

304.   The elements of fraud under Pennsylvania law are (1) a material factual misrepresentation; (2) made with knowledge or belief of its falsity; (3) with the intention that the other party rely thereon; (4) resulting in justifiable reliance to that party to his detriment.

305.   Under Pennsylvania law, fraud can consist of anything calculated to deceive, whether by single act or combination or by suppression of truth or suggestion of what is false.

306.   Under Pennsylvania law, Fraudulent concealment is simply a type of fraudulent misrepresentation, the concealment substituting for false words so long as the matters concealed were material to the transaction.

307.   Silence does constitute concealment sufficient for a finding of fraud if there is a duty to speak.

308.   The reckless assertion of a fact in conscious ignorance of its truth or falsity amounts to actionable fraud.

309.    The breach of a confidential or fiduciary relationship constitutes "constructive" or "implied" or "legal" fraud.

310.    In each of the transactions described in paragraphs 47 through 256 heretofore, the defendants individually and severally engaged in fraud to the detriment of the plaintiffs.  Specifically , the following group of defendants acted in concert to defraud Plaintiffs:

a.    As to WILKINSON, TIMOTHY MCKENNA, MICHAEL MCKENNA, Bobby Aerenson, Pettinaro, Plaintiffs incorporate paragraphs 45-78 herein at length;

b.    As to DiDonato, TIMOTHY MCKENNA, and MICHAEL MCKENNA, Plaintiffs incorporate paragraphs 78-88 herein at length;

c.    As to EAISE, TIMOTHY MCKENNA, MICHAEL MCKENNA, Pulaski & Sons Construction Company, Plaintiffs incorporate paragraphs 89-111 herein at length;

d.    As to HAINES & KIBBLEHOUSE, TIMOTHY MCKENNA, MICHAEL MCKENNA, Plaintiffs incorporate paragraphs 112-120 herein at length;

e.    As to Hank Julicher, Margit Julicher, MAT Site Management, TIMOTHY MCKENNA, MICHAEL MCKENNA, Moon Nurseries, Chris Wright, Plaintiffs incorporate paragraphs 121-126 herein at length;

f.    As to HYNANSKY, WILKINSON, PERRY, TIMOTHY MCKENNA, and MICHAEL MCKENNA, Plaintiffs incorporate paragraphs 127-133 herein at length;

18417809v.1

g.      As to DON ISKEN, PAUL ISKEN,  TIMOTHY MCKENNA, and MICHAEL MCKENNA, Bobby Aerenson, Pettinaro, Plaintiffs incorporate paragraphs 134-137 herein at length;

h.      As to LONGVIEW, TIMOTHY MCKENNA, MICHAEL MCKENNA, Plaintiffs incorporate paragraphs 138-146 herein at length;

i.      As to MATTHEW SIBLEY, TIMOTHY MCKENNA, and MICHAEL MCKENNA, Plaintiffs incorporate paragraphs 147-156 herein at length;

j.      As to TIMOTHY MCKENNA and MICHAEL MCKENNA, Plaintiffs incorporate paragraphs 45-270 herein at length;

k.      As to MOON NURSERIES, CHRIS WRIGHT, HANK JULICHER, TIMOTHY MCKENNA, and MICHAEL MCKENNA, Plaintiffs incorporate paragraphs 225-241 herein at length;

l.      As to SAUL EWING, JOHN SNYDER, DAVID FALCONE, TIMOTHY MCKENNA, and MICHAEL MCKENNA, Plaintiffs incorporate paragraphs 242-251 herein at length;

m.      As to FRANK ALCARAZ, STRIVE FORCE, TIMOTHY MCKENNA, and MICHAEL MCKENNA, Plaintiffs incorporate paragraphs 252-260 herein at length;

n.      As to CHARLES WILKINSON, FRANK ALCARAZ, TECHNIVATE, INC., BOBBY AERENSON, TIMOTHY MCKENNA, and MICHAEL MCKENNA, Plaintiffs incorporate paragraphs 261-270 herein at length.

311.    As a result of the fraud averred herein, Plaintiffs have suffered damages.

WHEREFORE, Plaintiffs demand judgment in their favor together with interest, costs and attorneys' fees as permitted by law in an amount in excess of $150,000.00.

### Count VII
### Breach of Fiduciary Duty
### (vs. Timothy McKenna and Michael McKenna)

312.    Plaintiffs incorporate by reference paragraphs 1 through 295 as if set forth herein at length.

313.    Under Pennsylvania law, a confidential relationship, along with the fiduciary duty, may arise where the parties have relationships such as: guardian and ward, attorney and client, principal and agent, or where the facts and circumstances so indicate and are apparent on the record.

314.    A party in whom the trust and confidence of another are reposed must act with scrupulous fairness and good faith in his dealings with the other, and refrain from using his position to the other's detriment and his own advantage.

