IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LAUREL GARDENS, LLC, *et al.*, | |
| Plaintiffs, | CIVIL ACTION |
| v. | NO. 17-570 |
| TIMOTHY MCKENNA, *et al.*, | |
| Defendants. | |

**MEMORANDUM**

**SCHMEHL, J.**  */s/JLS*  DECEMBER __20__, 2019

Plaintiff Charles Gaudioso first met and conducted business with Defendant Timothy McKenna in 2007 or 2008. (ECF Docket No. 281 at ¶7.) In the intervening years, the relationship between Mr. Gaudioso and Mr. McKenna collapsed and become hostile. As a result, Mr. Gaudioso and his co-plaintiff companies[1] have now filed suit against Mr. McKenna and 32 other defendants, alleging that Mr. McKenna coordinated "a widespread criminal conspiracy that was engaged in a pattern of racketeering activity across state lines … [in violation of] the Racketeer Influenced and Corrupt Organizations Act ('RICO'), 18 U.S.C. §§1961-1968." (ECF Docket No. 268 at 1.)

Plaintiffs filed their first Complaint in this matter on February 7, 2017. (ECF Docket No. 1.) This Complaint named 30 defendants, all allegedly involved in a conspiracy "to inflict severe and sustained economic hardship on Plaintiffs with the intent to impair, obstruct, prevent, and discourage Plaintiffs from continuing to work in the field of commercial landscaping and snow

---

[1] The Plaintiffs in this matter are (1) Charles P. Gaudioso; (2) LGSM, GP; (3) Laurel Gardens Holdings, LLC; (4) American Winter Services, LLC; and (5) Laurel Gardens, LLC. (ECF Docket No. 43.)

1

removal." (*Id*. at ¶4.) On April 21, 2017 Plaintiffs filed an Amended Complaint, adding three defendants to those named in the first Complaint: Saul Ewing LLP,[2] David Falcone, and John Snyder (collectively, the "Saul Defendants").[3] (ECF Docket No. 43.) On December 13, 2018, to clarify Plaintiffs' claims against the Saul Defendants and others, this Court ordered Plaintiffs to file a RICO Case Statement. (ECF Docket No. 226.) In this Statement, Plaintiffs attributed 27 alleged RICO predicate acts to the Saul Defendants. (ECF Docket No. 242 at 87-89.)

This matter is now before the Court on the Saul Defendants' Motion for Summary Judgment. (ECF Docket No. 258.) For reasons detailed below, the accompanying Order grants this Motion.

I. **RELEVANT FACTUAL BACKGROUND**

Charles Gaudioso first did business with Timothy McKenna as a consultant, arranging financing for McKenna on a New Jersey-based real estate development project in 2007 or 2008. (ECF Docket No. 281 at ¶7.) Although this initial venture ultimately failed, McKenna and Gaudioso continued to work together. (*Id*.)

Through this working relationship, Gaudioso learned of an opportunity to acquire two landscaping and snow removal businesses: Laurel Gardens, LLC ("LG") and American Winter Services, LLC ("AWS"). (*Id*. at ¶¶ 11-13.) On March 1, 2012, both Gaudioso and McKenna acquired an ownership stake in Laurel Gardens Holdings, LLC ("LGH"), a limited liability company formed to facilitate the purchase of LG and AWS (collectively, "Laurel Gardens

---

[2] Saul Ewing LLP presently operates under the name Saul Ewing Arnstein & Lehr LLP. (ECF Docket No. 258 at 1.) At the time this action was filed, it was known as Saul Ewing LLP. For clarity, it will be referred to as such in this Memorandum and the accompanying Order.
[3] Saul Ewing LLP is a Philadelphia, Pennsylvania-based limited partnership engaged in the practice of law. (ECF Docket No. 43 at ¶39). David Falcone and John Snyder are attorneys who were employed by Saul Ewing LLP during the relevant period. (*Id*.)

