IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LAUREL GARDENS, LLC, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> TIMOTHY MCKENNA, *et al.*, <br><br> Defendants. | CIVIL ACTION <br> NO. 17-570 |

**MEMORANDUM**

**SCHMEHL, J.**  /s/ JLS                                             FEBRUARY 5, 2020

      Plaintiff Charles Gaudioso first met and conducted business with Defendant Timothy McKenna in 2007 or 2008. (ECF Docket No. 281, Ex. 3 at ¶ 7.) In the intervening years, the relationship between Mr. Gaudioso and Mr. McKenna collapsed and become hostile. As a result, Mr. Gaudioso and his co-plaintiff companies[1] have now filed suit against Mr. McKenna and 32 other defendants, alleging that Mr. McKenna coordinated "a widespread criminal conspiracy that was engaged in a pattern of racketeering activity across state lines … [in violation of] the Racketeer Influenced and Corrupt Organizations Act ('RICO'), 18 U.S.C. §§ 1961-1968." (ECF Docket No. 286 at 1.)

      Now, the Court addresses Defendant Thomas DiDonato's Motion for Summary Judgment. (ECF Docket No. 272.) DiDonato owns and operates the Centre Exxon gas station in Wilmington, Delaware. (ECF Docket No. 309 at 1.) Plaintiffs assert that Timothy McKenna used DiDonato's gas station exclusively for fuel from September 2013 to May 2014. (ECF

---

[1] The Plaintiffs in this matter are (1) Charles P. Gaudioso; (2) LGSM, GP; (3) Laurel Gardens Holdings, LLC; (4) American Winter Services, LLC; and (5) Laurel Gardens, LLC. (ECF Docket No. 43.)

1

Docket No. 43 at ¶ 80.) Throughout this period, Plaintiffs "operated under the system of purchasing gift cards at the station and handing them out to [their] crews to use for fuel." (*Id.* at ¶ 81.)

Out of this process, Plaintiffs allege that "[t]here are over $17,000 in missing receipts, because Timothy McKenna and Michael McKenna arranged a scam with DiDonato to produce phony gift card receipts and . . . steal the cash." (*Id.* at ¶ 83.) As a result, Plaintiffs have brought nine claims against DiDonato.[2] For reasons detailed below, we grant summary judgment in favor of DiDonato on all claims.

I.     **RELEVANT FACTUAL BACKGROUND**

Thomas DiDonato owns and operates the Centre Exxon located at 1001 Centre Road in Wilmington, Delaware. (ECF Docket No. 309 at ¶ 1.) Centre Exxon is in the business of providing fuel and vehicle maintenance and repair services. (ECF Docket No. 272 Ex. A at ¶ 4.) From September 2013 through May 2014, Timothy and Michael McKenna used DiDonato's Centre Exxon to fuel vehicles for the Plaintiff Companies.[3] (ECF Docket No. 309 at ¶ 2; ECF Docket No. 305 at ¶ 4.) During this period, Plaintiffs, through the McKennas, purchased gift

---

[2] As numbered in Plaintiffs' Amended Complaint, the allegations against DiDonato are as follows:
    I.        Aiding and Abetting Breach of Fiduciary Duty;
    II.       Civil Conspiracy;
    III.      Civil RICO § 1962(c);
    IV.      Civil RICO § 1962(b);
    V.       Civil RICO § 1962(d);
    VI.      Fraud;
    VIII.    Conversion;
    IX.      Negligent Misrepresentation; and
    X.       Tortious Interference with Contract. (ECF Docket No. 43 at ¶¶271-336.)

[3] In a Declaration attached to his Motion for Summary Judgment, DiDonato noted that, to the best of his recollection, he first met Timothy and Michael McKenna in or around 2012. (ECF Docket No. 272 Ex. A at ¶5.) DiDonato also stated that from "that point until early 2014, both Timothy McKenna and Michael McKenna frequently purchased fuel and gift cards at Centre Exxon and brought various vehicles in for maintenance and repairs." (*Id.* at ¶6.) Plaintiffs have represented that the McKennas began doing business with Centre Exxon on Plaintiffs' behalf (in addition to the aforementioned allegations) in September 2013. (ECF Docket No. 309 at ¶2.)

