IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LAUREL GARDENS, LLC, *et al.*, | |
| Plaintiffs, | |
| v. | CIVIL ACTION NO. 17-570 |
| TIMOTHY MCKENNA, *et al.*, | |
| Defendants. | |

## MEMORANDUM

**SCHMEHL, J.** /s/ JLS                                                                                    May 17, 2021

    Presently before the Court is the Isken defendants' Motion for Judgement on the Pleadings, or alternatively, Motion for Summary Judgment. I previously Ordered discovery to commence with the Isken defendants given the posture of the case and merits of the allegations, therefore, the Motion for Judgment on the Pleadings is improper. Accordingly, I need only address the Motion for Summary Judgment.

    In their Motion, the Iskens argue that they are not the proper parties for this suit, that the statute of limitations have expired, and that the civil RICO claims are insufficient as a matter of law. I deny the Iskens' Motion because the Iskens are proper parties to this suit, the statute of limitations have not expired given the plaintiffs' reasonable diligence in discovering the Iskens' involvement, and the RICO claims are sufficient because the Iskens loaned monies to the kingpin of the racketeering enterprise and received free services in return.

## FACTUAL BACKGROUND

Plaintiff Charles Gaudioso first met and conducted business with Defendant Timothy McKenna in 2007 or 2008. (ECF #281 at ¶7.) In the intervening years, the relationship between Mr. Gaudioso and Mr. McKenna collapsed and become hostile. As a result, Mr. Gaudioso and his co-plaintiff companies[1] filed suit against Mr. McKenna and 32 other defendants, alleging that Mr. McKenna coordinated "a widespread criminal conspiracy that was engaged in a pattern of racketeering activity across state lines … [in violation of] the Racketeer Influenced and Corrupt Organizations Act ('RICO'), 18 U.S.C. §§ 1961-1968." (ECF #268 at 1.)

Presently before the Court is the Isken[2] defendants' Motion for Judgement on the pleadings, or alternatively, Motion for Summary Judgment.[3] (ECF #342.) In their motion, the Iskens argue that they are not the proper parties to this suit, that the statute of limitations have expired, and the civil RICO claims are insufficient as a matter of law.

The Iskens' alleged involvement with the racketeering enterprise is based on personal loans made by the Iskens to Tim McKenna, and the Iskens receiving free or discounted snow removal and salt services in return. Don and Paul Isken first met Tim McKenna in 2004 or 2005. (ECF #391, Joint Statement of Undisputed Facts.) In January 2007, Isken Enterprises, LLC, loaned the McKennas $100,000. (*Id.* ¶7.) It took the McKennas eight years to repay this loan. (*Id.* ¶11.) In the interim, the Iskens loaned more money in what they claim was their effort to eventually get repaid on the $100,000 loan, they nearly foreclosed on the McKennas' home, and they received numerous services from plaintiffs' business at no or a discounted cost.

---

[1] The Plaintiffs in this matter are (1) Charles P. Gaudioso; (2) LGSM, GP; (3) Laurel Gardens Holdings, LLC; (4) American Winter Services, LLC; and (5) Laurel Gardens, LLC. (ECF #43.)
[2] The Isken defendants are (1) Don Isken, (2) Paul Isken, and (3) Isken Enterprises, LLC.
[3] The Court Ordered discovery on the Iskens given the procedural posture of the case and the merits of the allegations, therefore, their Motion for Judgment on Pleadings is improper and the Motion for Summary Judgment is before the Court.

Specifically, the Iskens loaned the McKennas $25,000 in 2009, $72,500 in 2010 through five loans, $35,000 in 2011 through four loans, $25,000 in 2013, and $10,000 in 2014. (*Id.* ¶15.) The $100,000 loan was eventually paid off by Tim Mckenna paying $60,000, the mortgage against the McKennas' home was deemed satisfied, the sheriff's sale on the home was cancelled, and "[a]ll further debt collection actions against [the McKennas] and the outstanding judgment shall be 'satisfied.'" (*Id.* ¶11.) But more importantly to the RICO allegations, the Iskens allegedly received numerous snow removal and salt services for free or at a discount as further consideration for the loans. (*Id.* at 3-5, 20-24.) In fact, the Iskens and McKennas had an arrangement where the Isken hotels, a group of hotels in Delaware owned in part by the Iskens, would receive snowplow and salt services in exchange for free rooms at the hotels for the snowplow drivers. (*Id.* ¶3-4.) Additionally, on at least one occasion plaintiffs sent the Iskens a bill for snowplow and salt services that Paul Isken rejected and told plaintiffs "to discuss the transaction with Timothy McKenna." (*Id.* ¶5.)

