## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LAUREL GARDENS LLC *et al.*,      :
                                   :
        Plaintiffs,      :
                                   :
    v.                           :      CIVIL ACTION NO. 17-570
                                   :
TIMOTHY MCKENNA *et al.*,          :
                                   :
        Defendants.      :

### MEMORANDUM OPINION

SCHMEHL, J.                                                    August 10, 2023

Plaintiff Charles Gaudioso and his co-plaintiff companies[1] have filed suit against numerous defendants, principally concerning the allegation that Defendants Timothy and Michael McKenna were "at the center of" a longstanding "criminal enterprise" that would "convert assets owned by others for their own benefit, either directly or to pay off debts that they have accumulated." (Am. Compl. ¶ 45.) Specifically, the McKennas—together with many associates also named in this case—allegedly misappropriated Plaintiffs' company trade secrets for use by MAT Site Management, LLC, a competing company run by the McKennas (together with the McKennas, the "McKenna Defendants"); sabotaged Plaintiffs' relationships with clients; and otherwise impermissibly interfered with Plaintiffs' business dealings. (*Id.* ¶¶ 49–51.)

Presently, Defendants Donald Isken, Paul Isken, and Isken Enterprises, LLC (collectively, the "Isken Defendants") have moved for summary judgment on various theories: Plaintiffs' state

---

[1] The Plaintiffs in this matter are (1) Charles P. Gaudioso; (2) LGSM, GP; (3) Laurel Gardens Holdings, LLC; (4) American Winter Services, LLC; and (5) Laurel Gardens, LLC. (*See* Am. Compl., ECF No. 43.)

law claims are time-barred (*see* Isken Defs.' Br. at 13, ECF No. 441-2); Plaintiffs' RICO claims fail as a matter of law (*id.* at 14–24); Plaintiffs released the Isken Defendants from the present claims by at least one of various settlement agreements reached between Plaintiffs and other Defendants in this case (*id.* at 24–27); and Plaintiffs will be unable to prove damages at trial due to an allegedly deficient expert report (*id.* at 25).   Defendants Henry and Margit Julicher (the "Julicher Defendants") have joined in the Isken Defendants' Motion and present largely congruous bases for dismissal. (*See* Julicher Defs.' Br. at 1, ECF No. 442-1.)  Because the Court finds below that Plaintiffs have failed to establish the existence of a RICO enterprise, the Court grants the Motions filed by the Isken and Julicher Defendants.[2]

## I.   BACKGROUND

This action alleges a lengthy and complex conspiracy to siphon assets and services from Plaintiffs for the benefit of, primarily, Timothy McKenna and, secondarily, an alleged cohort of third parties that accepted the assets and services, often in exchange for relieving debts that Mr. McKenna owed these third parties. (Am. Compl. ¶ 6.)  Another related goal of the conspiracy, Plaintiffs allege, was to put Plaintiffs out of business by redirecting their clients and other business opportunities to the McKenna Defendants. (*Id.* ¶ 4.)

### A.   The Isken Defendants' Conduct

#### 1.   The "Rooms-for-Salt" Deal

Specific to the Isken Defendants, Paul Isken relied on Timothy McKenna for snow removal services since at least 2004. (First Joint Statement of Undisputed Facts ("1st JSUF") ¶¶ 2, 6, ECF

---

[2]    The McKenna Defendants have also moved for summary judgment (ECF No. 437) based on a settlement agreement with Plaintiffs purporting to release the McKenna Defendants of claims at issue in this case.  Given the Court's finding as to the non-existence of a RICO enterprise, the Court does not reach the merits of the McKenna Defendants' position.