315.    Thus, transactions between persons occupying confidential relationship are *prima facie* voidable, and this presumption of fraud must be rebutted by the party seeking to enforce the transaction.

316.    Thus, if in a transaction between the parties who stand in a relationship of trust and confidence, the party in whom the confidence is reposed obtains an apparent advantage over the other, he is presumed to have obtained that advantage fraudulently; and if he seeks to support the transaction, he must assume the burden of proof that he has taken no advantage of his influence or knowledge and that the arrangement is fair and conscientious.

317.    A confidential relationship exists "whenever one occupies toward another such a position of advisor or counsellor as reasonably to inspire confidence that he will act in good faith for the other's interest."

318.   Under Pennsylvania law, a confidential relationship is deemed to exist, whenever the relative position of the parties is such that one has power and means to take advantage of or exercise undue influence over the other.

319.   TIMOTHY MCKENNA and MICHAEL MCKENNA held a fiduciary and confidential relationship of trust with the Plaintiffs.

320.   TIMOTHY MCKENNA and MICHAEL MCKENNA breached their fiduciary and confidential relationship of trust with the Plaintiffs.

321.   As to the instances of breaches of trust by TIMOTHY MCKENNA and MICHAEL MCKENNA, Plaintiffs incorporate paragraphs 47-257 herein at length.

322.   As a result of the breaches of trust averred herein, Plaintiffs have suffered damages.

WHEREFORE, Plaintiffs demand judgment in their favor together with interest, costs and attorneys' fees as permitted by law in an amount in excess of $150,000.00.

### Count VIII
### Conversion
### (vs. All Defendants)

323.   Plaintiffs incorporate by reference paragraphs 1 through 306 as if set forth herein at length.

324.   Under Pennsylvania law, conversion is the deprivation of another's right of property in, or use or possession of, a chattel, without the owner's consent and without lawful justification.

325.   Under Pennsylvania law, conversion is unreasonably withholding possession from one who has the right to property, including money.

18417809v.1

326.    In each of the transactions described in paragraphs 47 through 256 heretofore, the defendants individually and severally engaged in fraud to the detriment of the plaintiffs.  Specifically , the following group of defendants acted in concert to defraud Plaintiffs:

      a.      As to WILKINSON, TIMOTHY MCKENNA, MICHAEL MCKENNA, BOBBY AERENSON, PETTINARO, Plaintiffs incorporate paragraphs 45-78 herein at length;

      b.      As to DIDONATO, TIMOTHY MCKENNA, and MICHAEL MCKENNA, Plaintiffs incorporate paragraphs 79-88 herein at length;

      c.      As to EAISE, TIMOTHY MCKENNA, MICHAEL MCKENNA, Pulaski & Sons Construction Company, Plaintiffs incorporate paragraphs 89-111 herein at length;

      d.      As to HAINES & KIBBLEHOUSE, TIMOTHY MCKENNA, MICHAEL MCKENNA, Plaintiffs incorporate paragraphs 112-120 herein at length;

      e.      As to HANK JULICHER, MARGIT JULICHER, MAT SITE MANAGEMENT, TIMOTHY MCKENNA, MICHAEL MCKENNA, MOON NURSERIES, CHRIS WRIGHT, Plaintiffs incorporate paragraphs 121-126 herein at length;

      f.      As to HYNANSKY, WILKINSON, PERRY, TIMOTHY MCKENNA, and MICHAEL MCKENNA, Plaintiffs incorporate paragraphs 127-133 herein at length;

      g.      As to DON ISKEN, PAUL ISKEN, TIMOTHY MCKENNA, and MICHAEL MCKENNA, BOBBY AERENSON, PETTINARO, Plaintiffs incorporate paragraphs 143-137 herein at length;

18417809v.1

h.      As to LONGVIEW, TIMOTHY MCKENNA, MICHAEL

MCKENNA, Plaintiffs incorporate paragraphs 138-146 herein at length;

i.      As to MATT SIBLEY, TIMOTHY MCKENNA, and MICHAEL

MCKENNA, Plaintiffs incorporate paragraphs 147-156 herein at length;

j.      As to TIMOTHY MCKENNA and MICHAEL MCKENNA,

Plaintiffs incorporate paragraphs 45-270 herein at length;

k.      As to MOON NURSERIES, CHRIS WRIGHT, HANK

JULICHER, TIMOTHY MCKENNA, and MICHAEL MCKENNA, Plaintiffs incorporate

paragraphs 225-241 herein at length;

l.      As to SAUL EWING, JOHN SNYDER, DAVID FALCONE,

TIMOTHY MCKENNA, and MICHAEL MCKENNA, Plaintiffs incorporate paragraphs 242-

251 herein at length;

m.      As to FRANK ALCARAZ, STRIVE FORCE, TIMOTHY

MCKENNA, and MICHAEL MCKENNA, Plaintiffs incorporate paragraphs 252-260 herein at

length;

n.      As to CHARLES WILKINSON, FRANK ALCARAZ,

TECHNIVATE, INC., BOBBY AERENSON, TIMOTHY MCKENNA, and MICHAEL

MCKENNA, Plaintiffs incorporate paragraphs 261-270 herein at length.