2

Entities"). As outlined in this deal's March 2012 Term Sheet—prepared by Defendant Saul Ewing LLP—Gaudioso and McKenna were to be the only two members of Laurel Gardens Holdings, LLC: Gaudioso was to hold 99.99% of the interest and McKenna was to own 0.01%. (*Id*. at ¶¶13, 20.) Before this purchase, Gaudioso did not conduct a financial evaluation or any significant due diligence on either company. (*Id*. at ¶18.) He was also not represented by counsel in connection with the acquisition. (*Id*. at ¶19.) Once this transaction was executed, Gaudioso appointed McKenna as the managing member of both companies as Gaudioso had no experience in the landscaping or snow removal business. (*Id*. at ¶16-17.)

Almost immediately, the Laurel Gardens Entities faced significant challenges under Gaudioso and McKenna. In April 2012, the month after Gaudioso acquired LG and AWS, the Laurel Gardens Entities were "expelled from WSFS Bank" as the bank would not allow McKenna to be a signer on any accounts. (*Id*. at ¶22.) The companies' financial issues did not end there. Within a few months, Gaudioso became aware that McKenna was misappropriating LG and AWS funds. (*Id*. at ¶¶23-25.) Under Gaudioso's direction, LG's controller analyzed McKenna's transactions with the company, ultimately determining that between March 1, 2012 and May 14, 2012 McKenna had taken at least $117,791.21 in company assets. (*Id*. at ¶25.) In June or July 2012, Gaudioso replaced McKenna as managing member of LGH but continued to retain McKenna as a consultant. (*Id*. at ¶¶24-25.) While McKenna continued as a consultant to the Laurel Gardens Entities, Gaudioso continued to investigate McKenna's thefts. (*Id*. at ¶¶25-27.)

On August 28, 2012, Gaudioso involved Saul Ewing LLP and its attorneys in this investigation, informing Saul Ewing LLP attorney Evan Foster that "'the best estimate of the

amount [of McKenna's theft] is the $117,791 plus $75,000 plus any interest and fees thereon.'"[4] (*Id*. at ¶26.) In the same communication, Gaudioso informed Foster that McKenna had admitted to taking $125,000. (*Id*.) In response, Foster advised Gaudioso that contacting the relevant authorities would "not be inappropriate" and recommended that Gaudioso "get to the total bottom of the outstanding issues and then have Tim [McKenna] document [each unauthorized transaction] in writing … and then get a further commitment in writing that he will repay everything by a date certain." (*Id*. at ¶27.)

In this August 28 communication, Foster also advised Gaudioso that he would be meeting with Timothy McKenna and his wife, Catharine McKenna, on August 30, 2012. (*Id*. at ¶28.) Saul Ewing LLP billing records indicate that the meeting concerned "McKenna American restructuring."[5] Although this meeting and its $360 cost were noted on Laurel Gardens' September 13, 2012 invoice from Saul Ewing LLP, Timothy McKenna paid this amount separately by personal check.[6] (*Id*. at ¶¶30-34.) When Gaudioso received Saul Ewing LLP's invoice, receipt of this payment had been noted and deducted from the total amount charged to the Laurel Gardens Entities. (*Id*. at ¶33.) Despite this, Plaintiffs claim that "Saul Ewing billed LGH for legal services provided to Tim, Michael, and Catherine McKenna, and McKenna American." (ECF Docket No. 268 at 2.)

---

[4] As of August 28, 2012 Gaudioso was also aware that McKenna's thefts involved multiple third parties—including Chemical Equipment Labs, JMFD, Ed Morgan, and Centre Exxon—which were used as vehicles to move Laurel Gardens' money. (ECF Docket No. 281 at ¶37.)

[5] McKenna American, LLC is a company separately owned, at least in part, by Timothy McKenna. It is not a party to this action.