2

cards for fuel at Centre Exxon and then distributed the cards to Plaintiffs' employees. (ECF Docket No. 43 at ¶ 81.) Plaintiffs advanced checks to the McKennas for the purchase of these gift cards, understanding that the McKennas would return receipts to Plaintiffs for the purchases. (*Id.*) In their Amended Complaint, Plaintiffs elaborate that advance checks were made out to Centre Exxon, Timothy McKenna, and Michael McKenna for this purpose. (*Id.* at ¶ 82.) Plaintiff Gaudioso also gave his personal credit cards to the McKennas to make these fuel gift card purchases. (*Id.*)

Thomas DiDonato, in a Declaration attached to his Motion for Summary Judgment, testified that throughout the relevant period he believed that Timothy McKenna was a part-owner of Plaintiff company Laurel Gardens, LLC. (ECF Docket No. 272 Ex. A at ¶ 7.) Indeed, he attested that Timothy McKenna represented this to him in 2012. (*Id.*) DiDonato also stated that he understood that Timothy McKenna was an authorized used of an American Express card issued to Plaintiff Charles Gaudioso, which McKenna used at times to purchase fuel and vehicle repair services. (*Id.* at ¶ 9.) DiDonato refutes Plaintiffs claims that he ever gave Timothy or Michael McKenna "cash in exchange for payment by credit card for fuel or services," emphasizing that any such transaction would result in a net loss for his business. (*Id.* at ¶ 11.)

In the present action, Plaintiffs assert that Thomas DiDonato collaborated with the McKennas to "skim money" from Plaintiffs. (ECF Docket No. 296 at 2.) Plaintiffs allege that there are over $17,000 in missing receipts related to transactions at Centre Exxon "because Timothy McKenna and Michael McKenna arranged a scam with DiDonato to produce phony gift card receipts and . . . steal the cash." (ECF Docket No. 43 at ¶ 83.) Further, Plaintiffs claim that on at least one occasion, Timothy and Michael McKenna:

> committed credit card fraud by using Gaudioso's credit card for a fraudulent $1,012 gift card purchase wherein the station owner [DiDonato] produced a

phony receipt. On the back of the receipt Michael McKenna wrote two bank account numbers that belonged to Timothy McKenna with amounts next to each account that totaled the amount of the credit card transaction (less the $12.00 "fee"), indicating the amount of cash . . . [stolen and] deposited into Timothy McKenna's personal bank accounts.

(*Id.* at ¶ 84.)

DiDonato has denied any knowledge as to why a bank account number associated with the McKennas would be written on the back of a Centre Exxon receipt. (ECF Docket No. 272 Ex. A at ¶ 12.)

Plaintiffs also allege that DiDonato produced receipts for purchases labeled as automotive "parts" that were used to charge Plaintiffs with "fees" for using a credit card. (*Id*. at ¶ 85.) DiDonato claims that these Centre Exxon receipts labeled for "'parts' . . . may designate various things, including vehicle parts or supplies purchased at [his] shop." (*Id*. at ¶ 13.) He further emphasizes that the term "does not designate and never has designated, with respect to the McKennas or any of [his] other customers, 'fees' charged for any good or service. Rather, in all cases, it reflects payment for an actual item or items that does not, for whatever reason, have a more specific description." (*Id.*)

However, Timothy McKenna's deposition tells a different story. In his deposition, McKenna recalled a pattern by which DiDonato provided McKenna with loans which were recorded by receipts labeled "parts." (ECF Docket No. 296 Ex. 4 at 187:16-188:10.)

> [KEVIN BERRY[4]]: Take a look at Exhibit 39. There's four receipts there for an even number of 100, 150, and 100 for parts. Do you recall what parts you— . . .
>
> [TIMOTHY McKENNA]: I believe these were loans to he [DiDonato] gave to me that I subsequently paid back.
>
> MR. BERRY: So, these receipts were for loans to you, and you paid the loans back?