Given the loans to Tim McKenna and the services the Iskens received through plaintiffs' businesses in exchange, plaintiffs filed common law claims of conversion and tortious interference of contract, and federal RICO claims against the Iskens. The Iskens seek judgment on all claims.

## **ANALYSIS**

**1. Summary Judgment Standard**

Summary judgment is granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In this analysis, all facts are viewed in the light most favorable to the non-moving party. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 903 (1990) (quoting *United States v. Diebold, Inc.*,

369 U.S. 654 (1962)). "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." *Pignataro v. Port Auth. of N.Y. and N.J.*, 593 F.3d 265, 268 (3d Cir. 2010) (citing *Reliance Ins. Co. v. Moessner*, 121 F.3d 895, 900 (3d Cir. 1997)). Therefore, it follows that for purposes of summary judgment a dispute is genuine when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law governing a case determines which facts are material. *Id.* As such, factual disputes that are irrelevant or unnecessary will not be counted and only those disputes of fact that "might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Id*.

2. **The Iskens are the Proper Parties.**

The Iskens argue that they are not proper parties for this suit because the "Isken hotels" are not entirely owned by Don or Paul Isken, nor Isken Enterprises. (ECF #342, at 4) (Joint Statement of Undisputed Facts labeling them as the "Isken Hotels.") The allegations against the Iskens are not simply about the hotels receiving snow removal and salt services. The allegations and evidence supports that the Iskens were involved with Tim McKenna and the racketeering enterprise by making personal loans to Tim McKenna, and receiving free or discounted services at their homes and the Isken Hotels (which they partly own). The Iskens' mere contention that they are not the proper parties is without merit.

3. **All Claims were Brought Within the Statute of Limitation Periods.**

The Federal civil RICO claims are subject to a four-year statute of limitations that begin to toll when a plaintiff is on "inquiry notice" of its injuries. *Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 506 (3d Cir. 2006). To determine when a party is on inquiry notice, the Third Circuit

applies "an injury discovery rule 'whereby a RICO claim accrues when plaintiffs knew or should have known of their injury.'" *Id.* at 507 (citing *Mathews v. Kidder Peabody & Co.*, 260 F.3d 239, 252 (3d Cir. 2001)).

The injury discovery rule inherently has both subjective and objective components. *Mathews*, 260 F.3d at 250. The Third Circuit has emphasized that "[t]he subjective component needs little explanation—a claim accrues no later than when the plaintiffs themselves discover their injuries." *Id*. To analyze the objective component, however, the Third Circuit has elaborated a two-step framework. *Id*. at 252. First, the burden is on the defendant to show the existence of "storm warnings" indicating the possibility of fraud. *Id*. at 251-52 (citing *Havernick v. Network Express*, 981 F. Supp. 480 (E.D. Mich. 1997); *Addeo v. Braver*, 956 F. Supp. 443 (S.D.N.Y. 1997)). The Third Circuit has declined to elaborate an exhaustive list of what constitutes such "storm warnings," but has described their existence as "a totally objective inquiry" emphasizing that "[p]laintiffs need not be aware of the suspicious circumstances or understand their import." *Id.* at 252. Indeed, the Court has underscored that "[i]t is enough that a reasonable investor of ordinary intelligence would have discovered the information and recognized it as a storm warning." *Id*. Second, if a defendant establishes the existence of "storm warnings," the burden shifts to the plaintiffs to demonstrate the inability to discover and avoid the injury despite exercising reasonable due diligence. *Id*.

On the other hand, the Pennsylvania common law claims are governed by a two-year statute of limitation period. PA. CONS. STAT. § 5524(3), (7). Under the applicable Pennsylvania law, statutes of limitations are calculated from the time the cause of action accrues. PA. CONS. STAT. 5502(a). A cause of action accrues when the plaintiff could have "first maintained the action to a successful conclusion." *Fine v. Checcio*, 870 A.2d 850, 857 (Pa. 2005).

Pennsylvania law, however, provides exceptions that act to toll the running of a statute of limitations. *Id*. at 858. In this matter, plaintiffs invoke the discovery rule and fraudulent concealment exceptions. (ECF #390, 18.) The discovery rule allows the tolling of a statute of limitations "where the existence of the injury is not known to the complaining party and such knowledge cannot reasonably be ascertained within the prescribed statutory period. . ." *Hayward v. Med. Ctr. of Beaver Cnty.*, 608 A.2d 1040, 1043 (Pa. 1992). In applying the discovery rule, the Pennsylvania Supreme Court has established that "the salient point . . . is the inability of the injured, despite the exercise of reasonable diligence, to know that he is injured and by what cause." *Fine*, 870 A.2d at 858. When the discovery rule applies, the statute of limitations "is tolled, and does not begin to run until the injured party discovers or reasonably should discover that he has been injured and that his injury has been caused by another party's conduct." *Id*. at 859.