No. 391.)[3]  The Isken Defendants had an arrangement with Mr. McKenna whereby the former would receive these services and ice-melting calcium at discounted rates, and the latter would receive free hotel guest rooms. (*Id.* ¶ 3.)  Plaintiffs claim that they were unaware of this "rooms-for-salt" deal when Charles Gaudioso purchased the company in March 2012. (Pls.' Br. Opp. Iskens at 8, ECF No. 453.)  Plaintiffs further allege that Paul Isken canceled the deal in February 2010 (Pls.' Br. Opp. Iskens Ex. 9, ECF No. 453-9), only to reinstate it later, without Mr. Gaudioso's knowledge or consent (Pls.' Br. Opp. Iskens at 9).  In fact, Plaintiffs claim that in mid-2013, Mr. Gaudioso informed Donald Isken that Mr. McKenna did not own or manage AWS or its affiliates and lacked authority to enter into agreements on their behalf. (*Id.* at 13–14.)  Perhaps relatedly, around that same time, Plaintiffs had investigated and discovered that Mr. McKenna had stolen "not huge amounts, but important amounts" of money, after which Plaintiffs signed an agreement with Mr. McKenna "giving him a second chance" and requiring him to eventually pay back the funds. (Gaudioso Dep. at 58:14–24, Apr. 28, 2022, ECF No. 441-3.)

Plaintiff American Winter Services, LLC ("AWS") provided snow melting products and snow plowing services to one of the Isken Defendants' hotels in January and February 2014 (Second Joint Statement of Undisputed Facts ¶ 1, ECF No. 441-4) and sent an invoice for these services in April 2014 (1st JSUF ¶¶ 20–21, 26).  In a phone call estimated to have occurred in late May 2014 (*see* Gaudioso Dep. at 93:12–95:11, Apr. 28, 2022), the Isken Defendants refused to pay the invoice and directed Plaintiffs to discuss the matter with Timothy McKenna (*id.*; *see also* 1st JSUF ¶¶ 21–22, 26).  Despite this interaction, Mr. Gaudioso testified that he did not follow up with Mr. McKenna about this arrangement because "this was just another instance" of Mr.

---

[3]     The parties submitted this joint statement in connection with a prior motion by the Isken Defendants (ECF No. 342), which this Court denied (ECF Nos. 400, 401).

McKenna allegedly stealing from Plaintiffs, Mr. Gaudioso "was already preparing to fire" Mr. McKenna, and Mr. Gaudioso was more concerned with recovering a different, larger stolen account. (Gaudioso Dep. at 95:12–96:15, Apr. 28, 2022.) Mr. Gaudioso did not schedule a follow-up meeting or otherwise pursue this invoice with any of the Isken Defendants until the filing of this litigation. (*Id.* at 365–67.) Finally, Plaintiffs also claim that Donald Isken has declined to pay for snow removal services completed at his home in January and February 2014. (Pls.' Br. Opp. Iskens at 12; Am. Compl. ¶ 135.) The parties dispute whether the corresponding invoice was ever sent to any of the Isken Defendants, and Plaintiffs did not attempt to collect before filing this lawsuit. (Isken Defs.' Br. at 7–8 n.5.)

According to Mr. Gaudioso's testimony, Plaintiffs hired an accounting firm, Asterion, in October 2015. (Gaudioso Dep. at 458:16–24, Feb. 14, 2019, ECF No. 441-3.) By early 2016, Asterion had completed a forensic audit of Plaintiffs' claimed losses, including those allegedly attributable to the Isken Defendants' involvement with Mr. McKenna. (*Id.*)

### 2.    Timothy McKenna's Debts to the Isken Defendants

In addition to the "rooms-for-salt" deal, Timothy McKenna and the Isken Defendants maintained a creditor-debtor relationship.   In January 2007, Isken Enterprises loaned Mr. McKenna and his wife $100,000, using the latter's home as collateral.   (1st JSUF ¶¶ 7, 9.) Although repayment was due in March 2007, Mr. McKenna did not resolve his debt until over eight years later.   (*Id.* at ¶¶ 10–11.)   Subsequent to the loan made in January 2007, and notwithstanding Mr. McKenna's nonpayment of that loan, the Isken Defendants loaned money to Mr. McKenna on 12 other occasions between December 2009 and May 2014, totaling $167,500 in additional debt. (*Id.* ¶ 15.) Donald Isken explained in deposition testimony that he continued to offer credit to Mr. McKenna "to fund whatever he was trying to accomplish in the hopes that ultimately he would pay the $100,000 back and we can sever all our ties to him." (*Id.* ¶ 16.)