327.    As a result of the conversion averred herein, Plaintiffs have suffered

damages.

WHEREFORE, Plaintiffs demand judgment in their favor together with interest,

costs and attorneys' fees as permitted by law in an amount in excess of $150,000.00.

## Count IX
## Negligent Misrepresentation
### (vs. All Defendants)

328.    Plaintiffs incorporate by reference paragraphs 1 through 311 as if set forth herein at length.

329.    Under Pennsylvania law, the elements of a claim for negligent misrepresentation are: (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

330.    A defendant is liable for losses sustained by (a) the person for whose benefit and guidance the defendant intends to supply the information; and (b) through reliance upon it in a transaction that the defendant intends the information to influence or in a substantially similar transaction.

331.    In each of the transactions described in paragraphs 47 through 256 heretofore, the defendants individually and severally engaged in negligent misrepresentation to the detriment of the plaintiffs:

a.    As to WILKINSON, TIMOTHY MCKENNA, MICHAEL MCKENNA, BOBBY AERENSON, PETTINARO, Plaintiffs incorporate paragraphs 45-78 herein at length;

b.    As to DIDONATO, TIMOTHY MCKENNA, and MICHAEL MCKENNA, Plaintiffs incorporate paragraphs 78-88 herein at length;

       c.      As to EAISE, TIMOTHY MCKENNA, MICHAEL MCKENNA, Pulaski & Sons Construction Company, Plaintiffs incorporate paragraphs 89-111 herein at length;

       d.      As to HAINES & KIBBLEHOUSE, TIMOTHY MCKENNA, MICHAEL MCKENNA, Plaintiffs incorporate paragraphs 112-120 herein at length;

       e.      As to HANK JULICHER, MARGIT JULICHER, MAT Site Management, TIMOTHY MCKENNA, MICHAEL MCKENNA, Moon Nurseries, Chris Wright, Plaintiffs incorporate paragraphs 121-126 herein at length;

       f.      As to HYNANSKY, WILKINSON, PERRY, TIMOTHY MCKENNA, and MICHAEL MCKENNA, Plaintiffs incorporate paragraphs 127-133 herein at length;

       g.      As to DON ISKEN, PAUL ISKEN,  TIMOTHY MCKENNA, and MICHAEL MCKENNA, BOBBY AERENSON, PETTINARO, Plaintiffs incorporate paragraphs 134-137 herein at length;

       h.      As to LONGVIEW, TIMOTHY MCKENNA, MICHAEL MCKENNA, Plaintiffs incorporate paragraphs 138-146 herein at length;

       i.      As to MATTHEW SIBLEY, TIMOTHY MCKENNA, and MICHAEL MCKENNA, Plaintiffs incorporate paragraphs 147-156 herein at length;

       j.      As to TIMOTHY MCKENNA and MICHAEL MCKENNA, Plaintiffs incorporate paragraphs 45-270 herein at length;

       k.      As to MOON NURSERIES, CHRIS WRIGHT, HANK JULICHER, TIMOTHY MCKENNA, and MICHAEL MCKENNA, Plaintiffs incorporate paragraphs 225-241 herein at length;

l.     As to SAUL EWING, JOHN SNYDER, DAVID FALCONE, TIMOTHY MCKENNA, and MICHAEL MCKENNA, Plaintiffs incorporate paragraphs 242-251 herein at length;

m.     As to FRANK ALCARAZ, STRIVE FORCE, TIMOTHY MCKENNA, and MICHAEL MCKENNA, Plaintiffs incorporate paragraphs 252-260 herein at length;

n.     As to CHARLES WILKINSON, FRANK ALCARAZ, TECHNIVATE, INC., BOBBY AERENSON, TIMOTHY MCKENNA, and MICHAEL MCKENNA, Plaintiffs incorporate paragraphs 261-270 herein at length.

332.     As a result of the negligent misrepresentations averred herein, Plaintiffs have suffered damages.

WHEREFORE, Plaintiffs demand judgment in their favor together with interest, costs in an amount in excess of $150,000.00.

### Count X
### Tortious Interference with Contract and
### Prospective Contractual Arrangements
### (vs. All Defendants)

333.     Plaintiffs incorporate by reference paragraphs 1 through 315 as if set forth herein at length.

334.     Pennsylvania has specifically adopted the 7 Restatement (Second) of Torts § 766, for tortious interference with contract claims, which provides that "[o]ne who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract."