[6] On August 31, 2012 Saul Ewing attorney Evan Foster sent an email to Timothy and Catharine McKenna billing them for the above-referenced meeting, stating: "I would appreciate it if you could ensure that this is paid as soon as possible so that it will appear as paid on the Laurel Gardens Holdings bill that we will send early next week." (ECF Docket No. 281 at ¶30.) In response to Foster's email, Catharine McKenna asked "Should we not keep this billing separate from the Laurel Gardens bill?" (*Id*. at ¶31.) Foster then responded to Ms. McKenna's email: "Catharine, we need to do it this way as neither McKenna American nor the McKennas personally are active clients in our system. (*Id*. at ¶32.) The bill was then addressed to "Laurel Gardens Holdings, LLC c/o Tim McKenna." (*Id*.) Timothy McKenna paid the bill via personal check before September 13, 2012, the date on which Saul Ewing LLP submitted its invoice to Laurel Gardens. (*Id*. at ¶¶33-34.)

4

Timothy McKenna remained a consultant to Laurel Gardens continuously from 2012 until June 2014, when Gaudioso terminated him for cause. (ECF Docket No. 281 at ¶55.) Timothy McKenna's son, Michael McKenna, who had served as Laurel Gardens' general manager since 2012, resigned from his position on November 9, 2014. (*Id*. at ¶56.) When Michael McKenna resigned, the Laurel Gardens Entities alleged that he had also misappropriated company secrets and taken a Laurel Gardens Entities computer and cellular telephone containing sensitive and confidential information. (*Id*. at ¶57.)

In December 2014, the Laurel Gardens Entities filed a suit in the Delaware Court of Chancery against Timothy McKenna, Michael McKenna, Arnold Dunn, and MAT Site Management, LLC. (*Id*. at ¶59.) The Delaware complaint alleged that while Michael McKenna was still employed by Laurel Gardens, he, Timothy McKenna, and Arnold Dunn formed a competing business, MAT Site Management, LLC. (*Id*. at ¶60.) Laurel Gardens further alleged that in doing so, the three conspired to misappropriate Laurel Gardens trade secrets and interfere with Laurel Gardens' business relationships. (*Id*.)

These allegations against Timothy and Michael McKenna are "at the center" of the Plaintiffs' wide-ranging claims against the defendants named in their Amended Complaint. (ECF Docket No. 43 at ¶45.) In the Amended Complaint, Plaintiffs allege that, while the McKennas "are at the center of a[n alleged] criminal enterprise … [t]heir network is organized into cells[.]" (*Id*.) The "cell" currently before the court involves the Saul Defendants: Saul Ewing LLP, David Falcone, and John Snyder.

Both David Falcone and John Snyder knew Timothy McKenna prior to their involvement with the Laurel Gardens Entities. (Snyder Dep. 9:14-10:15; Falcone Dep. 10:4-11:18.) David Falcone first met McKenna when an entity McKenna was affiliated with became a client of Saul

Ewing LLP in 2005. (Falcone Dep. 10:4-11:18.) John Snyder met Timothy McKenna in 1977 or 1978 when McKenna was a client of Snyder's former law firm. (Snyder Dep. 9:14-10:15.) While employed by this law firm, Snyder worked on at least one of McKenna's matters with the firm. (*Id*. at 10:10-10:20.) Since joining Saul Ewing LLP in 1997, McKenna has retained Snyder multiple times. (*Id*. at 10:24-11:22.)

Saul Ewing LLP, through its attorney David Falcone, began its formal relationship with the Laurel Gardens Entities through a January 5, 2011 letter of representation sent to AWS. (ECF Docket No. 258, Ex. T.) On March 1, 2012, the same day that Laurel Gardens Holdings ("LGH") was created, Saul Ewing LLP John Snyder sent the newly-formed company a letter of representation. (*Id*. at Ex. U.) Saul Ewing LLP later advised Gaudioso by a February 19, 2015 letter that its representation of Laurel Gardens had ended. (*Id*. at ¶65.)

Defendant David Falcone's relationship with the Laurel Gardens Entities extended beyond legal services. (*Id*. at ¶40.) Beginning in 2012, Laurel Gardens provided landscaping services to David Falcone.[7] (*Id*. at ¶40.) Laurel Gardens prepared monthly invoices for the landscaping work, charges for which totaled $29,182.11. (*Id*. at ¶41.) Among these invoices was an October 24, 2012 bill for $17,147.17. (*Id*. at ¶42.) Although Laurel Gardens provided the landscaping services and generated corresponding bills, it did not send Falcone an invoice or bill for the services until March 2014. (*Id*. at ¶43.)