---
[4] Mr. Berry is an attorney for Plaintiffs.

[MR. MCKENNA] That's correct. There were loans made by Mr. DiDonato that were monies that were used for tolls or used for various expenses.

(*Id.* at 187:16-188:9.)

Additionally, Plaintiffs claim that "many [Centre Exxon] receipts" show that "local accounts" were used for purchases at the gas station "without any accounting or back up detail to explain their use or business purpose." (ECF Docket No. 43 at ¶ 86.) Plaintiffs in particular note two such accounts named "Miscellaneous" and "Daisy," claiming never to have received receipts for payments toward these accounts. (*Id.*) DiDonato asserts that these accounts "are used to identify credit accounts that are not associated with any particular customer . . . [and] are used for all customers that do not have personal accounts with Centre Exxon." (ECF Docket No. 272 Ex. A at ¶ 15.)

Moreover, DiDonato states that he has never produced a fake receipt in connection with any transaction involving Plaintiffs or the McKennas, and that all receipts were provided as proof of actual purchases of fuel, fuel gift cards, and/or other vehicle services from Centre Exxon. (*Id.*) Plaintiffs discontinued this system of purchasing fuel gift cards in April 2014 when they "began using a fleet fuel card service that was much more secure." (ECF Docket No. 43 at ¶ 88.)

## II. STANDARD OF REVIEW

Summary judgment is granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In this analysis, all facts are viewed in the light most favorable to the non-moving party. ty. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 903 (1990) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654 (1962)). "After making all reasonable inferences in the nonmoving party's

5

favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." *Pignataro v. Port Auth. of N.Y. and N.J.*, 593 F.3d 265, 268 (3d Cir. 2010) (citing *Reliance Ins. Co. v. Moessner*, 121 F.3d 895, 900 (3d Cir. 1997)). Therefore, it follows that for purposes of summary judgment, a dispute is genuine when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The substantive law governing a case determines which facts are material. *Id.* As such, factual disputes that are irrelevant or unnecessary will not be counted and only those disputes of fact that "might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Id*.

Indeed, the Supreme Court has emphasized that:

> "[t]he plain language of Rule 56(c) of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial; in such a situation, there can be no genuine issues as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party bears the burden of proof. . ."

*Celotex Corp. v. Catrett* 477 U.S. 317, 319 (1986).

### III. ANALYSIS

For reasons detailed below, this Court grants summary judgment on all counts against Defendant DiDonato. We first discuss Plaintiffs' federal civil RICO claims and then turn to their Pennsylvania common law claims.

### a. Count III: Violation of Civil RICO § 1962(c)

Subsection 1962(c) of the Racketeer Influenced and Corrupt Organizations Act (RICO) prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c) (1970).

In *Reves v. Ernst & Young*, the Supreme Court interpreted what it means "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 177 (1993). More specifically, the Supreme Court considered whether one must participate in the "operation or management of the enterprise" to be found liable for a violation under this subsection. *Id*. at 172. In this context, the Supreme Court understood the word "conduct" to require a degree of direction and the word "participate" to require some part in that direction. *Id*. at 179. The Court further clarified in *Reves*, however, that for a defendant to be liable under RICO § 1962(c), the defendant need not have a "formal position in the enterprise, but [that] *some* part in directing the enterprise's affairs is required." *Id*. Thus, the Court adopted an "operation or management" test, holding that "Congress did not intend to extend § 1962(c) liability beyond those who participate in the operation or management of an enterprise through a pattern of racketeering activity." *Id*. at 184. It also held, however, that "outsiders" may be liable under § 1962(c) if they are "associated with" an enterprise *and* participate in the operation or management of the enterprise. *Id*. at 184-85.