Under the doctrine of fraudulent concealment, a defendant is estopped from invoking the statute of limitations if "through fraud or concealment, he causes the plaintiff to relax his vigilance or deviate from his right of inquiry into the facts." *Id.* at 860 (citing *Deemer v. Weaver*, 187 A. 215, 215 (Pa. 1936)). For the doctrine to apply, "fraud in the strictest sense" is not required, but rather "fraud in the broadest sense, which includes an unintentional deception." *Id*. The Pennsylvania Supreme Court, however, has also emphasized that the standard of reasonable diligence dictates that "a statute of limitations that is tolled by virtue of fraudulent concealment begins to run when the injured party knows or reasonably should know of his injury and its cause." *Id*. at 861.

Here, the complaint was filed on February 7, 2017, thereby making February 7, 2013, the RICO claim bar date, and February 7, 2015, the Pennsylvania common law claim bar date. The pertinent events and their respective dates are as follows.

In January 2012, a Controller for plaintiffs' business determined that Tim McKenna stole at least $117,000 from the business. In May 2012, the Iskens sued Tim McKenna for monies related to their first loan of $100,000. In April 2014, AWS sent an invoice to one of the Isken Hotels that Paul Isken refused to pay and told AWS to "discuss the transaction with Timothy McKenna." The invoice was never paid. In December 2014, plaintiffs sued Tim McKenna in the Delaware Court of Chancery for the fraudulent use of company assets. In February 2016, Asterion, an independent consultation company, provided a report after a full investigation into the McKennas' dealings and actions, which implicated the Iskens.

The Iskens argue that "[i]t is impossible for Plaintiffs [sic] to argue that they could not reasonably have discovered Tim McKenna's debt trouble with the Isken Defendants before February 17, 2016," and that "Plaintiffs cannot dispute that they knew the nature of Tim McKenna's malfeasance before the state claim bar date of February 7, 2015." (ECF #393, at 6-7.) These arguments miss the issue. The statute of limitations issue presented in the Iskens' own motion is, in essence, whether the plaintiffs could have reasonably discovered the *Iskens'* involvement with the racketeering enterprise—not whether the plaintiffs could have reasonably discovered Tim McKenna's involvement, debt troubles, and other malfeasance.

The only evidence that suggests that the plaintiffs could have been aware of the Iskens' involvement was Paul Isken refusing to pay a single bill in April 2014. But that is not sufficient notice. Plaintiffs performed reasonable diligence in relation to their issues and losses by hiring an independent consultation company, Asterion, to perform a full investigation and report on the

7

alleged racketeering. When Asterion provided their report in February 2016 the statute of limitation clearly began to toll at that point, therefore, plaintiffs suit that was brought in February 2017 was filed within the applicable two- and four-year statute of limitation periods.

**4. Plaintiffs' RICO Claims are Sufficient.**

    a. <u>"Operation or Management" of the Alleged Racketeering Enterprise under Section 1962(c).</u>

Subsection 1962(c) of the Racketeer Influenced and Corrupt Organizations Act (RICO) prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c) (1970).

In *Reves v. Ernst & Young*, the Supreme Court interpreted what it means "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 177 (1993). The Supreme Court considered whether one must participate in the "operation or management of the enterprise" to be found liable for a violation under this subsection. *Id*. at 172. In this context, the Supreme Court understood the word "conduct" to require a degree of direction and the word "participate" to require some part in that direction. *Id*. at 179. The Court further clarified in *Reves*, however, that for a defendant to be liable under RICO section 1962(c), the defendant need not have a "formal position in the enterprise, but [that] *some* part in directing the enterprise's affairs is required." *Id*. Thus, the Court adopted an "operation or management" test, holding that "Congress did not intend to extend section 1962(c) liability beyond those who participate in the operation or management of an enterprise through a pattern of racketeering activity." *Id*. at 184. It also held, however, that "outsiders" may be liable

under section 1962(c) if they are "associated with" an enterprise *and* participate in the operation or management of the enterprise. *Id*. at 184-85.

The head of the alleged racketeering enterprise is Tim McKenna who, along with his son Michael McKenna, inflicted severe economic hardship on the plaintiffs' businesses so that they would fail, and they were successful. The Iskens' alleged role in the racketeering is that they provided fuel to the fire by giving Tim McKenna hundreds of thousands of dollars in personal loans, and some of the repayment for those loans was free services using the plaintiffs' businesses.