Ultimately, in October 2015, Timothy McKenna agreed with the Isken Defendants to pay $60,000 to resolve the obligation (as well as to end debt collection procedures that the Isken Defendants pursued in the interim). (*Id.* ¶¶ 10–11, 14.) Critically, in Plaintiffs' view, the extraordinary interest rate applicable to the original January 2007 loan meant that at the time of the October 2015 resolution, Mr. McKenna owed a grand total of over $500,000 to the Isken Defendants. (Pls.' Br. Opp. Iskens at 4–5.) Furthermore, the October 2015 agreement may have also resolved Mr. McKenna's *other* debts to the Isken Defendants, though the parties have not provided a definitive answer on this point. (1st JSUF ¶ 19; Pls.' Br. Opp. Iskens at 9–11.) In any event, to make this $60,000 payment, Mr. McKenna relied on $10,000 of his own funds and $50,000 from Bernard Meyers.[4] (1st JSUF ¶ 12.) Thereafter, the Isken Defendants made another four loans to Mr. McKenna between November 2015 and March 2016, totaling $39,200 in debt. (*Id.* ¶ 15 & n.3.)

In light of the paltry sum of $60,000 that appears to have resolved Timothy McKenna's significant debts to the Isken Defendants, Plaintiffs infer that the unpaid or discounted services and ice-melting salt provided to them represent additional consideration for Mr. McKenna's debt relief and, consequently, are assets misappropriated by Mr. McKenna and the Isken Defendants— especially given the latter's alleged knowledge that Mr. McKenna lacked authority to contract on behalf of Plaintiffs. (Pls.' Br. Opp. Iskens at 12–14.)

### B.      The Julicher Defendants' Conduct

As was the case for the Isken Defendants, the Julicher Defendants have lent the McKenna Defendants potentially significant sums of money. The grand total appears to be unknown, though

---

[4]      Mr. Meyers was formerly a defendant in this case, but Plaintiffs' First Amended Complaint removed him as a named party.

Mr. Julicher testified that this extension of credit "was an ongoing process of getting hit up every couple weeks for another $5,000 because [Timothy McKenna's] business had to . . . keep going or his mortgage had to be paid." (Pls.' Br. Opp. Julichers at 4 (quoting deposition testimony).) The Julicher Defendants also loaned $300,000 to Plaintiffs, which Plaintiffs repaid through three separate deals. First, Plaintiffs paid the Julicher Defendants $84,000 and provided another $40,000 in landscaping services to them. (*Id.* at 5.) Second, the Julicher Defendants agreed to reduce Plaintiffs' obligation by $100,000 in exchange for plants and other inventory received from Moon Nurseries.[5] (*Id.* at 5–6.) Plaintiffs had acquired this inventory after agreeing to provide Moon Nurseries with salt from another company, Chemical Equipment Labs of Delaware. (*Id.*) Chemical Equipment, in turn, provided this salt in exchange for Mr. McKenna's assumption of a debt owed by one Plaintiff to Chemical Equipment. (*Id.*) The upshot of this multipart transaction was that the Julicher Defendants ultimately sold the Moon Nurseries inventory to MAT Site Management for $370,000. (*Id.* at 6.) This complex series of transactions has become known as the "salt-for-trees" deal in the parties' filings. Third, and finally, after Plaintiffs sued Mr. McKenna in Delaware, they negotiated for the McKenna Defendants to assume another $100,000 of Plaintiffs' debt to the Julicher Defendants. (*Id.*)

Basic math suggests (and Plaintiffs indeed allege) that the Julicher Defendants received far more than $300,000 in return for their loan. (*Id.* at 7.) Although the law does not prohibit shrewd business maneuvering, Plaintiffs allege further that they only agreed to the salt-for-trees deal due to physical and commercial threats made by Mr. Julicher, including that Mr. Julicher would put Plaintiffs out of business. (*Id.* at 7–9.) Such coercion might explain why Plaintiffs exchanged

---

[5]      Plaintiffs named Moon Nurseries as a defendant in their initial Complaint but later dropped them from this case in the Amended Complaint. (*Compare* ECF No. 1, *with* ECF No. 43.)