-85-

335.   The elements of the claim for tortious interference are: (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage as a result of the defendant's conduct.

336.   In each of the transactions described in paragraphs 47 through 256 heretofore, the defendants individually and severally engaged in tortious conduct to interfere in the contracts of the Plaintiffs to the detriment of the Plaintiffs.  Specifically , the following group of defendants acted in concert to engage in tortious conduct to interfere in the contracts of the Plaintiffs:

a.   As to Wilkinson, TIMOTHY MCKENNA, MICHAEL MCKENNA, BOBBY AERENSON, PETTINARO, Plaintiffs incorporate paragraphs 45-78 herein at length;

b.   As to DIDONATO, TIMOTHY MCKENNA, and MICHAEL MCKENNA, Plaintiffs incorporate paragraphs 78-88 herein at length;

c.   As to EAISE, TIMOTHY MCKENNA, MICHAEL MCKENNA, Pulaski & Sons Construction Company, Plaintiffs incorporate paragraphs 89-111 herein at length;

d.   As to HAINES & KIBBLEHOUSE, TIMOTHY MCKENNA, MICHAEL MCKENNA, Plaintiffs incorporate paragraphs 112-120 herein at length;

       e.      As to HANK JULICHER, MARGIT JULICHER, MAT SITE MANAGEMENT, TIMOTHY MCKENNA, MICHAEL MCKENNA, Moon Nurseries, Chris Wright, Plaintiffs incorporate paragraphs 121-126 herein at length;

       f.      As to HYNANSKY, WILKINSON, PERRY, TIMOTHY MCKENNA, and MICHAEL MCKENNA, Plaintiffs incorporate paragraphs 127-133 herein at length;

       g.      As to DON ISKEN, PAUL ISKEN, TIMOTHY MCKENNA, and MICHAEL MCKENNA, BOBBY AERENSON, PETTINARO, Plaintiffs incorporate paragraphs 134-137 herein at length;

       h.      As to LONGVIEW, TIMOTHY MCKENNA, MICHAEL MCKENNA, Plaintiffs incorporate paragraphs 138-146 herein at length;

       i.      As to MATTHEW SIBLEY, TIMOTHY MCKENNA, and MICHAEL MCKENNA, Plaintiffs incorporate paragraphs 147-156 herein at length;

       j.      As to TIMOTHY MCKENNA and MICHAEL MCKENNA, Plaintiffs incorporate paragraphs 45-270 herein at length;

       k.      As to MOON NURSERIES, CHRIS WRIGHT, HANK JULICHER, TIMOTHY MCKENNA, and MICHAEL MCKENNA, Plaintiffs incorporate paragraphs 225-241 herein at length;

       l.      As to SAUL EWING, JOHN SNYDER, DAVID FALCONE, TIMOTHY MCKENNA, and MICHAEL MCKENNA, Plaintiffs incorporate paragraphs 242-251 herein at length;

18417809v.I

m.     As to FRANK ALCARAZ, STRIVE FORCE, TIMOTHY MCKENNA, and MICHAEL MCKENNA, Plaintiffs incorporate paragraphs 252-260 herein at length;

n.     As to CHARLES WILKINSON, FRANK ALCARAZ, TECHNIVATE, INC., BOBBY AERENSON, TIMOTHY MCKENNA, and MICHAEL MCKENNA, Plaintiffs incorporate paragraphs 261-270 herein at length.

337.     As a result of the conspiracy averred herein, Plaintiffs have suffered damages.

WHEREFORE, Plaintiffs demand judgment in their favor together with interest, costs and attorneys' fees in an amount in excess of $150,000.00.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury on all issues of law and fact.

**WHITE AND WILLIAMS LLP**

By: _____

Kevin F. Berry
White and Williams LLP
1650 Market Street
One Liberty Place, Suite 1800
Philadelphia, PA  19103
PH: 215.864.6290/FX: 215.789.7654
berryk@whiteandwilliams.com
Dated:  September 15, 2016
*Attorneys for Plaintiffs*

Dated: FEBRUARY 7, 2017

-88-

18417809v.1

## VERIFICATION

I, Charles Gaudioso, Plaintiff in the above captioned matter, hereby verify that I am an adult individual; I am authorized to make this verification on behalf of myself, Laurel Gardens, LLC, American Winter Services, LLC, Laurel Garden Holdings, LLC and LGSM, GP; I verify that the statements made in the foregoing Complaint are true and correct to the best of my knowledge, information, and belief.  The undersigned understands that the statements made therein are subject to the penalties of 18 Pa.C.S. §4904, relating to unsworn falsification to authorities.


CHARLES GAUDIOSO


Date:  February 6, 2017