On March 12, 2014 Laura Mohr, Laurel Gardens' bookkeeper, emailed Falcone stating that she "was asked to forward [to him] copies of the attached invoices [for unpaid landscaping work]." (*Id*. at ¶44.) This was the first time Falcone had received an invoice for these landscaping services. (*Id*. at ¶46.) The same day, Falcone responded to Mohr assuring her that

---

[7] Additionally, on at least two occasions in 2013 Gaudioso asked Falcone to make a short-term loan to Laurel Gardens. (ECF Docket No. 281 at ¶54.) Falcone made these loans and was repaid. (*Id*.)

6

he would "be sure to pay these right away" as he "had not previously received them." (*Id*. at ¶48.) Falcone and Mohr continued to exchange emails and Mohr ultimately sent Falcone a revised invoice for $26,611.41. (*Id*.) On March 17, 2014 Falcone paid this outstanding revised invoice via wire transfer. (*Id*.)

On April 21, 2017, in response to these facts, Plaintiffs asserted the following federal and state law claims against the Saul Defendants: "(1) aiding and abetting breach of fiduciary duty; (2) civil conspiracy; (3) RICO violations under 18 U.S.C. §§ 1962(c), 1962(b) & 1962(d); (4) fraud; (5) conversion; [(6)] negligent misrepresentation; and (7) tortious interference with contract and prospective contractual arrangements." (ECF Docket No. 268 at 3.)

## II. STANDARD OF REVIEW

### a. SUMMARY JUDGMENT

Summary judgment is granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In this analysis, all facts are viewed in the light most favorable to the non-moving party. ty. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 903 (1990) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654 (1962)). "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." *Pignataro v. Port Auth. of N.Y. and N.J.*, 593 F.3d 265, 268 (3d Cir. 2010) (citing *Reliance Ins. Co. v. Moessner*, 121 F.3d 895, 900 (3d Cir. 1997)). Therefore, it follows that for purposes of summary judgment, a dispute is genuine when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The substantive law governing a case determines which facts are material. *Id.* As such, factual disputes that are irrelevant or unnecessary will not be counted and only those disputes of fact that "might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Id*.

Indeed, the Supreme Court has emphasized that:

> "[t]he plain language of Rule 56(c) of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial; in such a situation, there can be no genuine issues as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party bears the burden of proof. . ."

*Celotex Corp. v. Catrett* 477 U.S. 317, 319 (1986).

### b. STATUTES OF LIMITATION

#### i. Racketeering Influenced and Corrupt Organizations (RICO) Act Claims

Federal civil RICO claims are subject to a four-year statute of limitations that begins to toll when a plaintiff is on "inquiry notice" of its injuries. *Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 506 (3d Cir. 2006). To determine when a party is on inquiry notice, the Third Circuit applies "an injury discovery rule 'whereby a RICO claim accrues when plaintiffs knew or should have known of their injury.'" *Id*. at 507 (citing *Mathews v. Kidder Peabody & Co.*, 260 F.3d 239, 252 (3d Cir. 2001)).

This rule inherently has both subjective and objective components. *Mathews*, 260 F.3d at 250. The Third Circuit has emphasized that "[t]he subjective component needs little explanation—a claim accrues no later than when the plaintiffs themselves discover their injuries." *Id*. To analyze the objective component, however, the Third Circuit has elaborated a

two-step framework. *Id*. at 252. First, the burden is on the defendant to show the existence of "storm warnings" indicating the possibility of fraud. *Id*. at 251-52 (citing *Havernick v. Network Express*, 981 F. Supp. 480 (E.D. Mich. 1997); *Addeo v. Braver*, 956 F. Supp. 443 (S.D.N.Y. 1997)). The Third Circuit has declined to elaborate an exhaustive list of what constitutes such "storm warnings," but has described their existence as "a totally objective inquiry" emphasizing that "[p]laintiffs need not be aware of the suspicious circumstances or understand their import." *Id.* at 252. Indeed, the Court has underscored that "[i]t is enough that a reasonable investor of ordinary intelligence would have discovered the information and recognized it as a storm warning." *Id*. Second, if a defendant establishes the existence of "storm warnings," the burden shifts to the plaintiffs to demonstrate the inability to discover and avoid the injury despite exercising reasonable due diligence. *Id*.