In their Amended Complaint, Plaintiffs allege that Defendant DiDonato committed multiple violations of the federal mail fraud and wire fraud statutes, constituting RICO predicate acts. (ECF Docket No. 43 at 66.) They allege that DiDonato charged Plaintiff Gaudioso's

American Express credit, gave cash from the transactions to Timothy McKenna, and then produced receipts falsely labeling the transactions as purchases for "parts" and fuel "gift cards." (*Id*. at 69.) They also claim that DiDonato illegally charged fees on Defendant Gaudioso's credit card, marking the alleged fee as a charge for "parts." (*Id*.)

None of these claims against Defendant DiDonato meet the Supreme Court's operation or management test. Plaintiffs do not contend that DiDonato operated or managed the alleged RICO enterprise. Moreover, even if they did so allege, DiDonato's involvement with Timothy McKenna does not rise to the level of operation or management required to find him in violation of § 1962(c). *See Schuylkill Skyport Inn v. Rich*, No. 95-3128, 1996 U.S. Dist. LEXIS 12655, at *103-04 (E.D. Pa. Aug. 20, 1996) (finding that even a corporate officer of the alleged RICO enterprise did not pass the operation or management test because he was only an assistant secretary to some of the corporate defendants comprising the enterprise); *See also Univ. of Md. v. Peat, Marwick, Main & Co.*, 996 F.2d 1534, 1539 (3d Cir. 1993) (finding that an auditor preparing false financial statements for an insurer was not participating in the operation or management of the enterprise); *Fidelity Fed. Sav. & Loan Ass'n v. Felicetti*, 830 F. Supp. 257, 260 (E.D. Pa. 1993) (finding that a real estate appraiser providing misleading and fraudulent appraisals did not constitute operation or management). Even assuming all of Plaintiffs' claims are true, DiDonato did not participate in the operation or management of the RICO enterprise. As such, there is no dispute of material fact relevant to the claims under RICO § 1962(c) and we grant summary judgment in favor of Defendant DiDonato.

### b. Count IV: Violation of Civil RICO § 1962(b)

Plaintiffs also accuse Defendant DiDonato of violations of § 1962(b) of RICO. (ECF Docket No. 43 at 73-74.) Subsection 1962(b) prohibits "any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(b) (1970).

In the context of RICO actions, the Supreme Court has held that "interest" means a "right, claim, title, or legal share in something." *Frankford Trust Co. v. Advest, Inc.*, No. 93-329, 1997 U.S. Dist. LEXIS 3441, at *23 (E.D. Pa. Jan. 14, 1997) (quoting *Russello v. U.S.*, 464 U.S. 16, 21 (1983)). The Supreme Court, however, has not defined the word "control" as it appears in this statute. *Id.* Notwithstanding, the Third Circuit has distinguished between subsection 1962(b) and 1962(c) of the statute, categorizing 1962(b) as the provision which prohibits the *acquisition* of an enterprise and 1962(c) as that which prohibits the *operation* of an enterprise through racketeering. *Id.* at *23-24 (citing *Jaguar Cars, Inc. v. Royal Oaks Motor Car*, 46 F.3d 258, 267 (3d Cir. 1995)).

Following this reasoning, this Court has held that "the control contemplated by section 1962(b) is in the nature of the control one gains through the acquisition of sufficient stock to affect the composition of a board of directors . . . or by gaining a proprietary interest in the enterprise." *Id.* at *24. Indeed, this Court has cited the facts of *United States v. Local Union 560 of the International Brotherhood of Teamsters* as a "classic example of the degree of control" required under this subsection. *Id.* (citing *United States v. Local 560 of the Int'l Brotherhood of Teamsters*, 780 F.2d 267 (3d Cir. 1985)). In that case, an organized crime syndicate seized

9

control of a union, through murder and extortion, ultimately infiltrating and essentially acquiring the alleged RICO enterprise (the union). *Id*. at *24-25.