The Iskens met Tim McKenna in 2004 or 2005, and made their first loan of $100,000 to him in January 2007. (ECF #391, ¶6-7.) After that loan, the Iskens loaned Tim McKenna $25,000 in 2009, $72,500 in 2010 through five loans, $35,000 in 2011 through four loans, $25,000 in 2013, and $10,000 in 2014. (*Id.* ¶15.) The parties provide little evidence as to what loans were paid back and in what amounts. But the first loan of $100,000 was repaid eight years later by Tim McKenna paying $60,000, the mortgage against McKenna's home was deemed satisfied, the sheriff's sale on the home was cancelled, and "[a]ll further debt collection actions against [the McKennas] and the outstanding judgment shall be 'satisfied.'" (*Id.* ¶11.)

But that one repayment and agreement is not the full story of the consideration exchanged for the loans. Rather, some of the consideration was Tim McKenna using plaintiffs' businesses to perform unpaid services for the Iskens, which is one of the main ways that the McKennas destroyed the plaintiffs' businesses. Additionally, sometime in 2013 or 2014 Gaudioso met Don Isken to pitch him in becoming an investor in his business. During the pitch, he informed Isken that Tim McKenna had no ownership stake or management authority in the business. (ECF #390, Ex. BB.) Nevertheless, in the years after this meeting, the Iskens continued to provide loans to

9

Tim McKenna and receive free services to the detriment of plaintiffs. The Iskens and McKennas even had an agreement, unbeknownst to the plaintiffs, where the Iskens would receive snow removal and salt services for free or at a discount in exchange for providing rooms at their hotels for the snowplow drivers. (ECF #390, Ex. A & Y.) Additionally, Don Isken's driveway was plowed on a few occasions, Paul Isken rejected a $12,874 bill from AWS and told them to "discuss the transaction with Timothy McKenna," and other snow removal and salt bills were never paid by the Iskens.

These are genuine disputes of facts in which a jury could find that the Iskens "directly or indirectly" participated in the racketeering enterprise's affairs.

  b. <u>"Interest in or Control of" the Alleged Enterprise under Section 1962(b).</u>

Subsection 1962(b) of the federal RICO statute prohibits "any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(b) (1970).

In the context of RICO actions, the Supreme Court has held that "interest" means a "right, claim, title, or legal share in something." *Frankford Trust Co. v. Advest, Inc.*, No. 93-329, 1997 U.S. Dist. LEXIS 3441, at *23 (E.D. Pa. Jan. 14, 1997) (quoting *Russello v. U.S.*, 464 U.S. 16, 21 (1983)). The Supreme Court, however, has not defined the word "control" as it appears in this statute. *Id*. Notwithstanding, the Third Circuit has distinguished between subsection 1962(b) and 1962(c) of the statute, categorizing 1962(b) as the provision which prohibits the *acquisition* of an enterprise and 1962(c) as that which prohibits the *operation* of an enterprise through racketeering. *Id*. at *23-24 (citing *Jaguar Cars, Inc. v. Royal Oaks Motor Car*, 46 F.3d 258, 267 (3d Cir. 1995)).

Following this reasoning, this Court has held that "the control contemplated by section 1962(b) is in the nature of the control one gains through the acquisition of sufficient stock to affect the composition of a board of directors . . . or by gaining a proprietary interest in the enterprise." *Id.* at *24. Indeed, this Court has cited the facts of *United States v. Local Union 560 of the International Brotherhood of Teamsters* as a "classic example of the degree of control" required under this subsection. *Id.* (citing *United States v. Local 560 of the Int'l Bhd. of Teamsters*, 780 F.2d 267 (3d Cir. 1985)). In that case, an organized crime syndicate seized control of a union, through murder and extortion, ultimately infiltrating, and essentially acquiring, the alleged RICO enterprise (the union). *Id*. at *24-25.

Ultimately, the McKennas achieved their objective in destroying the plaintiffs' businesses, and the Iskens allegedly had an "interest in or control of" this objective by providing personal loans for free services. No evidence suggests that the Iskens directly coordinated with the McKennas' plans in any way, but the evidence shows that substantial loans were made to the racketeering kingpin, and little money and free services were exchanged in return for the loans. In sum, Tim McKenna was in substantial debt to the Iskens and the Iskens received free services in return—this is sufficient to establish triable issues as to whether the Iskens had an "interest in or control of" the RICO enterprise.

    c. <u>Rico Conspiracy Claim under Section 1962(d).</u>

Section 1963(d) makes it unlawful to "conspire to violate . . . subsections (a), (b), or (c) of this section. 18 U.S.C. § 1962(d). Given the triable issues of facts in the previous two sections, the section 1963(d) claims must survive summary judgment.

## CONCLUSION

After viewing all the facts in a light most favorable to the plaintiffs, the Isken defendants' Motion for Judgment on the Pleadings, or alternatively, Motion for Summary Judgment is denied.