$370,000 in Moon Nurseries inventory for just $100,000 in debt relief. Plaintiffs also point to the Julicher Defendants' provision of loans and Plaintiffs' confidential business information to the McKenna Defendants as further evidence of the Julicher Defendants' intent to bankrupt Plaintiffs by supporting their competitors. (*Id.* at 10–12.) The motives for such malicious intent, Plaintiffs claim, include following: the Julicher Defendants came to view the McKenna Defendants as offering better business opportunities; and if Plaintiffs fell into bankruptcy, a contract provision relating to the $300,000 loan entitled the Julicher Defendants to acquire a 70 percent ownership interest in Laurel Gardens, which interest they could, thereafter, transfer to the apparently more viable McKenna Defendants. (*Id.* at 12–13.)

  **C.**  **The Isken and Julicher Defendants' Relationship to the RICO Enterprise**

  The record's reflection of the Isken and Julicher Defendants' relationship to each other and the rest of the RICO enterprise is limited. As to their relationship with each other, Mr. Gaudioso testified in his deposition that he was "aware of [a] conspiracy between the Julichers and the Iskens to harm the Plaintiffs," because the Julicher Defendants "funded the payout to the Iskens again strengthening Tim and Michael McKenna to continue damages to us." (Gaudioso Dep. at 184:20–185:24, Apr. 28, 2022.) But it is not clear what transaction Mr. Gaudioso refers to here as "the payout," and he was not able to specify the evidence that, in his view, supported this belief. (*Id.*) Later in his deposition, Mr. Gaudioso also testified that he did not know of "any personal relationship between the Iskens and the Julichers," but he assumed that they knew of each other because the Isken Defendants "got money from [the Julicher Defendants] so they should know who they are." (*Id.* at 199:18–200:2.) Donald Isken and Hank Julicher's testimony contradicts this assertion, however: Mr. Isken testified that he never heard of Mr. Julicher until he read the Complaint in this case (D. Isken Dep. at 59:4–13, Nov. 11, 2020, ECF No. 441-3), and Mr. Julicher claimed that he did not know or do business with the Isken Defendants (H. Julicher Dep. at 35:22–

- 7 -

23, Aug. 30, 2019, ECF No. 452-1).  Plaintiffs' own counsel acknowledged, in the context of whether the Isken and Julicher Defendants should be considered joint tortfeasors, that "[a]lthough the Iskens and Julichers acted in conjunction with the McKennas, the Iskens and Julichers did not act in conspiracy with each other."  (Isken App. Ex. M at 4, ECF No. 441-3.)  Plaintiffs, in their briefing on the present Motions, make no reference to any connection between the Isken and Julicher Defendants other than their supposed shared interest in putting Plaintiffs out of business so that the McKenna Defendants could succeed and pay back their debts. (Pls.' Br. Opp. Iskens at 29.)

The parties have not focused on the Isken and Julicher Defendants' relationships to other members of the alleged RICO enterprise, perhaps because they are likewise minimal or non-existent.  As noted above, former defendant Bernard Meyers once paid $50,000 to the Isken Defendants in partial satisfaction of Timothy McKenna's debts to them.  (1st JSUF ¶ 12.)  Mr. Gaudioso identified this lone payment as basis to believe in a conspiracy between Mr. Meyers and the Isken Defendants to harm Plaintiffs.  (Gaudioso Dep. at 182:23–183:14, Apr. 28, 2022.)  Donald Isken, however, testified that other than receiving this payment from Mr. Meyers, Mr. Isken never met or spoke with him.  (D. Isken Dep. at 41:3–7, Nov. 11, 2020.)

Also according to Mr. Gaudioso's testimony, the law firm Saul Ewing LLP and certain of its attorneys, also former defendants who this Court dismissed from the case based on the applicable statutes of limitation (ECF Nos. 311–12), conspired with the Isken Defendants to harm Plaintiffs (Gaudioso Dep. at 198:16–22, Apr. 28, 2022).  But as Mr. Gaudioso quickly acknowledged, those former defendants in fact represented Timothy McKenna *against* claims brought by the Isken Defendants, suggesting that "probably it's not a conspiracy." (Gaudioso Dep. at 199:10–17, Apr. 28, 2022.)