### ii. Pennsylvania State Law Claims

Plaintiffs have also brought six Pennsylvania state law claims against the Saul Defendants:

Count I: Aiding and Abetting Breach of Fiduciary Duty;
Count II: Civil Conspiracy;
Count VI: Fraud;
Count VIII: Conversion;
Count IX: Negligent Misrepresentation; and
Count X: Tortious Interference with Contract and Prospective Contractual Arrangements.

(ECF Docket No. 268 at 6.)

Each of these claims is governed by a two-year statute of limitations.[8] PA. CONS. STAT. §5524(3), (7). Under the applicable Pennsylvania law, statutes of limitations are calculated from the time the cause of action accrues. PA. CONS. STAT. 5502(a). A cause of action accrues when the plaintiff could have "first maintained the action to a successful conclusion." *Fine v. Checcio*, 870 A.2d 850, 857 (Pa. 2005).

Pennsylvania law, however, provides exceptions that act to toll the running of a statute of limitations. *Id*. at 858. In this matter, Plaintiffs invoke the discovery rule and fraudulent concealment exceptions. (ECF Docket No. 268 at 7-8.) The discovery rule allows the tolling of a statute of limitations "where the existence of the injury is not known to the complaining party and such knowledge cannot reasonably be ascertained within the prescribed statutory period. . ." *Hayward v. Med. Ctr. of Beaver Cnty.*, 608 A.2d 1040, 1043 (Pa. 1992). In applying the discovery rule, the Pennsylvania Supreme Court has established that "the salient point . . . is the inability of the injured, despite the exercise of reasonable diligence, to know that he is injured and by what cause." *Fine*, 870 A.2d at 858. When the discovery rule applies, the statute of limitations "is tolled, and does not begin to run until the injured party discovers or reasonably should discover that he has been injured and that his injury has been caused by another party's conduct." *Id*. at 859.

Under the doctrine of fraudulent concealment, a defendant is estopped from invoking the statute of limitations if "through fraud or concealment, he causes the plaintiff to relax his vigilance or deviate from his right of inquiry into the facts." *Id.* at 860 (citing *Deemer v.*

---

[8] Counts VIII and X are governed by Section 5524(3), which applies to "[a]n action for taking, detaining or injuring personal property, including actions for specific recovery thereof." PA. CONS. STAT. §5524(3). Counts I, VI, and IX are controlled by Section 5524(7), which applies a two-year statute of limitations to "any other action or proceeding to recover damages for injury to person or property which is founded on negligent, intentional, or otherwise tortious conduct or any other action or proceeding sounding in trespass, including deceit or fraud . . ." PA. CONS. STAT. §5524(7). Count II, civil conspiracy, is governed by either Section 5524(3) or 5542(7) as "the statute of limitations for conspiracy is the same as that for the underlying action which forms the basis of the conspiracy." *Kingston Coal Co. v. Felton Mining Co.*, 690 A.2d 284, 287 n.1 (Pa. Super. Ct. 1997).

*Weaver*, 187 A. 215, 215 (Pa. 1936)). For the doctrine to apply, "fraud in the strictest sense" is not required, but rather "fraud in the broadest sense, which includes an unintentional deception." *Id*. The Pennsylvania Supreme Court, however, has also emphasized that the standard of reasonable diligence dictates that "a statute of limitations that is tolled by virtue of fraudulent concealment begins to run when the injured party knows or reasonably should know of his injury and its cause." *Id*. at 861.