Here, Plaintiffs allege that Defendant DiDonato "acquired and/or maintained, directly or indirectly, an interest in or control of each of the Plaintiffs, whose activities affected interstate commerce…" (ECF Docket No. 43 at 73.) Further, they claim that DiDonato, along with other named defendants, "by and through their active participation in and/or by exercising control over Plaintiffs . . . caused each of those entities to be undercapitalized . . . and forced them to default on obligations and/or lose business opportunities and suffer significant losses. (*Id.* at 74.) Plaintiffs, however, have failed to provide any evidence that Defendant DiDonato held any interest or control over Plaintiffs at any time. First, they have not shown that DiDonato ever possessed a right, claim, title, or legal share of any amount in any of the Plaintiff companies. Second, they have not demonstrated that DiDonato ever acquired the level of control required to sustain a claim under § 1962(b). Indeed, Plaintiffs have not provided any evidence showing any level of control over Plaintiffs, let alone the requisite level of control as this Court described in *United States v. Local Union 560*. Thus, there is no dispute of applicable material fact on this claim, and DiDonato is entitled to judgment as a matter of law. As such, we grant summary judgment in favor of Defendant DiDonato on Plaintiffs' claim for a violation of RICO § 1962(b).

### c. Count V: Violation Civil RICO § 1962(d)

Subsection 1962(d) of RICO dictates that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d) (1970). Claims under § 1962(d) must fail if the substantive claims on which they are based fail. *Lightning Lube v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir. 1993) (citations omitted).

Plaintiffs' claims under subsections (b) and (c) do not survive summary judgment. Because Plaintiffs' substantive RICO claims fail, this conspiracy claim must also fail. Thus, we also grant summary judgment in Defendant's favor on Plaintiffs' claim under RICO § 1962(d).

### d. Pennsylvania Common Law Claims (Counts I, II, VI, VII, IX, and X)

To conserve Court time and resources, Defendant DiDonato, in his Motion for Summary Judgment, "incorporate[d] . . . Co-Defendants' statutory and case citations/references as though set forth at length herein." (ECF Docket No. 272 at 3-4.) As DiDonato noted, all of Plaintiffs' claims against him are common among the co-defendants to whose motions for summary judgment he joined.[5] (*Id.* at 3.)

In their Memorandum of Law in Opposition to DiDonato's Motion, Plaintiffs cite to several out-of-circuit opinions that discourage such incorporation by reference. (ECF Docket No. 296 at 6.) Notably, none of these decisions hold that a defendant may not incorporate by reference portions of a co-defendant's motion for summary judgment. While such incorporation by reference may, in some cases, be "unworkable from a practical standpoint" as Plaintiffs' argue, here it is not. (ECF Docket No. 296 at 5.) Here, Defendant DiDonato explicitly incorporates portions of three co-defendant motions. As such, we find this incorporation to be acceptable.

The three motions that DiDonato incorporates by reference all discuss the Pennsylvania statutes of limitations applicable to Plaintiffs' common law claims. (ECF Docket No. 258 at 15-

---

[5] DiDonato specifically incorporates by reference the law cited in the motions for summary judgment of "[d]efendants including Saul Ewing Arnstein & Lehr LLP, John Snyder, and David Falcone (collectively, the 'Saul Defendants'), Norman and Robert Aerenson and [Gregory] Pettinaro . . ." (ECF Docket No. 272 at 3.) This Court granted the Saul Defendants' and the Aerensons' Motions for Summary Judgment on December 20, 2019 and January 17, 2020, respectively. (ECF Docket Nos. 312, 319.) Gregory Pettinaro was voluntarily dismissed with prejudice on September 16, 2019. (ECF Docket No. 288.)

11

16; ECF Docket No. 265 at 10-12; ECF Docket No. 266 at 11-13.) Under Pennsylvania common law, DiDonato is accused of:

> Count I: Aiding and Abetting Breach of Fiduciary Duty;
> Count II: Civil Conspiracy;
> Count VI: Fraud;
> Count VIII: Conversion;
> Count IX: Negligent Misrepresentation; and
> Count X: Tortious Interference with Contract.

(ECF Docket No. 43.)

Each of these claims is governed by a two-year statute of limitations.[6] PA. CONS. STAT. §5524(3), (7). Under the applicable Pennsylvania law, statutes of limitations are calculated from the time the cause of action accrues. PA. CONS. STAT. 5502(a). A cause of action accrues when the plaintiff could have "first maintained the action to a successful conclusion." *Fine v. Checcio*, 870 A.2d 850, 857 (Pa. 2005).