As to the Julicher Defendants' relationships with other enterprise members, Mr. Julicher testified to limited or no connections with many enterprise members, though he appears to have been a somewhat forgetful witness in his deposition. (H. Julicher Dep. at 34:16–38:11, Aug. 30, 2019.) At the very least, he was familiar with and had loaned money to former defendant Moon Nurseries (*id.* at 57:19–21), but most such transactions (if not all but one, the "salt-for-trees" deal) did not involve the McKenna Defendants or Plaintiffs (Wright Dep. at 29:7–30:21, Sept. 17, 2018, ECF No. 452-1). The Julicher Defendants also employed former defendant Christopher Wright, who ultimately reached a settlement agreement with Plaintiffs, in connection with their synthetic turf and lending businesses. (Wright Dep. at 7:7–9:18, Sept. 17, 2018.) Through this role, Mr. Wright interacted with Plaintiffs, the McKenna Defendants, and Moon Nurseries (including in connection with the "salt-for-trees" deal).

## II.   STANDARD OF REVIEW

On a motion for summary judgment, the court must consider the "underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Slagle v. Cnty. of Clarion*, 435 F.3d 262, 264 (3d Cir. 2006) (citations omitted). Summary judgment is proper when there is no genuine dispute of material fact and the movant is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

If the movant carries its initial burden of showing the basis of its motion, the burden shifts to the non-moving party to go beyond the pleadings and point to "specific facts showing that a genuine issue exists for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). In other words, the non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." *Podobnik v. US. Postal Serv.*, 409 F.3d

584, 594 (3d Cir. 2005) (citation and internal quotation marks omitted). Summary judgment must be granted against a non-moving party who fails to sufficiently "establish the existence of an essential element of its case on which it bears the burden of proof at trial." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014).

## III.   ANALYSIS

The Isken and Julicher Defendants provide various bases for their position that Plaintiffs' RICO claims are deficient, but the Court resolves the present Motions on just one: Plaintiffs have failed to establish the existence of a RICO enterprise. In other words, using the metaphor of a wheel comprising a hub, spokes, and rim, Plaintiffs have merely shown a "rimless" enterprise in which the "spokes" engage in independent, parallel conduct with the "hub." Because Plaintiffs have failed to establish the requisite relationships among the "spokes," the Court must dismiss their RICO claims.

### A.    Legal Standards

Plaintiffs have brought their RICO claims under 18 U.S.C. § 1962(b)–(d). Subsection (b) provides that "[i]t shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." Subsection (c) provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." Finally, subsection (d) proscribes any person from "conspir[ing] to violate" the foregoing subsections.

Plaintiffs have alleged an enterprise "of individuals associated in fact," *see* 18 U.S.C. §

1961(4), which the U.S. Supreme Court has explained "must have at least three structural features:

a purpose, relationships among those associated with the enterprise, and longevity sufficient to

permit these associates to pursue the enterprise's purpose," *Boyle v. United States*, 556 U.S. 938,

946 (2009).  Explaining the second feature, the Court wrote that "[t]he concept of 'associat[ion]'

requires both interpersonal relationships and a common interest."  *Id.*  The Court then provided, in

the context of proving certain elements of a RICO claim, the following scenario:

> It is easy to envision situations in which proof that individuals
> engaged in a pattern of racketeering activity would not establish the
> existence of an enterprise.  For example, suppose that several
> individuals, *independently and without coordination*, engaged in a
> pattern of crimes listed as RICO predicates—for example, bribery
> or extortion.  Proof of these patterns would not be enough to show
> that the individuals were members of an enterprise.

*Id.* at 947 n.4 (emphasis added).

The Third Circuit encountered this very situation—*i.e.*, one involving independent and

uncoordinated conduct—in a case addressing alleged bid-rigging and customer steering schemes

by insurance companies and their brokers.  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 374

(3d Cir. 2010).  As to the customer steering schemes, the Third Circuit held that no "horizontal

agreement" existed between the insurers (there, the "spokes") vis-à-vis their brokers (the "hubs"),

even considering the following allegations:

> [E]ach insurer entered into a similar contingent-commission
> agreement in order to become a "strategic partner"; . . . each insurer
> knew the identity of the broker's other insurer-partners and the
> details of their contingent-commission agreements; . . . each insurer
> entered into an agreement with the broker not to disclose the details
> of its contingent-commission agreements; . . . [and] the brokers
> utilized certain devices, such as affording "first" and "last looks," to
> steer business to the designated insurer . . . .