### III. ANALYSIS

  a. <u>Racketeering Influenced and Corrupt Organizations (Rico) Act Claims</u>

Plaintiffs filed their Amended Complaint adding the Saul Defendants to this action on April 21, 2017. (ECF Docket No. 43.) Considering the applicable four-year statute of limitations, our analysis thus seeks to determine if the statutes began to run on or before April 20, 2013.

In determining this date, we must ascertain when Plaintiffs were on inquiry notice of their injuries. Applying the injury discovery rule, we first assess the rule's subjective component to define when Plaintiffs discovered the injuries that led to this dispute. It is undisputed that Plaintiffs knew of Timothy McKenna's financial misconduct (at the core of Plaintiffs' alleged RICO conspiracy) by July 3, 2012. (ECF Docket No. 281 at ¶25.) In June or July 2012, Gaudioso replaced Timothy McKenna as managing member of the Laurel Gardens Entities and installed himself in the role. (Gaudioso Dep. At 28:12-28:24.) Shortly thereafter, the Laurel Gardens Entities' controller determined that as of July 3, 2012, Timothy McKenna had taken at least $117,791.21 from the companies. (ECF Docket No. 281 at ¶25.) Gaudioso then reported the controller's findings and analysis to counsel, Evan Foster of Saul Ewing LLP. (*Id*. at ¶¶26-

11

28.) Thus, as demonstrated by Plaintiff Gaudioso's own actions, Plaintiffs clearly had discovered their injuries before April 20, 2013.

Next, we follow the Third Circuit's framework for analyzing the injury discovery rule's objective component. Based on the above facts, Defendants have more than adequately met their burden to show the existence of "storm warnings" that would indicate to Plaintiffs the possibility of fraud. Despite having discovered Timothy McKenna's takings from the Laurel Gardens Entities, Gaudioso not only did not pursue timely legal action, but also continued to retain McKenna as a consultant. As such, Plaintiffs cannot reasonably claim that they were unable to discover their injuries despite an exercise of reasonable due diligence. Plaintiffs discovered the injuries as a direct result of such due diligence yet failed to timely act to either prevent future injury or remedy past injury. Consequently, all federal civil RICO claims against the Saul Defendants are time-barred.

### b. State Law Claims

We next turn to the question of when Plaintiffs' Pennsylvania state law claims accrued; that is, when Plaintiffs could have first maintained the present claims against the Saul Defendants. Plaintiffs filed their Amended Complaint on April 21, 2017. (ECF Docket No. 43.) As such, given the two-year statutes of limitations that apply to these state law claims, we must determine if these claims accrued on or before April 20, 2015.

As detailed above, Plaintiffs had knowledge of their injuries, and their root cause, by 2012. (ECF Docket No. 281 at ¶¶25-28.) Moreover, in his deposition, Plaintiff Gaudioso was unable to name any relevant conduct by the Saul Defendants that he was not aware of by the time

the Laurel Gardens Entities completed an extensive internal audit in February 2015. (Gaudioso Dep. 283:3-6.)

Given this, we must then consider whether (1) the discovery rule tolls the applicable statutes of limitations or (2) the doctrine of fraudulent concealment estops the Saul Defendants from invoking the statutes. Here, neither prevents application of the statutes of limitations. First, the discovery rule does not apply because there is no dispute that Plaintiffs knew of their injuries by 2012. Indeed, Plaintiff Gaudioso testified to this in his deposition. Second, the doctrine of fraudulent concealment cannot apply as Plaintiffs have failed to provide any facts or argument in favor of its application. (*See* ECF Docket No. 268 at 7-8.) As such, the applicable statutes of limitations are not tolled, and the Saul Defendants are not estopped from invoking them. Thus, Plaintiffs did not timely file their Pennsylvania state law claims against the Saul Defendants and all such claims are time-barred.

## IV. CONCLUSION

In the accompanying Order, this Court grants the Saul Defendants' Motion for Summary Judgment. (ECF Docket No. 258.) No genuine dispute of material facts exists that is relevant to the applicable statutes of limitations or their tolling. Thus, all claims that Plaintiffs have asserted against the Saul Defendants in this matter are time-barred.