Pennsylvania law, however, provides exceptions that toll the running of a statute of limitations. *Id.* at 858. Among these exceptions are the discovery rule and fraudulent concealment exceptions. The discovery rule allows the tolling of a statute of limitations "where the existence of the injury is not known to the complaining party and such knowledge cannot reasonably be ascertained within the prescribed statutory period. . ." *Hayward v. Med. Ctr. of Beaver Cnty.*, 608 A.2d 1040, 1043 (Pa. 1992). In applying the discovery rule, the Pennsylvania Supreme Court has established that "the salient point . . . is the inability of the injured, despite the exercise of reasonable diligence, to know that he is injured and by what cause." *Fine*, 870

---

[6] Counts VIII and X are governed by Section 5524(3), which applies to "[a]n action for taking, detaining or injuring personal property, including actions for specific recovery thereof." PA. CONS. STAT. §5524(3). Counts I, VI, and IX are controlled by Section 5524(7), which applies a two-year statute of limitations to "any other action or proceeding to recover damages for injury to person or property which is founded on negligent, intentional, or otherwise tortious conduct or any other action or proceeding sounding in trespass, including deceit or fraud . . ." PA. CONS. STAT. §5524(7). Count II, civil conspiracy, is governed by either Section 5524(3) or 5542(7) as "the statute of limitations for conspiracy is the same as that for the underlying action which forms the basis of the conspiracy." *Kingston Coal Co. v. Felton Mining Co.*, 690 A.2d 284, 287 n.1 (Pa. Super. Ct. 1997).

A.2d at 858. When the discovery rule applies, the statute of limitations "is tolled, and does not begin to run until the injured party discovers or reasonably should discover that he has been injured and that his injury has been caused by another party's conduct." *Id*. at 859. Nothing in the record indicates that this exception applies.

Under the doctrine of fraudulent concealment, a defendant is estopped from invoking the statute of limitations if "through fraud or concealment, he causes the plaintiff to relax his vigilance or deviate from his right of inquiry into the facts." *Id.* at 860 (citing *Deemer v. Weaver*, 187 A. 215, 215 (Pa. 1936)). For the doctrine to apply, "fraud in the strictest sense" is not required, but rather "fraud in the broadest sense, which includes an unintentional deception." *Id*. The Pennsylvania Supreme Court, however, has also emphasized that the standard of reasonable diligence dictates that "a statute of limitations that is tolled by virtue of fraudulent concealment begins to run when the injured party knows or reasonably should know of his injury and its cause." *Id*. at 861. Similarly, nothing in the record suggests that this exception applies here.

Plaintiffs filed their initial Complaint on February 7, 2017. (ECF Docket No. 1.) As such, given the two-year statutes of limitations that apply to these state law claims, we must determine if these claims accrued on or before February 7, 2015. Here, it is undisputed that all alleged actions giving rise to Plaintiffs' common law claims occurred prior to—at latest—May 2014. (ECF Docket No. 43 at ¶ 88 ("These practices ceased in April of 2014 because the Company began using a fleet fuel card service that was much more secure. . ."); ECF Docket No. 309 at ¶ 2 (". . . he did business with Plaintiff and the Defendants . . . during a timeframe (September [2013] through May 2014). . .").) Considering this, there is no genuine dispute of material fact relevant to the applicable statutes of limitations or their tolling. As such, Plaintiffs'

Pennsylvania common law claims are time-barred as the applicable statutes of limitation expired, at latest, in May 2016. Therefore, we grant summary judgment on this basis on all state law claims.

IV. **CONCLUSION**

We hereby grant Defendant Thomas DiDonato's Motion for Summary Judgment on all counts. (ECF Docket No. 272.) No genuine dispute of material fact exists relevant to (1) DiDonato's civil RICO liability or (2) the applicability of the Pennsylvania statutes of limitation that govern Plaintiffs' state law claims. An appropriate Order follows.