*Id.* at 374.  The court explained that "these allegations do not plausibly imply concerted action—as opposed to merely parallel conduct—by the insurers, and therefore cannot provide a 'rim' enclosing the 'spokes' of these alleged 'hub-and-spoke' enterprises."  *Id.*  The plaintiffs may have "provide[d] a plausible basis for the assertion of a number of bilateral enterprises, each encompassing a broker and one of its insurer-partners," but that was not how the plaintiffs chose to frame their case.  *Id.* at 375.

Unlike the foregoing customer steering schemes, however, the Third Circuit found that the plaintiffs *did* sufficiently allege a unifying rim for the bid-rigging schemes, in which the entity acting as the bid-rigging "hub" prepared "broking plans":

> The broking plans assigned the business to a specific insurer at a target price and outlined the coverage.  The broking plans also included instructions as to which preferred Insurers would be asked to provide alternative [*i.e.*, intentionally uncompetitive, or sham] quotes.  If the incumbent Insurer hit the "target," it would get the business and then [hub employees] would solicit "alternative" quotes from other members of the conspiracy.  The complaint also alleges the reasons why the insurers agreed to provide sham bids.  For example, it relates a statement by a former employee of a defendant insurer that his employer had agreed to "provide[] losing quotes" to [the hub] in exchange for, among other things, [the hub's] "getting 'quotes from other [insurance] carriers that would support the [employer, at least when it was the incumbent carrier] as being the best price.'"  This statement plausibly evinces an expectation of reciprocity and cooperation among the insurers.

*Id.* at 375–76 (cleaned up).  The Third Circuit explained further that the complaint satisfied *each* of the three requisite structural features—purpose, relationships, and longevity—by alleging a common purpose in "increase[ing] profits by deceiving insurance purchasers about the circumstances surrounding their purchase," the existence of relationships through "[t]he alleged reciprocal bid rigging," and sufficient longevity given the years-long scheme.  *Id.* at 376.  Finally, even though the insurers' reciprocity and cooperation were mediated through the hub, as opposed to taking the form of a direct quid pro quo transaction between the insurers, the Third Circuit

explained that it could infer the requisite interrelationship from the fact that the "reason the insurers were willing to furnish sham bids was so that they would be the beneficiaries of sham bids in the future." *Id.* at 377.

**B.      Relationships Between Enterprise Members in This Case**

With the Third Circuit's guidance in mind, the Court finds that Plaintiffs here have not established the requisite relationships between the Isken Defendants, the Julicher Defendants, and the alleged RICO enterprise.  In Plaintiffs' opposition briefs to both the Isken and Julicher Defendants' motions, Plaintiffs argue that the requisite relationships between the supposed enterprise members—*i.e.*, the unifying "rim"—was, in short, "to work with Tim McKenna to put [Plaintiffs] out of business and have MAT Site Management be the successful landscaping and snow removal company going into the future." (Pls.' Br. Opp. Iskens 29; Pls.' Br. Opp. Julichers 23.) Plaintiffs elaborate further that "every spoke would gain" from this scheme, as the McKenna Defendants would be more likely to pay back their creditors if they ran a successful business, and that the McKenna Defendants needed the involvement of every enterprise member to accomplish the scheme. (Pls.' Br. Opp. Iskens 27–29.) These arguments, however, conflate issues of purpose and causation with the relationship element set forth by the U.S. Supreme Court. *See Boyle*, 556 U.S. at 946 (requiring "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose").

As the Third Circuit held in *In re Ins. Brokerage Antitrust Litig.*, the interest of an alleged enterprise's members in increasing profits certainly speaks to their common purpose, but that fact stands apart from members' relationships with each other, which may be evidenced by, for example, *reciprocal* conduct, as in the case of the bid-rigging scheme. *See* 618 F.3d at 376. No such "expectation of reciprocity and cooperation" existed here.  *Id.*  If anything, the interests of creditors seeking to recover from a potentially insolvent borrow are *opposed*.  Indeed, as one

- 13 -

example, Mr. Wright testified that Mr. Julicher was "enraged" upon finding out that Plaintiffs had paid another creditor voluntarily dismissed from this case, Mr. Gregory Pettinaro, before paying Mr. Julicher. (Wright Dep. at 26:4–27:19, Sept. 17, 2018.) Nothing suggests that the Julicher Defendants felt any different about the Isken Defendants or any other enterprise member. Likewise, the Isken Defendants litigated *against* other supposed enterprise members—the Saul Ewing firm and certain of its attorneys—through their representation of Timothy McKenna. Lacking any indicum of reciprocity or other coordination between the supposed enterprise members here, Plaintiffs' case does not resemble the bid-rigging scheme addressed by the Third Circuit. Just because various parties would "gain" from certain conduct they partake in does not make their actions a joint enterprise with others.

Further, the members of the alleged enterprise in this case have even weaker relationships than those between the members of the customer steering schemes that the Third Circuit found insufficient for RICO purposes. There, the insurer-members "entered into a similar contingent-commission agreement[s]" with the "hub" of the scheme and "knew the identity of the [hub's] other insurer-partners and the details of their contingent-commission agreements . . . ." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 374. Here, the Isken and Julicher Defendants testified to not knowing each other, and at most there may have been one transaction (which Mr. Gaudioso, when asked for evidentiary purposes, was unable to specify) between them. Likewise, Plaintiffs have established only that the Julicher Defendants frequently interacted with former defendants Christopher Wright and Moon Nurseries. The Isken Defendants, having received one payment from Mr. Meyers, whom they did not know, have even fewer ties to other putative enterprise members.

For these reasons, Plaintiffs have failed to establish the requisite relationships between the Isken Defendants, Julicher Defendants, and other members of the claimed enterprise. At most,

Plaintiffs have established "a number of bilateral enterprises," *id.* at 375, but that is not how they chose to frame their case. Because establishing the existence of an enterprise is central to Plaintiffs' claims under section 1962(b) and (c), the Court must dismiss those claims. And although Plaintiffs are correct that liability under subsections (b) and (c) "is not a prerequisite to § 1962(d) liability," *Smith v. Berg*, 247 F.3d 532, 537 (3d Cir. 2001) (discussing *Salinas v. United States*, 522 U.S. 52, 65 (1997)), that line of cases holds that enterprise members who have not committed the requisite number of predicate acts may still be liable for conspiring to achieve the aims of the enterprise. Even in such cases, however, "[a] conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense." *Salinas*, 522 U.S. at 65. To the extent that the Isken and Julicher Defendants each conspired to further the endeavor of putting Plaintiffs out of business and redirecting that business to the McKenna Defendants, it remains the case that Plaintiffs have failed to show that such endeavor had the requisite relationships to constitute a RICO enterprise (and thereby satisfy the substantive offenses provided by sections 1962(b) and (c)). *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 383 (upholding the district court's dismissal of section 1962(d) claims for the customer steering schemes found to be insufficient for a substantive RICO offense under section 1962(c)). Accordingly, this Court must dismiss all of Plaintiffs' RICO claims.

### C. Dismissal of the Entire Action

Because the parties in this case are not diverse, Plaintiffs' state law claims rely on the federal question jurisdiction provided by their now-dismissed RICO claims. *See* 28 U.S.C. §§ 1331, 1367(a). This Court "may decline to exercise supplemental jurisdiction over" these state law claims if "the district court has dismissed all claims over which it has original jurisdiction," 28 U.S.C. § 1367(c)(3), and the Third Circuit has counseled that "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court *must* decline to

decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (quoting *Borough of W. Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995)). Dismissal is appropriate even considering "the already substantial time devoted to the case and the expense incurred by the parties," *Tully v. Mott Supermarkets, Inc.*, 540 F.2d 187, 196 (3d Cir. 1976), as is the case here. And although the Isken and Julicher Defendants have raised the issue of statutes of limitations as to the state law claims, section 1367(d) will toll the applicable statutes of limitation for 30 days following the entry of this memorandum and corresponding order; accordingly, Plaintiffs will have the opportunity to re-file in state court and have that court address any timeliness issues as though Plaintiffs had filed suit there on February 7, 2017—the date on which they brought suit here. *See Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000). In other words, if Plaintiffs re-file within 30 days, the only defects in Plaintiffs' timeliness will be those present at the time they filed suit in this Court; no additional defects will have accrued as a result of the pendency of this litigation before this Court.

## IV.    CONCLUSION

For the foregoing reasons, the Court grants the Motions filed by the Isken and Julicher Defendants. A corresponding order accompanies this memorandum.